UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| COMMUNITY ASSOCIATIONS INSTITUTE; CANTERBURY CROSSING CONDOMINIUM TRUST; TOWNHOUSE GREEN COOPERATIVE; TERRACES ON MEMORIAL HOMEOWNERS ASSOCIATION; REGENCY AT ASHBURN GREENBRIER CONDOMINIUM ASSOCIATION; AND FARRCROFT HOMEOWNERS ASSOCIATION, INC. | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JANET YELLEN, in her official capacity as the Secretary of the United States Department of the Treasury, UNITED STATES DEPARTMENT OF THE TREASURY, and ANDREA GACKI, in her official capacity as Director of Financial Crimes Enforcement Network, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No. _____

## **COMPLAINT**

Plaintiffs Community Associations Institute ("CAI"), Canterbury Crossing Condominium Trust, Townhouse Green Cooperative, Terraces on Memorial Homeowners Association, Regency at Ashburn Greenbrier Condominium Association, and Farrcroft Homeowners Association bring this action in their own stead and on behalf of CAI's Community Association members against Janet Yellen, in her official capacity as the Secretary of the U.S. Department of the Treasury, the U.S. Department of the Treasury ("the Treasury"), and Andrea Gacki, in her official capacity as Director of the Financial Crimes Enforcement Network ("FinCEN"), seeking a declaration that Community Associations are exempt from compliance with the Corporate Transparency Act, 31

U.S.C. § 5336 (the "CTA"); seeking judicial review under the Administrative Procedure Act ("APA") of FAQs issued by FinCEN's creating new legislative rules outside of the APA's notice-and-comment procedures; seeking judicial review under the APA that FinCEN's denial of CAI's request for an exemption was arbitrary and capricious; and that the CTA is unconstitutional as applied to Community Associations, regardless of their organizational form and structure.

## JURISDICTION AND VENUE

1.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702-703. It has jurisdiction under 5 U.S.C. §§ 705-706 and 28 U.S.C. §§ 1361 and § 2201-2202 to render the declaratory and injunctive relief that Plaintiffs request.

2.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(3) because no real property is involved, Plaintiff CAI is headquartered in Falls Church, Virginia, within this judicial district and it has members in all fifty states.

3.     Defendants are agencies or officers of the United States sued in their official capacities.

## PARTIES

4.     CAI is an international not-for-profit research and education organization with 63 chapters and 47,000 members formed in 1973 by the Urban Land Institute, the National Association of Home Builders, the U.S. League of Savings and Loan Associations, the Veterans Administration, and the U.S. Department of Housing and Urban Development to provide education, guidance and advocacy for and on behalf of condominium associations, homeowner associations, housing cooperatives, business trusts, planned unit developments, and similar entities (collectively, "Community Associations"). CAI has its principal place of business at 6402

Arlington Blvd, Suite 500, Falls Church, VA 22042. CAI brings this action in its own behalf and in a representational capacity on behalf of its Community Association volunteer Community Board members.

5.      Plaintiff Canterbury Crossing Condominium is the organization of unit owners for the Canterbury Crossing Condominium, which is a sixty-six (66) unit residential condominium in Holbrook, Massachusetts. Canterbury Crossing Condominium is registered as a condominium trust and was created by the recording of a Master Deed recorded in Norfolk County Land Court in 1986. It is a Massachusetts nonprofit entity and is tax-exempt under Section 528 of the Internal Revenue Code.

6.      Plaintiff Townhouse Green Cooperative ("Townhouse Green") was incorporated as a housing cooperative in Clinton Township, Michigan in 1968. Townhouse Green Cooperative is the organization of unit owners for a 255-unit Michigan not-for-profit corporation and submits its federal tax filing as a tax-exempt entity using IRS Form 1120-C.

7.      Plaintiff Terraces on Memorial Homeowners Association ("Terraces") is the organization of unit owners for a 273-unit homeowners association in Houston, Texas. It is a Texas nonprofit corporation and is tax-exempt under Section 528 of the Internal Revenue Code.

8.      Plaintiff Regency at Ashburn Greenbrier Condominium Unit Owners Association ("Greenbrier") is the organization of unit owners for a 142-unit condominium complex located in Loudon County, Virginia. Greenbrier is an age 55-and-older active adult community within a larger adult community called Regency at Ashburn Community Association. It is an unincorporated condominium association. Greenbrier is a Virginia not-for-profit entity and is tax exempt under Section 528 of the Internal Revenue Code.

9.      Plaintiff Farrcroft Homeowners Association, Inc. ("Farrcroft") is the organization of unit owners for a 300-unit homeowners association located in suburban Northern Virginia. It is a nonstock corporation. Farrcroft is a Virginia not-for-profit entity and is tax exempt under Section 528 of the Internal Revenue Code.

10.     Defendant U.S. Department of the Treasury is an executive branch department of the federal government located at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20500 responsible for the administration and enforcement of the CTA, through FinCEN, which is a bureau of the U.S. Department of the Treasury, located at 2070 Chain Bridge Road, Vienna, VA 22182.

11.     Defendant Janet Yellen is the Secretary of the U.S. Treasury and is named as a party in her official capacity.

12.     Defendant Andrea Gacki is the Director of FinCEN and is named as a party in her official capacity.

## FACTUAL ALLEGATIONS

### The Requirements of the CTA

13.     The CTA was enacted on January 1, 2021, as part of the omnibus National Defense Authorization Act for Fiscal Year 2021.[1]

14.     The stated purpose of the CTA is to combat money laundering, the financing of terrorism, and other illicit activity by cracking down on the use of anonymous "shell companies."

15.     To that end, the CTA requires most business entities to provide sensitive personal information to FinCEN, regardless of corporate form, area of industry, or likelihood of engaging

---

[1]  William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

in financial crimes.

16.     The CTA requires "reporting companies" to provide personal identifying information to FinCEN regarding each "beneficial owner" and "applicant."

17.     A "reporting company" is defined as a "corporation, limited liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A).

18.     A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity"; or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id*. § 5336(a)(3)(A).

19.     An "applicant" is defined as any individual who files an application to form a reporting company or "registers or files an application to register" a non-U.S. company to do business in the United States. *Id*. § 5336(a)(2).

20.     For each beneficial owner and applicant, the reporting company must provide to FinCEN their full legal name, date of birth, current residential or business street address, and "unique identifying number from an acceptable identification document," such as an unexpired passport or State-issued identification card or driver's license, provided that the same has a photograph of the individual, and also download a photograph or copy of their State-issued

identification card or driver's license or obtain a FinCEN-issued identifier number. 31 U.S.C. § 5336(b)(2)(A).[2]

21.     This personal information must be reported within 30 days of formation or registration of the reporting company, or, in the case of existing reporting companies, prior to January 1, 2025. *Id*. § 5336(b)(1)(B), (C).

22.     If there are any changes to the reported data—such as if a "beneficial owner" or "applicant" moves their personal residence or gets a new driver's license—the entity must provide updated information to FinCEN no more than 30 days after the change. *Id*. § 5336(b)(1)(D).

23.     Reporting companies, beneficial owners, and applicants that "willfully" fail to comply with the CTA's reporting requirements are subject to a civil penalty of up to $500 per day up to $10,000, two years' imprisonment, or both a fine and confinement. *Id*. § 5336(h)(1), (3).

**Database of Personal Information.**

24.     In a vast database, FinCEN will retain the personal identifying information of beneficial owners and applicants reported under the CTA, including photographs of their faces as they appear on state issued identification cards.

25.     The CTA requires FinCEN to retain this personal identifying information for at least five years after the date on which the reporting company is wound down. 31 U.S.C. § 5336(c)(1).

26.     FinCEN is authorized to share this personal identifying information with federal, state, local, and tribal law enforcement agencies; with financial institutions for customer due

---

[2]  In order to obtain a FinCEN identifier number, the individual or the organization must make the same disclosures otherwise required under the CTA.

diligence (with the reporting company's consent); and with "a Federal functional regulator or other appropriate regulatory agency," including foreign governmental agencies. *Id.* § 5336(c)(2)(B).

27.     If the request for personal identifying information comes from a state, local, or tribal law enforcement agency, the statute requires that it come through "appropriate protocols," and that "a court of competent jurisdiction… has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id.* § 5336(c)(2)(B)(i)(II).

28.     However, no court authorization is required if the request comes from a "Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." *Id.* § 5336(c)(2)(B)(i)(I).

29.     Similarly, if a federal agency requests a beneficial owner or an applicant's personal identifying information on behalf of a non-U.S. law enforcement agency, prosecutor, or judge, for instance, pursuant to an international treaty, FinCEN may provide that information so long as the requested data is limited to the "investigation or national security or intelligence activity" that the foreign or international entity has in mind. *Id.* § 5336(c)(2)(B)(ii).

30.     For example, if a foreign government acting pursuant to a U.S.-ratified treaty like the United Nations Convention Against Corruption, requests certain personal identifying information of beneficial owners or applicants related to LLC-owned real property located in the United States, FinCEN is authorized to provide such data without any independent examination of the foreign country's need for the information.

### The Form, Structure, and Operation of Community Associations

31.     CAI's industry data estimates that, as of 2020, there are approximately 75.5 million Americans living in 365,000 Community Associations in the United States. This number constitutes roughly 30% of the population of the United States.

32.    There are three primary types of Community Associations in the United States: condominiums, homeowner's associations, and cooperatives.

33.    Overwhelmingly, the creation, organization, management, and termination of Community Associations are governed by state statute.

34.    Every Community Association, regardless of how and where it is formed, is an organization of owners whose purpose is to maintain, repair and replace the common elements of the community, manage its finances, preserve and protect the property's value, and enforce the rules and restrictions of the community.

35.    The majority of these Community Association organizations are non-profit entities that may be incorporated companies, unincorporated associations, and in some cases, business trusts.

36.    Regardless of the form, all Community Associations file annual statements with the state Secretary of State's office, the local registry of deeds, or a similar office, identifying the unit owners who serve as officers, directors, or trustees of the Association.

37.    While Community Associations are called the "last bastion of affordable housing" in the United States, the communities they represent are quite varied.

38.    Some are urban two-family or three-floor buildings, others are mobile home parks, campground communities, large sprawling communities, and even over-55 age-restricted communities.

39.    Some community members are unsophisticated first-time homebuyers just learning about the responsibilities and burdens of homeownership and Community Association governance.

40.     Others, like age-restricted communities, are comprised of elderly or retired individuals on fixed incomes, many of whom are not computer savvy or abreast of regulatory developments.

41.     Still, others are sophisticated high-rise buildings with amenities in places like Miami, Los Angeles, Houston, and New York. Unit owners, including those who serve on their Community Association Boards, are often high profile, high net worth individuals with a greater desire for privacy.

42.     Community Associations are generally created after a building developer sells the majority of the individual units in the community and turns over control to the homeowners.

43.     The governing body of a Community Association is the board of directors or trustees (the "Community Board").

44.     Community Board members are elected by their fellow homeowners, who serve in that capacity as unpaid volunteers. State enabling statutes generally provide that Board members must be owners within the community.

45.     These volunteer homeowners are elected to their Community Boards annually and sometimes more frequently in case of death, resignation, or removal by their fellow homeowners.

46.     Unlike a traditional corporation or limited liability company, Community Board members have no different financial stake in the Community Association than their fellow homeowners.

47.     Community Boards range in size from 3 members to 11 members who typically serve terms of 1 to 3 years each.

48.     Some Community Associations have primary and secondary boards, meaning multiple boards in a single community could govern different aspects of the community.

49.     Community Boards often have staggered terms to prevent annual turnover of the entire Board, but there is usually turnover of Community Board members at least once a year.

50.     Community Association by-laws typically contain provisions to replace Community Board Members who resign, die, or are removed from office. Resignation frequently follows from Community Board members moving out of the Community Association.

51.     Approximately 67% of CAI members surveyed reported that they experience Community Board changes every year, and approximately another 18% of CAI members surveyed reported that they experience Community Board changes every three years.

52.     Under ordinary circumstances, it is well recognized that Community Associations have difficulty recruiting homeowners to run and serve on their Community Boards. It is a time-consuming, uncompensated volunteer position that often requires board members to resolve disputes among fellow homeowners in their community—their neighbors.

53.     No CAI member surveyed reported that they are compensated for serving on their Community Board and approximately 81% of CAI members surveyed stated that the CTA reporting requirements will affect homeowner volunteer participation on the Community Boards and the ability to recruit homeowners for the Community Boards.

**The CTA's Injurious Impact on Plaintiffs**

54.     Compliance with the CTA will be unduly burdensome for Community Associations and will lead to mass resignations from the Board.

55.     Typically, Community Associations file an annual statement with the state Secretary of State, local registry of deeds, or other state government agency listing the names of the current Community Board Members. The document is usually completed and filed by a Community Board member, a property manager, or an agent of the Community Board.

56.     The CTA requires the reporting of data to the federal government well beyond what most States currently require for entity formations and reporting in their respective jurisdictions, and without regard to whether the entity engages in interstate commerce.

57.     CAI is not aware of any state government agency that requires Community Associations to provide state agencies with personal identifying information, such as birth dates, active driver's license or passport information, or accompanying photo identification.

58.      Over 75% of CAI members surveyed reported that they would not feel comfortable sharing personal identifying information for fear that uncontrolled access to that information makes them increasingly vulnerable to data breaches and possible identity theft, even inadvertently.

59.     For the same reasons, Community Board members and agents will be reluctant to take responsibility for collecting and storing other Community Board members' personal identifying information.

60.     Nor will Community Board members or agents want to be responsible for filing BOI reports or tracking when the updated reporting requirements are triggered for as many as 11 board members—such as when a member resigns, changes their name, or renews their driver's license or passport—given that they or the Association face steep penalties if amended reports are not filed within thirty days of such changes.

61.     79% of CAI members surveyed report being concerned that they may be held personally responsible for not strictly complying with reporting requirements and exposed to fines levied against the Community Association, which could be assessed in the form of increased dues against all members of the Community Association. That liability may also attach where an

individual beneficial owner who is not a board member refuses to disclose personal identifying information.

62.     Industry data also shows that more than 100,000 Community Associations are self-managed and likely unaware of their reporting obligations under the CTA or the severe penalties that may be imposed on them for failing to comply.

63.     In addition to the above-described burdens imposed by the CTA, volunteer Community Board members may be forced to expend limited resources to consult lawyers to parse through nearly 100 pages of regulations to determine whether the vague and confusing reporting requirements of the CTA apply, or alternatively, risk incurring severe penalties for interpreting such terms on their own.

64.     Volunteer Community Board members are unlikely to know the legal meaning of "beneficial ownership" under the vague terms of the statute and regulations.

65.     For example, the CTA defines a "beneficial owner," in part, as an individual or entity that "directly or indirectly, through any contract, arrangement, understanding, [or] relationship... exercises substantial control" over the entity. 31 U.S.C. § 5336(a)(3)(A).

66.     The term "substantial control" could apply to make a property manager or managing agent hired by the Community Association a "beneficial owner" whose personal identifying information must be reported to FinCEN.

67.     By the same token, the entire Community of owners could be considered "beneficial owners" because state condominium statutes and/or by-laws give owners the power to elect Board members and also to ratify or veto the Community Board's decisions.

68.     If a statute or the by-laws require the Community Board to "obtain the approval of a majority of homeowners" to pass an annual budget, authorize an improvement to the common

areas, obtain a loan, call a special meeting, or vote to remove a Community Board member, the entire community of owners could be viewed as exercising "substantial control" of the Association.

69.     Conversely, the CTA also defines a "beneficial owner" as one who owns or controls "not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A). An individual who owns 25% of the units in the community need not be a member of the Community Board, in which case that individual would have no power over the operation or finances of the Community Board. Yet that owner is considered a "beneficial owner" whose personal identifying information must be reported to FinCEN despite having no ability to engage in illegal financial transactions on behalf of the entity.

70.     If that individual refused to provide his personal identifying information to FinCEN, the entire Community Association would be subject to liability for severe non-reporting penalties under the CTA.

### The CTA's Injurious Impact on Volunteerism

71.     The CTA's reporting requirements, and risk of personal liability for non-reporting penalties, will deter homeowners from volunteering to serve on their Community Boards. Approximately 53% of CAI members surveyed cited that the reporting requirements were at least one of the reasons why they will stop serving as a member of their Community Board.

72.     Congress expressly recognized that volunteerism is adversely impacted by the risk of potential personal liability in adopting the Volunteer Protection Act, 42 U.S.C. §§ 14501, *et seq.*, which limits a volunteer's risk of tort liability when acting for nonprofit organizations or governmental entities.

73.     With the Volunteer Protection Act, Congress found that "the willingness of volunteers to offer their services to nonprofits and other organizations is deterred by the potential for liability actions against them" and, "as a result, many nonprofit public and private organizations … have been adversely affected by the withdrawal of volunteers from boards of directors and services in other capacities." 42 U.S.C. §§ 14501(a)(1), (2).

74.     Similarly here, requiring Community Board members to provide personal information to the federal government as part of CTA compliance—and be subject to personal liability if they or other Board members do not comply with the CTA's reporting requirements—will not only exacerbate homeowners' reluctance to volunteer for these positions. It will also result in a slew of resignations that will disrupt the operation of Community Associations across the United States.

### Community Associations are Not Engaged in Interstate Commerce

75.     The vast majority of Community Associations are not engaged in commerce at all, and to the extent they are, they are non-profit entities.

76.     Their primary purpose is to maintain, repair, and replace the common areas of the Community Association.

77.     These non-profit entities are required by statute to have a board comprised of owners whose primary function is to maintain, repair, and replace common elements of the communities.

78.     The activities of Community Associations are overwhelmingly intrastate rather than interstate.

### CTA Compels and Chills Speech and Association and Affects Participation in Local Politics and/or Advocacy and Lobbying Activities by Community Associations

79.     Given the nature of property ownership, many Community Associations actively participate in the political process to lobby for public services, funding, or other cooperation from elected officials.

80.     Community Associations frequently advocate for and against issues that affect the community and/or its residents. These issues may include local planning and zoning related policies, environmental sustainability issues; zoning; short and long-term rentals; fining and foreclosure; building and façade inspections; housing affordability; and electronic voting and virtual meetings.

81.     The prospect of having to report sensitive personal identifying information to FinCEN is likely to deter homeowners from serving on their Community Boards to avoid the personal risks associated with being a "beneficial owner" or "applicant."

82.     Without homeowners willing to serve as Community Board members, Community Associations will no longer be able to serve in an advocacy role for their members in the community.

83.     As a result, Community Associations will be denied the opportunity to exercise their free speech and free association rights or participate in lobbying their government in violation of the First Amendment.

84.     The burdens the CTA imposes upon entity formation and annual reporting in every state will have a direct, predictable impact on CAI itself.

85.     An important service CAI offers to its membership is the provision of information, education, assistance, and advocacy regarding legal and regulatory compliance issues facing Community Associations.

86.     To serve faithfully the needs and interests of its membership, CAI has already been—and will continue to be—forced to devote its own scarce resources to assisting members in understanding how the CTA applies to them, how it will affect their Community Associations, and what they must do to comply.

87.     The benefits of the CTA do not justify the burdens it imposes on Community Associations and CAI and its chapters.

**Community Associations are Non-Profit Organizations Exempt from the CTA**

88.     According to FinCEN, the "reporting companies" subject to the CTA will include approximately 32.6 million existing entities in 2024, plus roughly 5 million additional corporate entities created or registered under State law every year from 2025 to 2035, as well as foreign companies registered to do business in the United States. Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. at 59549 (2022).

89.     However, the CTA excludes 23 categories of entities from the definition of a "reporting company," and those entities do not have to comply with the BOI reporting requirements of the CTA.

90.     Congress also specifically excluded non-profit organizations ("NPOs") from the CTA's reach: "[t]he term 'reporting company' does not include… any organization that is described in section 501(c) of the Internal Revenue Code… and exempt from tax under section 501(a) of such Code." 31 USC § 5336(a)(11)(B)(xix) ("NPO Exemption").

91.     For the last decade, Treasury and FinCEN have published the National Terrorist Financing Risk Assessment Report ("NFTRA Report") in which they have stated that "the vast

majority of U.S.-based tax-exempt [NPOs] face little or no risk of being abused for [terrorist financing]." 2024 National Terrorist Financing Risk Assessment, p. 23-25.[3]

92.     The 2024 NTFRA Report states that NPOs are considered very low risk for engaging in illicit financial activity because they abide by internal due diligence standards, self-governance, transparency, and other accountability and compliance measures. *Id.*

93.     Section 5336(a)(11)(B)(xxiv) of the CTA allows FinCEN to create additional exemptions when the collection of BOI "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." 31 USC § 5336(a)(11)(B)(xxiv).

94.     Prior to 1976, homeowners and condominium management associations largely qualified for tax-exempt status under Section 501(c).

95.     With the passage of the Tax Reform Act of 1976, Congress created Section 528 of the Internal Revenue Code to provide a tax-exemption classification unique to "homeowners associations."[4] 26 USC § 528.

---

[3]   Available   at   https://home.treasury.gov/system/files/136/2024-National-Terrorist-Financing-Risk-Assessment.pdf (last accessed September 10, 2024).

[4] "Homeowners association" is defined as "an organization which is a condominium management association, a residential real estate management association, or a timeshare association," if (A) it is organized and operated "to provide for the acquisition, construction, management, maintenance, and care of association property"; (B) 60% or more of its gross income for the taxable year "consists solely of amounts received as membership dues, fees, or assessments" from owners of residential units, residences, lots, or timeshare rights; (C) 90% or more of its expenditures for the taxable year are for the "acquisition, construction, management, maintenance, and care of association property" or activities for members of the timeshare association; (D) no part of its net earnings inures to the benefit of any private shareholder or individual (with limited exceptions); and (E) it elects to have this section apply for the taxable year. 26 USC § 528(c).

96.     Section 528 states that "[a] homeowners association shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 USC § 528(a).

97.     Despite this language, FinCEN does not recognize that "homeowners associations," as defined by Section 528, or Community Associations, as defined herein, are NPOs exempt from the CTA. *See* FinCEN Beneficial Ownership Information FAQs.[5]

98.     Nor did FinCEN exercise its authority under Section 5336(a)(11)(B)(xxiv) of the CTA to create an additional exemption for Community Associations in promulgating implementing regulations for the CTA on September 30, 2022. *See* 31 C.F.R. § 1010.380(c)(2).

**FinCEN's Improper Issuance of FAQs Classifying Homeowners Associations as Reporting Companies Subject to the CTA**

99.     On December 28, 2023, CAI submitted a request to FinCEN seeking an exemption from the CTA's reporting requirements under the NPO Exemption for all community living associations, including homeowners associations, condominium associations, and housing cooperatives.

100.    The correspondence stated that, although Community Associations are not organized under Section 501(c) of the Internal Revenue Code, they are non-profit organizations that operate the same way as the Section 501(c) NPOs that are excluded from the CTA's reporting requirements. Accordingly, it requested that Community Associations be granted the same exclusion.

101.    Instead of responding to CAI's correspondence, FinCEN released a Frequently Asked Question ("FAQ") regarding the categorization of homeowners associations as reporting

---

[5] https://www.fincen.gov/sites/default/files/shared/BOI-FAQs-QA-508C.pdf

companies on its website. FAQ C.10 now claims that homeowners associations are considered a

reporting company. FAQ C.10 states:

> *C. 10. Are homeowners associations reporting companies?*
>
> It depends. Homeowners associations (HOAs) can take different forms. As with any entity, if an HOA was not created by the filing of a document with a secretary of state or similar office, then it is not a domestic reporting company. An incorporated HOA or other HOA that was created by such a filing also may qualify for an exemption from the reporting requirements. For example, HOAs recognized by the IRS as section 501(c)(4) social welfare organizations (or that claim such status and meet the requirements) may qualify for the tax-exempt entity exemption. An incorporated HOA that is not a section 501(c)(4) organization, however, may fall within the reporting company definition and therefore be required to report BOI to FinCEN.

[Updated June 10, 2024]

102.    Further, FAQ D.13 details who the "beneficial owner" of a homeowners association

is under the CTA. FAQ D.13 states:

> *D. 13. Who is the beneficial owner of a homeowners association?*
>
> A homeowners association (HOA) that meets the reporting company definition and does not qualify for any exemptions must report its beneficial owner(s). A beneficial owner is any individual who, directly or indirectly, exercises substantial control over a reporting company, or owns or controls at least 25 percent of the ownership interests of a reporting company.
>
> There may be instances in which no individuals own or control at least 25 percent of the ownership interests of an HOA that is a reporting company. However, FinCEN expects that at least one individual exercises substantial control over each reporting company. Individuals who meet one of the following criteria are considered to exercise substantial control over the HOA:
>
> - the individual is a senior officer;
>
> - the individual has authority to appoint or remove certain officers or a majority of directors of the HOA;
>
> - the individual is an important decision-maker; or
>
> - the individual has any other form of substantial control over the HOA.

[Issued April 18, 2024]

103.    By issuing these FAQs in lieu of responding to CAI's exemption request, FinCEN improperly denied CAI and homeowners associations the opportunity to engage in any meaningful discussion before it created a new categorization of Community Associations as reporting companies and created identification criteria for determining "beneficial ownership" without engaging with CAI.

104.    On July 25, 2024, FinCEN responded to CAI's exemption request sent seven months earlier. FinCEN stated that, if a Community Association met the definition of a "reporting company," it would be required to report BOI to FinCEN under the CTA.

105.    FinCEN also stated that it would consider CAI's exemption request, but noted that Community Associations should comply with the BOI reporting requirements absent an exemption.

## FinCEN's FAQC.10 and D.13 are final administrative decisions under the Administrative Procedure Act ("APA")

106.    FinCEN's July 25, 2024 correspondence also demonstrates that it treats the FAQs as controlling in the same manner as a legislative rule. Therefore, they are "binding" for purposes of asserting an APA challenge.

107.    The FAQs categorize some community associations as reporting companies and identify criteria for determining who their beneficial owners might be. The FAQs are FinCEN's only determination on this topic, despite CAI's correspondence requesting an exception to the CTA's reporting requirements months earlier.

108.    Further, legal consequences flow from FinCEN's FAQ since, as stated in the FAQs, there are "direct and appreciable legal consequences" should a community association not comply with the reporting category as outlined in FAQ C.10.

109.     These FAQs will lead Community Associations, and Plaintiffs, to believe that they substantively control the categorization of their entities as it relates to the CTA.

**The CTA was Declared Unconstitutional by the United States District Court for the Northern District of Alabama**

110.     On March 1, 2024, in the case of *National Small Business United v. Yellen*, No. 5:22-cv-01448 (N.D. Ala.), a federal district court in the Northern District of Alabama entered a final declaratory judgment concluding that the CTA exceeds the Constitution's limits on Congress's power and enjoined the Department of the Treasury and FinCEN from enforcing the CTA.[6] CAI now seeks a similar ruling as it applies to Community Associations and its members and/or a declaration that CTA does not apply to Community Associations.

## CAUSES OF ACTION

## COUNT I

### Declaratory Judgment Under 28 U.S.C. §§ 2201 *et seq.*

111.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

112.     An actual controversy exists as to whether Community Associations are exempt from compliance with the CTA.

113.     Accordingly, Plaintiffs seek, pursuant to 28 U.S.C. § 2201, a judgment declaring that the CTA does not apply to Community Associations.

114.     A declaration is necessary and appropriate at this time to affirm that Community Associations are not reporting companies under the CTA because, in the absence of such a

---

[6]   On March 11, 2024, the United States Department of the Treasury and FinCEN appealed that Judgment to the 11th Circuit Court of Appeals, where it remains pending.

declaration, they may face federal prosecution resulting in harsh criminal and/or civil penalties for wrongful non-compliance.

115.    Under the CTA's NPO Exemption, non-profit organizations are expressly excluded from the definition of reporting companies: "[t]he term 'reporting company' does not include… any organization that is described in section 501(c) of the Internal Revenue Code… and exempt from tax under section 501(a) of such Code." 31 USC § 5336(a)(11)(B)(xix).

116.    CAI's member Community Associations are also NPOs excluded from the CTA's regulatory requirements for reporting companies under the tax-exemption classification unique to "homeowners associations" in Section 528(a) of the Internal Revenue Code, 26 U.S.C. § 528(a).[7]

117.    Under Section 528(a), "[a] homeowners association shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 USC § 528(a).

118.    Reading Section 528(a) together with the NPO Exemption, Community Association members are "exempt from tax under section 501(a)" and therefore excluded from the definition of a "reporting company" under the CTA.

119.    Accordingly, this Court should declare that the beneficial ownership reporting requirements of the CTA do not apply to Community Associations.

---

[7] "Homeowners association" is defined as "an organization which is a condominium management association, a residential real estate management association, or a timeshare association," if (A) it is organized and operated "to provide for the acquisition, construction, management, maintenance, and care of association property"; (B) 60% or more of its gross income for the taxable year "consists solely of amounts received as membership dues, fees, or assessments" from owners of residential units, residences, lots, or timeshare rights; (C) 90% or more of its expenditures for the taxable year are for the "acquisition, construction, management, maintenance, and care of association property" or activities for members of the timeshare association; (D) no part of its net earnings inures to the benefit of any private shareholder or individual (with limited exceptions); and (E) it elects to have this section apply for the taxable year. 26 USC § 528(c).

120.    Plaintiffs further request, pursuant to 28 U.S.C. § 2201, that the Court enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA against Community Associations and their respective Community Board members.

## COUNT II

### Administrative Procedure Act, 5 U.S.C. § 706(2)(D)
### Lack of Notice and Comment (FAQs C.10 and D.13)

121.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

122.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

123.    The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, 5 U.S.C. § 553(b), and to "give interested persons as opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

124.    Agencies must follow notice-and-comment procedures when proposing new rules, except where the agency is merely promulgating "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 5(b).

125.    FAQs C.10 and D.13 are final agency actions subject to judicial review under the APA because they create new rules not sourced from the statutory authority or governing rule.

126.    FAQs C.10 and D.13 are not mere interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice. Rather, they significantly affect Community Associations' rights and obligations.

127.    As such, FAQs C.10 and D.13 are legislative rules that substantively amended FinCEN's existing CTA regulations and are subject to the notice-and-comment procedures under

the APA, but were issued and became effective without notice and comment in violation of the APA.

128.    Accordingly, pursuant to 5 U.S.C. § 706(2)(D), Plaintiffs request that the Court declare unlawful and set aside FAQs C.10 and D.13 and enjoin Defendants from enforcing, applying, or implementing FAQs C.10 and D.13.

## COUNT III

### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Agency Action that is Arbitrary and Capricious (Denial of Exclusion for Community Associations)

129.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

130.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary and capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

131.    CAI provided several reasons for FinCEN to consider when evaluating its request for an exemption for Community Associations:

(a.) they are nonprofit organizations like Section 501(c) organizations, although they are tax exempt under the derivative Section 528 of the Income Tax Code;

(b.) they collect and expend assessments through very limited mechanisms, making them ill-suited for terrorist financing or money laundering;

(c.) there is virtually no risk of them being used to fund terrorist activity or launder money due to their self-governance, transparency, and accountability mechanisms, as Treasury has publicly stated; and

(d.) compliance with the CTA would be extremely burdensome for Community Associations without yielding any information of value to the CTA's purpose of detecting and preventing financial crimes.

132.   FinCEN did not examine the arguments or relevant data or articulate any explanation for issuing FAQs that effectively denied CAI's exemption request without including a rational connection between the facts found and the choice made.

133.   FinCEN acted arbitrarily and capriciously when it relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before it, and is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

134.   Accordingly, pursuant to 5 U.S.C. § 706(2)(A), Plaintiffs request that the Court declare unlawful and set aside FAQs C.10 and D.13 and enjoining Defendants from enforcing, applying, or implementing FAQs C.10 and D.13.

## COUNT IV

**Unconstitutional Invasion of Privacy; Unreasonable Search and Seizure Violation of the Fourth Amendment; Compelled Self Incrimination Violation of the Fifth Amendment; Right of Privacy Violation of the Ninth Amendment (U.S. Const. Amends. IV, V, IX)**

135.   Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

136.   The CTA is a statute providing for criminal punishments enacted for the purpose of harvesting "sensitive" personal information from individuals to create a database for law enforcement purposes by FinCEN and other United States and foreign law-enforcement and intelligence agencies. The stated purpose of the CTA is to provide the federal government with a supplemental means of enforcing federal criminal laws. No matter the degree of invasiveness,

suspicionless searches and compelled disclosures are never allowed if their principal end is crime-solving.

137.    Privacy is often a key motivation in State entity formation. No State has chosen to require the extent of disclosure of beneficial ownership and applicant information upon filing that the CTA mandates. Upon information and belief, no State, for instance, appears to require birth dates and personal identification numbers of filers or photo id's and drivers licenses. The States' entity-formation laws reflect the judgment that individuals need not disclose sensitive information as a condition of forming corporate entities. Individuals who form an entity under such State laws have a reasonable expectation of privacy from the intrusion of the federal government as to that information. The CTA's requirements violate that expectation of privacy by compelling the disclosure of that information by individuals protected by the Fourth, Fifth, and Ninth Amendments.

138.    The CTA contains no limitations on the provision of the required personal information to situations where there is an articulable individualized suspicion of a crime or wrongdoing by such beneficial owners and applicants. The CTA also authorizes the provision of private, personal information to foreign governments, federal regulators, and regulatory agencies without any court authorization or specific requirements regarding those federal and foreign government agencies' need for the information.

139.    By requiring, under threat of criminal penalty, reporting companies to provide individuals' "sensitive" personal information for law enforcement purposes in the absence of specific prior indicia of wrongdoing, the CTA deprives Plaintiff and the members of CAI and Community Associations of their privacy rights and violates the Fourth Amendment, Fifth Amendment, and Ninth Amendment of the Constitution of the United States.

140.    By compelling disclosures and permitting the release of sensitive personal data to federal and foreign government agencies without the reporting company's consent or authorization from a court of competent jurisdiction, *see* 31 U.S.C. § 5336(c)(2)(B) (requiring court authorization for requests from state, local, or tribal law enforcement agencies and consent from a financial institution, without imposing a similar requirement of court authorization for requests from federal or non-U.S. law enforcement agencies), the CTA violates the Fourth, Fifth, and Ninth Amendment rights of Plaintiffs and the members of CAI.

**COUNT V**

**Compelled Speech and Unreasonable Burdens on the Freedoms of
Speech and Association
(U.S. Const. Amend. I)**

141.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

142.    Under the CTA, the obligation to report personal information to the federal government arises at the time of formation of an entity under State law. The CTA forces filers to disclose more personal information to the federal government than what is required to be disclosed under State entity-formation statutes; in most States, disclosure of "beneficial ownership" as expansively set forth in the CTA and "applicant" personal information is not required at all. State laws providing for entity formation, however, reflect the States' respective judgments that the provision of such information is not a necessary or appropriate prerequisite of entity formation.

143.    Community Associations, for the most part, are required to form entities under State law, without seeking 501(c) federal tax-exempt status, for the purpose of running and/or operating recreational facilities and/or maintaining, repairing and replacing common elements within a Community Association, all of which is affiliated with home ownership. They need volunteer

homeowners in the form of Community Boards to run the associations. Many of these U.S. persons who would have to be registered under the CTA have a heightened reason to desire privacy, as this pertains solely to their ownership of their home.

144.    The CTA compels Community Associations and Community Board members to publicly reveal their associations to the federal government, which may in turn transmit that information upon request to: (i) federal and State law enforcement agencies, courts, and prosecutors; (ii) foreign governments and law enforcement authorities; (iii) financial institutions; and (iv) various federal regulators and regulatory agencies.

145.    This forced disclosure will also deter such persons from exercising their rights of free speech and association and dissuade others from joining or assuming leadership positions within Community Associations in the entities (and thus arguably becoming "beneficial owners"). It will also affect Community Associations' ability to advocate on behalf of their members for issues that affect their local communities.

146.    The United States does not have a compelling, overriding interest in obtaining the information required by the CTA because less onerous alternatives are available to accomplish the stated goals of the CTA and the methods employed by the Act are not narrowly tailored for their stated purpose.

147.    The most obvious and direct way to stem money laundering and international terrorism funding is to ramp up regulation and scrutiny of large cross-border money transfers, for instance, by banks, financial agents, and escrow agents. The requirements of the CTA are neither justified by nor necessary to promote the stated goals of the CTA.

148.    By requiring, under threat of criminal sanction, CAI and its member Community Associations and Community Board members to disclose information in the manner mandated by

the CTA despite the availability of less onerous alternative methods to achieve the statute's stated goals, the CTA's disclosure requirements constitute compelled speech in violation of the First Amendment to the Constitution of the United States.

149.     By requiring U.S. persons who have formed, wish to form or who have volunteered to participate in the governance of a Community Association to engage in protected speech despite the availability of less onerous alternative methods to achieve the stated goals of the CTA, the CTA violates the First Amendment by burdening the right to speech and private association. As the Supreme Court recently affirmed, "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored. This requirement makes sense. Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

## COUNT VI

### Unconstitutional Usurpation of the States' Power to Regulate Entity Formations in Excess of Congress's Constitutional Powers (U.S. Const. Art. I, Amends. IX, X)

150.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated above.

151.     For more than two centuries, the States have had independent authority to charter corporations and otherwise regulate the formation and governance of corporations they have chartered. This was a sovereign power of the British Crown that was commonly understood to have devolved to the original thirteen States through their charters after the adoption of the Declaration of Independence in 1776. The newly independent States began chartering corporations soon after independence for the purposes of creating financial and transportation infrastructure,

forming subordinate municipal governments, and for charitable and other public purposes. *See* Ronald E. Seavoy, *The Public Service Origins of the American Business Corporation*, 52 Bus. History R. 30, 33 (1978).

152.    The Constitution did not intrude on this power of the States to charter corporations. At the Constitutional Convention, Virginia delegate James Madison introduced a proposal to give Congress the authority "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent." 2 *The Records of the Federal Convention of 1787*, at 615 (Max Farrand, ed., 1911). Madison's proposal reflected the settled understanding that the States possessed—and would continue to retain under the new Constitution—the primary sovereign powers for chartering corporate entities. *See id*. at 616 (containing James Madison's notes documenting the defeat of his proposal for an explicit Congressional power of chartering corporations by a vote of 3 in favor and 8 against).

153.    As the Supreme Court made clear in 1819, other than ensuring that State legislatures did not impair vested colonial-era corporate charters, the Constitution does not vest the federal government—including Congress and the Treasury Department—with any authority to dictate to the States the terms under which they charter companies. *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819). This fundamental principle remains true today, as corporations formed for private purposes have proliferated and now outnumber the public-purpose and non-commercial corporations prevalent in the Founding era. The States remain the primary sovereigns for the creation of corporate entities and, pursuant to the well-established "internal affairs" doctrine, the internal functioning of such entities remains a matter of the law of the State of formation. "It thus is an accepted part of the business landscape in this country for

States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares." *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 91, (1987).[8]

154.    Despite this original constitutional meaning, history, and tradition, the CTA aims to establish "a clear, Federal standard for incorporation practices," 31 U.S.C. § 5336 note (5)(A), above and beyond what State entity laws require, imposing a penalty—mandatory disclosure of names, addresses, birth dates, photographs, drivers licenses and identification numbers of all beneficial owners and applicants—on persons who seek to form entities under State law. As detailed above, failure to make these disclosures is punishable by fines and imprisonment. In addition, the CTA also interferes with State authority to determine the permissible structures of corporate or homeowner ownership by prohibiting any State from authorizing the issuance of "a certificate in bearer form evidencing either a whole or fractional interest" in an entity created and organized under that State's laws. 31 U.S.C. § 5336(f). Upon information and belief, although many States authorized such bearer certificates through the early twenty-first century, no State currently does so. Nevertheless, the CTA's categorical prohibition is an unprecedented intrusion on the States' sole authority to regulate the formation and governance of State-entities' internal affairs.

155.    One of the enumerated powers of Congress—and perhaps the most heavily used of those powers in recent decades—is the power to regulate foreign, interstate, or Indian commerce. Congress also can wield its taxing power to tax income earned by individuals through corporate entities as it currently does through federal income taxes on corporations. However, Congress has no regulatory interest or constitutional authority over corporate formation because a reporting

---

[8] Although Congress has the ability to create federally chartered corporations, it has no authority to intervene in the internal affairs of entities organized under State law, except as noted above.

company has not yet engaged in any foreign, interstate, or Indian commerce at the moment of its inception. The formation of an entity under State law is an entirely ministerial act and many entities will engage in no activity until some indeterminate time after they have been formed.

156.    Indeed, Community Associations and many of the "reporting companies" subject to the Act may never engage in any such foreign, interstate, or Indian commerce. State law permits the formation of a corporate entity for numerous purposes unrelated to commerce, such as local property holding or associational entities like neighborhood organizations and residential housing associations.

157.    For example, Section 10A-1-2.01 of the Alabama Business and Nonprofit Entities Code indicates that a "domestic entity may have any lawful purpose or purposes, unless otherwise provided by this title." Ala. Code § 10A-1-2.01 (2014) (emphasis added). Section 101(b) of the Delaware General Corporation Law provides that a "corporation may be incorporated or organized under this chapter to conduct or promote any lawful business or purposes, except as may otherwise be provided by the Constitution or other law of this State." 8 Del. Code § 101(b) (emphasis added).

158.    Similarly, Section 18-106(a) of the Delaware Limited Liability Company Act provides that "[a] limited liability company may carry on any lawful business, purpose or activity, whether or not for profit . . . ." 6 Del. Code § 18-1101. A large proportion of the CTA's coverage is thus likely to include entities that do not engage in commerce or business at all, or that engage in strictly intrastate commerce (such as residential real property holding) outside the reach of federal regulation.

159.    This fact exposes a fundamental flaw in the CTA's structure: it does not regulate any specifically identified commercial activity. "The Constitution grants Congress the power to 'regulate Commerce.' The power to regulate commerce presupposes the existence of commercial

activity to be regulated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 520 (2012) (emphasis in original). As discussed above, there is no exercise of commerce inherent in the creation of a state-chartered entity to be the organization of unit owners for a Community Association; it is an entirely ministerial act, and many entities so formed do not engage in any commercial activity. By imposing requirements on the mere act of entity formation without any inkling as to whether the formed entity will engage in commercial activity, the CTA clearly exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

160.    Community Associations do not engage in interstate commerce.

161.    The CTA commandeers State agencies by coercing States into giving notice to State filers of the CTA's reporting requirements and providing filers with a copy of the CTA filing form. Because the States are the only agents capable of providing notice to entity formation filers at the time of formation, States are likely to feel compelled to provide the notice and the FinCEN filing form to protect their citizens from the severe criminal penalties that would result from failure to comply with the CTA's filing requirements.

162.    Through these requirements, the CTA violates Plaintiffs' rights and the rights of all CAI members by exceeding the enumerated powers of the federal government set forth in Article I, Section 8 of the Constitution of the United States, violating the Ninth and Tenth Amendments, and violating the constitutional principles of federalism and retained State powers.

## COUNT VII

### Unconstitutional Violation of Due Process
### (U.S. Const. Amend. V)

163.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

164.     Both the CTA and the FinCEN rules relating to the CTA fail to provide definitions specific enough for CAI, its Community Association members and the volunteer Community Board members of each of those Community Associations or similar entities to understand what conduct is required to avoid criminal sanctions including, but not limited to, failing to sufficiently define "beneficial owner," "understanding," "relationship," "substantial control," and "applicant."

165.     All these terms, most significantly "beneficial owner" and "applicant," have no obvious analogue in State entity formation laws, which typically address "organizers" and "incorporators." In addition, the CTA's overall framework for mandatory reporting, updating, access, and record-keeping is so vague and complex that Community Association members and their Board members or other similar entities cannot reasonably comply with these requirements.

166.     Should Community Association members, their Board members, and similar entities be forced to attempt to comply with the vague and complex requirements of the CTA to avoid criminal penalties, they will be forced to incur substantial costs and other burdens. The stated goals of the CTA do not justify the enormous burden it places on Community Associations and their volunteer Community Board Members or similar entities and can be accomplished through less onerous alternative means.

167.     By subjecting Community Association members, their Board members, and similar entities and individuals, including millions of U.S. persons, covered by the CTA to potential criminal sanctions without adequate notice of the actions required to avoid the sanctions, and, by the same token, expanding the federal government's discretion in enforcing the requirements, the CTA violates the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

## COUNT VIII

### Unconstitutional Infringement of Right of Equal Protection

168.    Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in the paragraphs above.

169.    Under the Equal Protection Clause of the Fifth Amendment, Plaintiffs must be afforded equal protection of the laws, ensuring similar treatment to similarly situated persons.

170.    FinCEN, Treasury, and related federal agencies have publicly recognized that the "vast majority" of domestic nonprofit organizations ("NPOs") "face little or no risk" of being used in terrorist financing schemes, for example, because they observe certain due diligence practices, including self-governance, transparency, and other accountability and compliance measures.

171.    Under Section 31 U.S.C. § 5336(a)(11)(B)(xix) of the CTA, an NPO described in Section 501(c) of the Internal Revenue Code and exempt from tax under Section 501(a) of that Code, are exempt from the CTA's filing requirements. 26 U.S.C. § 501(a), (c).

172.    Community Associations are required by state law to operate as NPOs.

173.    Community Associations are tax-exempt entities as described in Section 528 of the Internal Revenue Code pertaining to "certain homeowners associations" (which definition includes Community Associations as herein defined). Section 528(a) states that a homeowners association "shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. § 528(a).

174.    Community Associations observe the same due diligence practices, including self-governance, transparency, and other accountability and compliance measures, as other NPOs.

175.    Community Associations are required by state law provide homeowners, and often prospective homebuyers and their lenders, with open access to their financial records and books upon request.

176.    As a matter of industry standard, many Community Associations' by-laws also require that their financial records be audited or inspected by an independent auditor on an annual basis.

177.    Despite the fact that state laws require Community Associations to be organized as NPOs, make their financial records available to homeowners and others upon request, and that they are tax-exempt under the specific provisions of Section 528 of the Code, FinCEN refused to grant Community Associations an exemption from the CTA's filing requirements under the NPO Exemption.

178.    The CTA and FinCEN's application of it infringes on Plaintiffs' and their members' rights to equal protection of the law. Tax-exempt NPOs organized under Section 528 of the Code must comply with the CTA, but tax-exempt NPOs organized under Section 501(c) of the Code do not, even though both categories of NPOs observe the same due diligence practices that make them of "little or no risk" of engaging in the types of financial crimes targeted by the CTA. 2024 National Terrorist Financing Risk Assessment, p. 23-25; *see also* 31 USC § 53365336(a)(11)(B)(xxiv).

179.    The Government cannot articulate any legitimate interest or rational basis for exempting NPOs organized under Section 501(c) of the Code from the requirements of the CTA but not exempting NPOs organized under Section 528, despite having the same or functionally similar disclosure requirements.

180.     By subjecting Plaintiffs, Community Associations, and their Board members to the requirements and burdens of the CTA, including possible imprisonment, while simultaneously allowing exemptions for NPOs organized under 501(c) of the Code, the CTA violates the guarantee of equal protection under the Fifth Amendment to the Constitution of the United States.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

181.     On Count I, declare that the CTA does not apply to Community Associations;

182.     On Count I, enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA against Community Associations and their respective Community Board members;

183.     On Counts II and III declare unlawful and set aside FAQs C.10 and D.13 because FinCEN failed to follow the Administrative Procedure Act's notice-and-comment procedures and FinCEN's denial of CAI's request for an exclusion under the CTA was arbitrary and capricious;

184.     On Counts IV through VIII, declare that the CTA is unconstitutional facially or as applied to Community Associations;

185.     On Counts IV through VIII, enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the CTA generally or as against Community Associations and their respective volunteer Community Board members;

186.     On all Counts, destroy any personal identifying information provided by Community Associations and their respective Community Board members to FinCEN and over which it currently maintains possession; and

187.     On all Counts award Plaintiffs their costs and attorneys' fees and grant such other relief as the Court may deem just and proper.

Dated: September 10, 2024

Respectfully submitted,

*/s/ Brendan Bunn*
Brendan Bunn, No. 38461
Chadwick, Washington, Moriarty,
Elmore & Bunn, P.C.
3201 Jermantown Road, Suite 600
Fairfax, VA 22030
Tel: 703-352-1900
Fax: 703-352-5293
bpbunn@chadwickwashington.com

*Attorneys for Canterbury*
*Crossing Condominium Trust,*
*Townhouse Green Cooperative Inc.,*
*Terraces on Memorial Homeowners*
*Association, Farrcroft Homeowners*
*Association, Regency at Ashburn Greenbrier*
*Condominium Association*

Edmund Allcock (*Pro Hac Vice* forthcoming)
Allcock Marcus
10 Forbes Road, Suite 400W
Braintree, MA 02184
Tel: 781-884-1660
ed@amcondolaw.com

*Attorneys for Canterbury Crossing*
*Condominium Trust*

*/s/ Damon W.D. Wright*
Damon W.D. Wright, No. 40319
Clair E. Wischusen, No. 99174
Stephanie Bortnick, No. 87216
Gordon Rees Scully Mansukhani LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Tel: 202-399-1009
Fax: 202-800-2999
dwright@grsm.com
cwischusen@grsm.com
sbortnick@grsm.com

Gretchen Sperry (*Pro Hac Vice*
forthcoming)
Mary J. Goers (*Pro Hac Vic*
forthcoming)
Gordon Rees Scully Mansukhani LLP
One North Wacker, Suite 1600
Chicago, IL 60606
Tel: 312-565-1400
Fax: 312-565-6511
gsperry@grsm.com
mgoers@grsm.com

*Attorneys for Community Associations*
*Institute*