UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| COMMUNITY ASSOCIATIONS INSTITUTE, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case no. 1:24-cv-1597 |
| v. | ) ) | |
| JANET YELLEN, in her official capacity as the Secretary of the United States Department of the Treasury, UNITED STATES DEPARTMENT OF THE TREASURY, and ANDREA GACKI, in her official capacity as Director of Financial Crimes Enforcement Network, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 1

      A.      Plaintiffs and the Operation of State-Created Community Associations ................ 1

      B.      The Corporate Transparency Act. ......................................................................... 4

      C.      The CTA creates a vast database of personal identifying information that may be shared with other law enforcement agencies and foreign governments virtually without limit.......................................................................................................... 6

      D.      The CTA applies to virtually any type of business entity, regardless of whether it is the type of business targeted by the statute. ........................................................ 7

      E.      Subjecting Community Associations to the CTA's reporting requirements will significantly impair their ability to function as required by state law, if they can function at all. .................................................................................................... 9

      F.      The CTA's vague definitions of "beneficial ownership" are irrelevant as applied to Community Associations .................................................................................. 12

      G.      The CTA Compels Speech and Chills the Freedom to Associate. ....................... 12

      H.      Another federal court has already ruled that the CTA is unconstitutional ........... 13

ARGUMENT ..................................................................................................................... 14

I.      Plaintiffs are Likely to Succeed on the Merits of their Claims. ...................................... 15

      A.      Plaintiffs are entitled to a declaration that they are not "reporting companies" under the CTA and are exempt from compliance with BOI reporting requirements because they are nonprofit organizations as contemplated by the CTA and the Internal Revenue Code .......................................................................................... 15

      B.      FinCEN violated the Administrative Procedures Act when it issued FAQs definitively classifying Community Associations as "reporting companies" subject to the CTA and defining who their "beneficial owners" are without following the mandatory notice-and-comment procedures. ................................ 19

              1.      The FAQs are final and binding agency actions subject to the APA's notice-and-comment requirements ........................................................... 21

i

2.     Even if the FAQs are valid, FinCEN's *de facto* denial of Plaintiffs' request for an exemption from the CTA's reporting requirements was arbitrary and capricious. ........................................................................................... 24

C.     The CTA is an unconstitutional invasion of privacy and an unreasonable search in violation of the Fourth Amendment ...................................................................... 27

     1.     The CTA violates the Fourth Amendment rights of Community Associations and their Board members ....................................................... 28

     2.     No Fourth Amendment exceptions apply to the CTA. ............................ 30

D.     The CTA is unconstitutional because its disclosure requirements chill speech and impair associational rights in violation of the First Amendment ......................... 31

E.     Because the CTA was already found unconstitutional in *NSBU v. Yellen*, Plaintiffs are likely to succeed on the merits on the same grounds. ..................................... 35

     1.     Congress lacks constitutional authority to enact the CTA under the Commerce Clause. .................................................................................... 36

          a.     The CTA does not regulate the channels of interstate and foreign commerce. ...................................................................................... 36

          b.     The CTA does not regulate activities that have a "substantial effect" on interstate and foreign commerce. ................................. 37

     2.     The CTA was not passed pursuant to Congress's Taxing Power and the Necessary and Proper Clause. ................................................................ 39

     3.     The CTA was not passed pursuant to Congress's Foreign Affairs Powers and the Necessary and Proper Clause. ...................................................... 40

II.     Plaintiffs will be Irreparably Harmed Absent Injunctive Relief. ...................................... 42

III.     The Balance of Hardships Weighs in Plaintiffs' Favor, and Granting an Injunction Serves the Public Interest. ............................................................................................................ 44

CONCLUSION ................................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Vac EMS, Inc. v. McVey*,
  37 F.4th 89 (4th Cir. 2022) ..................................................................................44

*Am. Mining Cong. v. Mine Safety and Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993) ...........................................................................21

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ........................................................................................34, 35

*Appalachian Power Co. v. E.P.A.*,
  208 F.3d 1015 (D.C. Cir. 2000) .............................................................21, 22, 23

*Baird v. State Bar of Ariz.*,
  401 U.S. 1 (1971) (plurality opinion) ...................................................................34

*Bennett v. Spear*,
  520 U.S. 154 (1997)..........................................................................................21, 23

*Bond v. United States*,
  572 U.S. 844 (2014)................................................................................................41

*Boyd v. United States*,
  116 U.S. 616 (1886)................................................................................................28

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ...........................................................................44, 45

*Carpenter v. United States*,
  585 U.S. 296 (2018)..........................................................................................27, 28

*City of Indianapolis v. Edmond*,
  531 U.S. 32 (2000)..................................................................................................31

*City of Los Angeles v. Patel*,
  576 U.S. 409 (2015)..........................................................................................28, 29

*Cort v. Ash*,
  422 U.S. 66 (1975)..................................................................................................41

*CTS Corp. v. Dynamics Corp. of Am.*,
  481 U.S. 69 (1987)..................................................................................................37

*Doe v. Reed*,
　561 U.S. 186 (2010) .................................................................................................34, 35

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
　653 F.3d 1 (D.C. Cir. 2011) .................................................................................23

*Elrod v. Burns*,
　427 U.S. 347 (1976) ..............................................................................................42

*Farrell v. Blinken*,
　4 F.4th 124 (D.C. Cir. 2021) ................................................................................25

*Fox v. Clinton*,
　684 F.3d 67 (D.C. Cir. 2012) ...............................................................................24

*Gonzales v. Raich*,
　545 U.S. 1 (2005) ..................................................................................................37

*Grimm v. Gloucester Cnty. Sch. Bd.*,
　400 F.Supp.3d 444 (E.D. Va. 2019) ....................................................................15

*Ibanez v. Florida Dept. of Business and Professional Regulation*,
　512 U.S. 136 (1994) ..............................................................................................32

*Katz v. U.S.*,
　389 U.S. 347 (1967) ..............................................................................................30

*McLouth Steel Pros. Corp. v. Thomas*,
　838 F.2d 1317 (D.C. Cir. 1988) ...........................................................................21

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
　571 U.S. 191 (2014) ..............................................................................................15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
　463 U.S. 29 (1983) ................................................................................................24

*NAACP v. Alabama*,
　357 U.S. 449 (1958) ..............................................................................................33

*Nat'l Federation of Independent Business (NFIB) v. Sebelius*,
　567 U.S. 519 (2012) ..............................................................................................40

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
　585 U.S. 755 (2018) ..............................................................................................32

*National Small Business United (NSBU) v. Yellen*,
　No. 5:22-cv-01448, 2024 WL 899372 (N.D. Ala. Mar. 1, 2024) ...............13, 35, 40

iv

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................................................44

*Northcross v. Bd. of Ed. of Memphis City Sch.*,
   412 U.S. 427 (1973) (per curiam) ............................................................................18

*NSBU v. Yellen*,
   5:22-cv-1448-LCB (N.D. Ala. 2024) ........................................................................40

*Oetjen v. Cent. Leather Co.*,
   246 U.S. 297 (1918) ..................................................................................................40

*Patel v. City of Los Angeles*,
   738 F.3d 1058 (9th Cir. 2013) (*en banc*) ...............................................................29

*Richmond Ass'n of Credit Men v. Bar Ass'n of City of Richmond*,
   189 S.E. 153 (Va. 1937)...............................................................................................7

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ..................................................................................................34

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006)...............................................................................................31, 34

*See v. City of Seattle*,
   387 U.S. 541 (1967) ..................................................................................................28

*Select Specialty Hosp.-Bloomington, Inc. v. Burwell*,
   757 F.3d 308 (D.C. Cir. 2014) ..................................................................................26

*Sharp Corp. v. Hisense USA Corp.*,
   292 F.Supp.3d 157 (D.D.C. 2017) ............................................................................15

*Skinner v. Ry. Lab. Executives' Ass'n*,
   489 U.S. 602 (1989) ..................................................................................................31

*Smith v. Maryland*,
   442 U.S. 735 (1979) ..................................................................................................30

*Stuart v. Camnitz*,
   774 F.3d 238 (4th Cir. 2014) ....................................................................................32

*Texas Children's Hosp. v. Azar*,
   315 F.Supp.3d 322 (D.D.C. 2018) ..............................................................22, 23, 25

*United States v. Ballinger*,
   395 F.3d 1218 (11th Cir. 2005) ................................................................................37

*United States v. Bass*,
  404 U.S. 336 (1995) ........................................................................................39

*United States v. Comstock*,
  560 U.S. 126 (1949) ........................................................................................40

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) ........................................................................................41

*United States v. Di Re*,
  332 U.S. 581 (1948) ........................................................................................28

*United States v. Lopez*,
  514 U.S. 549 (1995) ............................................................................36, 38, 39

*United States v. Morrison*,
  529 U.S. 598 (2000) ................................................................................36, 38

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) ........................................................................................27

*United States v. Stevens*,
  559 U.S. 460 (2010) ........................................................................................34

*United States v. W. T. Grant Co.*,
  345 U.S. 629 (1953) ........................................................................................43

*United to Protect Democracy v. Presidential Advisory Comm'n on Election
  Integrity*,
  288 F.Supp.3d 99 (D.D.C. 2017) ............................................................17, 18

*Veronia Sch. Dist. 47J v. Acton*,
  515 U.S. 646 (1995) ........................................................................................31

*Wickard v. Filburn*,
  317 U.S. 11 (1942) ..........................................................................................38

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................15

*Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*,
  471 U.S. 626 (1985) ........................................................................................32

**Constitutions**

U.S. Const. amend. I ...............................................................................................31

U.S. Const. amend. IV .............................................................................................27

U.S. Const. amend. XVI ..................................................................................................39

U.S. Const. art. I, § 8 .....................................................................................................40

U.S. Const. art. I, § 8, cl. 1 ............................................................................................39

U.S. Const. art. I, § 8, cl. 3 ............................................................................................36

U.S. Const. art. I, § 8, cl. 18 ..........................................................................................40

U.S. Const. art. II, § 2 ....................................................................................................40

**Statutes**

5 U.S.C. § 5(b) ...............................................................................................................19

5 U.S.C. § 704 ................................................................................................................21

5 U.S.C. § 706(2)(A) ......................................................................................................24

5 U.S.C. § 706(2)(D) ......................................................................................................19

18 U.S.C. § 922(q)(1)(A) ................................................................................................38

26 U.S.C. § 501 ................................................................................................................8

26 U.S.C. § 501(c) ................................................................................................... *passim*

26 U.S.C. § 528 ....................................................................................................... *passim*

26 U.S.C. § 528(a) ...............................................................................................17, 26, 33

26 U.S.C. § 528(c) ..........................................................................................................17

31 U.S.C. § 5336 ...............................................................................................1, 16, 32, 36

31 U.S.C. § 5336(a)(2) ......................................................................................................4

31 U.S.C. § 5336(a)(3)(A) ...........................................................................................4, 12

31 U.S.C. § 5336(a)(11) ..................................................................................................39

31 U.S.C. § 5336(a)(11)(A) ........................................................................................4, 15

31 U.S.C. § 5336(a)(11)(B) ............................................................................................33

31 U.S.C. § 5336(a)(11)(B)(xix) ............................................................................. *passim*

31 U.S.C. § 5336(a)(11)(B)(xxiv) .......................................................................1, 16, 42

31 U.S.C. § 5336(b)(1) .................................................................................................27

31 U.S.C. § 5336(b)(1)(B) ...............................................................................................5

31 U.S.C. § 5336(b)(1)(C) ...............................................................................................5

31 U.S.C. § 5336(b)(1)(D) ...............................................................................................5

31 U.S.C. § 5336(b)(2) ...................................................................................................27

31 U.S.C. § 5336(b)(2)(A) ........................................................................................5, 16

31 U.S.C. § 5336(b)(3)(A) ...............................................................................................5

31 U.S.C. § 5336(c)(1) ...............................................................................................6, 10

31 U.S.C. § 5336(c)(2) ...................................................................................................10

31 U.S.C. § 5336(c)(2)(B) ................................................................................................6

31 U.S.C. § 5336(c)(2)(B)(i)(I) .......................................................................................7

31 U.S.C. § 5336(c)(2)(B)(i)(II) ..................................................................................6, 7

31 U.S.C. § 5336(c)(2)(B)(ii) ..........................................................................................7

31 U.S.C. § 5336(c)(5) ...................................................................................................27

31 U.S.C. § 5336(h) .......................................................................................................16

31 U.S.C. § 5336(h)(1) .............................................................................................5, 23

31 U.S.C. § 5336(h)(3) .............................................................................................5, 23

42 U.S.C. § 14501(a)(1) .........................................................................................11, 43

42 U.S.C. § 14501(a)(2) .........................................................................................11, 43

42 U.S.C. § 14501(a)(3) .........................................................................................11, 43

42 U.S.C. § 14501(a)(6) .........................................................................................11, 43

42 U.S.C. § 14501(a)(7)(A) ...................................................................................11, 43

42 U.S.C. § 14501(b) .............................................................................................11, 43

William M. (Mac) Thornberry National Defense Authorization Act
    for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388 (2021) ..........................................4

**Rules**

Fed. R. Civ. P. 65 .................................................................................................................14, 15

**Other Authorities**

31 C.F.R. § 1010.380(a)(1)(iii) ....................................................................................................5

31 C.F.R. § 1010.380(a)(2) ..........................................................................................................5

31 C.F.R. § 1010.380(b)(1)(ii) .....................................................................................................5

31 C.F.R. § 1010.380(b)(ii)(E) ...................................................................................................16

87 Fed. Reg. 59498 .......................................................................................................................5

87 Fed. Reg. 59504 ..................................................................................................................6, 31

87 Fed. Reg. 59504-59505 ............................................................................................................5

87 Fed. Reg. 59505 .......................................................................................................................6

87 Fed. Reg. 59549 ..................................................................................................................8, 27

87 Fed. Reg. 59582 .....................................................................................................................41

87 Fed. Reg. 594498-01 ..............................................................................................................41

2024 National Terrorist Financing Risk Assessment,
    https://home.treasury.gov/system/files/136/2024-National-Terrorist-
    Financing-Risk-Assessment.pdf (last accessed July 8, 2024) ...............................................16

Department of the Treasury, "Anti-Money Laundering and Countering the
    Financing of Terrorism (AML/CFT) Programs; Effectiveness,"
    https://home.treasury.gov/system/files/126/20180511_SAR_AboutUs.pdf..........................25

Fin. Crimes Enforcement Network, *UPDATED: Notice Regarding Nat'l Small
    Business United v. Yellen, No. 5:22-cv-01448 (N.D. Ala.)* (March 11, 2024),
    https://www.fincen.gov/news/news-releases/updated-notice-regarding-
    national-small-business-united-v-yellen-no-522-cv-01448 ...................................................13

Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidances, Manuals,
    and the Like—Should Federal Agencies Use Them to Bind the Public?,* 41
    DUKE L.J. 1311, 1328–29 (1992).........................................................................................22

## INTRODUCTION

Plaintiffs bring this Motion for Preliminary Injunction against Defendants Janet Yellen, in her official capacity as Secretary of the U.S. Department of the Treasury, the U.S. Department of the Treasury ("Treasury") and Andrea Gacki, in her official capacity as Director of the Financial Crimes Enforcement Network ("FinCEN") seeking a preliminary injunction precluding enforcement of the Corporate Transparency Act ("CTA"), 31 U.S.C. § 5336, against CAI's affected members, which are homeowners associations, condominium associations, cooperatives, business trusts, and entities performing similar functions (collectively, "Community Associations").

Community Associations should be exempt from the CTA's beneficial owner information ("BOI") reporting requirements, either because they are nonprofit organizations as contemplated by § 5336(a)(11)(B)(xix) of the CTA or are entitled to an exemption under § 5336(a)(11)(B)(xxiv). The CTA is also an unconstitutional intrusion on Community Associations' and Board members' Fourth Amendment rights to be free from illegal searches and seizures, an unconstitutional suppression of their First Amendment freedom of speech and free association, and an unconstitutional exercise of Congressional power untethered to any of its limited enumerated powers. Accordingly, and because all other preliminary injunction factors weigh in Plaintiffs' favor, this Court should grant the Motion and enjoin enforcement of the CTA against Community Associations.

## STATEMENT OF FACTS

### A.    Plaintiffs and the Operation of State-Created Community Associations.

Plaintiffs are Community Associations from states across the country, as well as the Community Associations Institute, a nonprofit membership organization that assists Community

Associations and their Boards with management obligations and advocates on behalf of the industry as a whole to protect their interests.

Community Associations are creatures of the state statutes that govern their creation, organization, and function. Exh. A-1, Declaration of Senya Ehrstein, ¶ 10; Exh. A-2, Declaration of Nancy Wiegand, ¶ 6; Exh. A-3, Declaration of Nick Kornuta, ¶ 8; Exh. A-4, Declaration of Cheri Heaton, ¶ 5; Exh. A-5, Declaration of Kathi Robinson, ¶ 6; Exh. A-6, Declaration of Thomas M. Skiba, ¶ 24. Their primary purpose is to operate and maintain the common areas of the property for the benefit of all homeowners in the community. Exh. A-1, ¶ 10; Exh. A-2, ¶ 6; Exh. A-3, ¶ 3; Exh. A-4, ¶ 6; Exh. A-5, ¶ 6; Exh. A-6, ¶ 8. Nearly all Community Associations are required by law to operate as nonprofit entities, whether they take the form of corporations, unincorporated associations, cooperatives, business trusts, or some other form. Exh. A-6, ¶ 30.

Community Associations are governed by a group of volunteer homeowners who may be referred to as board members, directors, or trustees (collectively, "Board members"). Exh. A-1, ¶ 22; Exh. A-2, ¶ 9; Exh. A-3, ¶ 3; Exh. A-4, ¶ 6; Exh. A-5, ¶¶ 8-9; Exh. A-6, ¶ 8. They are elected by their fellow residents to carry out the Association's business. Exh. A-1, ¶ 22; Exh. A-2, ¶ 9; Exh. A-3, ¶ 3; Exh. A-4, ¶ 6; Exh. A-5, ¶¶ 8-9; Exh. A-6, ¶ 8. Typically, Board members create an operating budget based on known and anticipated needs and collect a proportionate share of that amount from individual homeowners as monthly dues used to pay maintenance expenses. Exh. A-1, ¶ 22; Exh. A-2, ¶ 9; Exh. A-3, ¶ 3; Exh. A-4, ¶ 6; Exh. A-5, ¶¶ 8-9; Exh. A-6, ¶ 8. Board members also manage the Association's finances, budget for capital improvements, preserve and protect common property, and enforce the Association's rules and restrictions. Exh. A-1, ¶ 22; Exh. A-2, ¶ 9; Exh. A-3, ¶ 3; Exh. A-4, ¶ 6; Exh. A-5, ¶¶ 8-9; Exh. A-6, ¶ 8. Unlike in traditional corporations or limited liability companies, Board members have no more financial or ownership interest in the

Community Association than their fellow homeowners. <u>Exh. A-1</u>, ¶ 10; <u>Exh. A-2</u>, ¶ 16; <u>Exh. A-3</u>, ¶ 3; <u>Exh. A-4</u>, ¶ 14; <u>Exh. A-5</u>, ¶ 15. All homeowners own the common areas of the property equally, typically as tenants-in-common.

Board members reside in the Community and typically serve without compensation. <u>Exh. A-6</u>, ¶ 8. They are typically elected to serve terms of one to three years in annual elections, unless there is an unexpected vacancy to be filled. <u>Exh. A-1</u>, ¶ 14; <u>Exh. A-2</u>, ¶ 11; <u>Exh. A-3</u>, ¶ 6; <u>Exh. A-4</u>, ¶ 10; <u>Exh. A-5</u>, ¶ 10; <u>Exh. A-6</u>, ¶ 8. In some jurisdictions, Community Associations may file an informational document with the Secretary of State's office or local registry of deeds, identifying homeowners who serve on the Board at that time. <u>Exh. A-1</u>, ¶¶ 4-5; <u>Exh. A-3</u>, ¶ 8.

There has long been a general reluctance among homeowners in Community Associations to volunteer for Board leadership positions. These are time-consuming, unpaid volunteer positions that sometimes require them to perform unpleasant and thankless tasks, like enforcing Community rules and restrictions against neighbors or resolving disputes among them. <u>Exh. A-1</u>, ¶ 22; <u>Exh. A-2</u>, ¶ 20; <u>Exh. A-3</u>, ¶ 15; <u>Exh. A-4</u>, ¶ 16; <u>Exh. A-5</u>, ¶ 9; <u>Exh. A-6</u>, ¶ 11. Even among the Board members who do serve, the turnover rate is high because Board members move out of the Community or resign due to time constraints. <u>Exh. A-1</u>, ¶ 17; <u>Exh. A-2</u>, ¶ 13; <u>Exh. A-4</u>, ¶ 11; <u>Exh. A-5</u>, ¶ 12. It is difficult enough to recruit homeowners to run in scheduled Board elections. <u>Exh. A-1</u>, ¶ 26; <u>Exh. A-2</u>, ¶ 20; <u>Exh. A-3</u>, ¶ 13; <u>Exh. A-4</u>, ¶ 16; <u>Exh. A-5</u>, ¶¶ 17-18; <u>Exh. A-6</u>, ¶ 37. It is all the more difficult to recruit replacement Board members on short notice to fill unexpected vacancies. <u>Exh. A-1</u>, ¶ 28; <u>Exh. A-2</u>, ¶ 20; <u>Exh. A-3</u>, ¶ 13; <u>Exh. A-4</u>, ¶ 16; <u>Exh. A-5</u>, ¶¶ 17-18; <u>Exh. A-6</u>, ¶ 37.

### B.     The Corporate Transparency Act.

The CTA was enacted on January 1, 2021, as part of the National Defense Authorization Act for Fiscal Year 2021.[1] The CTA's stated purpose is to combat money laundering, terrorism financing, and other illicit financial activity by cracking down on the use of anonymous "shell companies." To that end, the CTA requires virtually every business entity to provide sensitive and non-public personal information about its owners to FinCEN, regardless of its corporate form, area of industry, or its likelihood of engaging in financial crimes.

The CTA requires "reporting companies" to provide personal identifying information to FinCEN regarding each "beneficial owner" and "applicant." A "reporting company" is defined as a "corporation, limited liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A).

A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity;" or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id*. § 5336(a)(3)(A). An "applicant" is defined as any individual who files an application to form a reporting company or "registers or files an application to register" a non-U.S. company to do business in the United States. *Id*. § 5336(a)(2).

For each beneficial owner and applicant, the reporting company must provide to FinCEN their full legal name, date of birth, current residential or business address, and "unique identifying

---

[1]  William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

number from an acceptable identification document," such as an unexpired passport or state-issued identification card or driver's license, provided that the same has a photograph of the individual, and also download a photograph or copy of their state-issued identification card or driver's license. 31 U.S.C. § 5336(b)(2)(A); 31 C.F.R § 1010.380(b)(1)(ii). They may also obtain a FinCEN-issued identifier number, which requires them to provide all of the same information and documentation in the first instance.[2] Beginning January 1, 2024, this personal identifying information must be reported within 30 days of formation or registration of the reporting company, or, in the case of existing reporting companies, prior to January 1, 2025. 31 U.S.C. § 5336(b)(1)(B), (C); 31 C.F.R § 1010.380(a)(1)(iii).

If there are any changes to the reported data—such as when a "beneficial owner" or "applicant" changes their name or gets a new driver's license—the entity must provide updated information to FinCEN within 30 days of the change. 31 U.S.C. § 5336(b)(1)(D); 31 C.F.R § 1010.380(a)(2). Reporting companies, owners, and applicants that fail to comply with the CTA's reporting requirements are subject to a civil penalty of up to $500 per day and/or a criminal penalty of up to $10,000 and two years' imprisonment. 31 U.S.C. § 5336(h)(1), (3).

The CTA aims to collect the beneficial ownership information from entities whose information Congress believes would "facilitate the detection and prosecution of financial crime." FinCEN recognizes that law enforcement officials often cannot obtain beneficial ownership information from any other source, including the "secretary of state or similar office," from publicly available "property records," or under the 2016 Customer Due Diligence Rule. *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59504-59505.

---

[2]  To obtain a FinCEN identifier number, the individual or the organization must make the same filing otherwise required under the CTA. 31 U.S.C. § 5336(b)(3)(A).

As such, the CTA was designed to circumvent traditional Fourth Amendment protections. FinCEN's then-Director testified before Congress that the CTA was necessary to eliminate the need for its investigators to comply with fundamental safeguards, like grand jury subpoenas and search warrants, to obtain beneficial ownership information. *Id.* at 59504. According to the Director, complying with these requirements "takes an enormous amount of time" and "wastes resources."  *Id.* Thus, the CTA was designed to make companies' non-public ownership information "immediately available to law enforcement, intelligence, or national security agencies" without the hassle of a warrant or judicial oversight. *Id.* at 59505.

**C.     The CTA creates a vast database of personal identifying information that may be shared with other law enforcement agencies and foreign governments virtually without limit.**

The CTA creates a vast database of personal identifying information that may be shared with other law enforcement agencies and foreign governments and used for any law enforcement purpose without the need for a warrant or other judicial oversight. FinCEN must keep the personal data of a reporting company's beneficial owners and applicants for at least five years after the date on which the reporting company is wound down. 31 U.S.C. § 5336(c)(1).

FinCEN may share these highly personal disclosures with federal, state, local, and Tribal law enforcement agencies; with financial institutions for customer due diligence (with the reporting company's consent); and with "a Federal functional regulator or other appropriate regulatory agency," including foreign governmental agencies. *Id.* at § 5336(c)(2)(B). If a request for personal identifying information comes from a state, local, or Tribal law enforcement agency, it must come through "appropriate protocols" and "a court of competent jurisdiction … [that] has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id.* at § 5336(c)(2)(B)(i)(II). A "court of competent jurisdiction" is defined to include "any officer of such a court," meaning FinCEN may share these personal disclosures upon the mere request of

a prosecutor—without a warrant—since attorneys are considered "officer[s] of the court." *Id.* at §

5336(c)(2)(B)(i)(II); *see, e.g.*, *Richmond Ass'n of Credit Men v. Bar Ass'n of City of Richmond*,

189 S.E. 153, 157 (Va. 1937) (defining attorneys as officers of the court).

FinCEN may also share the personal disclosures without any court authorization or

oversight if the request comes from a "Federal agency engaged in national security, intelligence,

or law enforcement activity, for use in furtherance of such activity."   31 U.S.C. §

5336(c)(2)(B)(i)(I).  FinCEN may even share the personal disclosures with a foreign law

enforcement agency, prosecutor, or judge in connection with the foreign entity's "investigation or

national security or intelligence activity" if a federal agency requests the data on its behalf—again

without requiring court authorization or other "appropriate protocols." *See id.* at §

5336(c)(2)(B)(ii). For example, if a foreign government, acting pursuant to a U.S.-ratified treaty

like the United Nations Convention Against Corruption, requested certain beneficial owners' or

applicants' personal data related to real property located in the United States, FinCEN may provide

that data without any independent examination of the foreign government's need for the

information.

> **D.**     **The CTA applies to virtually any type of business entity, regardless of whether it is the type of business targeted by the statute.**

Notwithstanding the CTA's stated purpose of targeting the use of anonymous shell

companies to facilitate money laundering, terrorist financing, and fraud, the CTA's requirements

apply broadly to nearly all business entities—regardless of their corporate forms, their areas of

business, or an assessment of the risk they pose of engaging in financial crimes.

Nor does the CTA limit its disclosure requirements to individuals or entities suspected of

actually committing financial crimes. Rather, according to FinCEN, the "reporting companies"

subject to the CTA will include approximately 32.6 million existing entities in 2024, and nearly 5

million more over the next ten years, in addition to any foreign companies doing business in the United States. *See* Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. at 59549 (2022).

The CTA excludes two dozen categories of business entities from the definition of a "reporting company." *See* 31 U.S.C. § 5336(a)(11)(B)(xix). Relevant here, Congress created an exemption for tax exempt organizations as "described in section 501(c) of the Internal Revenue Code" and "exempt from tax under section 501(a) of such Code" ("NPO Exemption") *Id.*; 26 U.S.C. § 501. As FinCEN, Treasury, and related federal agencies have long recognized, nonprofit organizations ("NPOs") pose virtually no risk of engaging in money laundering, terrorist financing, or other financial crimes because they engage in the type of self-governance, transparency, and accountability measures that make it nearly impossible to hide evidence of financial crimes.

Most state statutes also require Community Associations to operate as tax-exempt, nonprofit organizations. But the majority of them file federal tax reporting under Internal Revenue Service section 528 of the Internal Revenue Code specific to "homeowners associations," which is defined to include a variety of condominium management associations (including the "Community Associations" defined in this pleading), residential real estate management associations, and timeshare associations. 26 U.S.C. § 528. Section 528 was enacted as part of the Tax Reform Act of 1976; prior to that time, homeowners' associations generally filed as tax-exempt entities under section 501(c). Section 528 expressly states that a "homeowners association shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." *Id.*

On December 28, 2023, CAI sent a letter to FinCEN requesting that Community Associations be exempt from CTA compliance under the NPO Exemption. Exh. B, Dec. 20, 2023, Ltr. from CAI to FinCEN. It recounted FinCEN's recognition that nonprofits pose minimal risk of engaging in the kinds of financial crimes targeted by the CTA. The letter also detailed the types of transparency Community Associations observe as required by state law or their internal by-laws.

Having gotten no response from FinCEN, CAI pursued other strategies to obtain relief from the CTA. On July 15, 2024, HR 9045 was introduced in the House of Representatives, which remains pending. Exh. C, HR 9045 Bill Text. The bill seeks to amend the CTA to expressly include those "homeowners associations" that file under section 528 of the Code within the NPO Exemption. *Id*.; see 31 U.S.C. § 5336(a)(11)(B)(xix). Over the weeks that followed, still having not responded to CAI's exemption request, FinCEN posted FAQs on its website, in April and June of 2024, creating new interpretations of the CTA as applied to Community Associations.

On July 25, 2024, FinCEN at last responded to CAI's letter sent seven months earlier. Exh. D, July 25, 2024, Ltr. from FinCEN to CAI. It did not engage with the substantive bases for CAI's exemption request. It simply recited the statutory language for the NPO Exemption and the catch-all exemption that exempts entities for which it would not serve the public's interest to collect beneficial ownership information because it would not be "highly useful" to law enforcement efforts to detect and prevent financial crimes. The letter concluded by saying that FinCEN "is considering [CAI's] request to exempt a class of [Community Associations]," but that they should comply with the CTA's reporting requirements in the meantime.

### E.   Subjecting Community Associations to the CTA's reporting requirements will significantly impair their ability to function as required by state law, if they can function at all.

As it currently stands, FinCEN does not recognize Community Associations as exempt under the NPO Exemption. But unless Community Associations are granted the same exemption

from CTA reporting requirements as other nonprofits, the undue burdens, invasion of privacy, and risk of personal liability associated with CTA compliance is certain to cause mass resignations of Board members, and extreme difficulty in soliciting new volunteers from the 365,000 Community Association Boards across the country, with no one stepping up to replace them.

Of particular concern to Plaintiffs and the 954 CAI members responding to a survey, the CTA requires all beneficial owners to disclose highly personal identifying information, including photo identification, to FinCEN, which may be stored indefinitely and used for any law enforcement purpose by a variety of foreign and domestic law enforcement agencies, with virtually no judicial oversight. 31 U.S.C. § 5336(c)(1), (2). Plaintiffs have attested that they and their fellow Board members will resign from their Boards rather than comply with these unduly burdensome regulations and dissuade other homeowners from volunteering. Exh. A-1, ¶¶ 20, 23; Exh. A-2, ¶¶ 18-19; Exh. A-3, ¶¶ 11-13; Exh. A-4, ¶¶ 15-16; Exh. A-5, ¶¶ 16-19; Exh. A-6, ¶ 32. The practical consequence of imposing BOI reporting requirements on Community Associations is that the resulting Board vacancies will disrupt and possibly shut down the operation of Community Associations across the country, further exposing them to penalties for noncompliance, with no discernable impact on fulfilling the CTA's purpose. Exh. A-1, ¶ 28; Exh. A-2, ¶ 20; Exh. A-3, ¶ 15; Exh. A-4, ¶ 16; Exh. A-5, ¶ 20; Exh. A-6, ¶ 38. Indeed, in some jurisdictions, if a Community Association cannot function as required by statute because it lacks the minimum number of members, it could end up in receivership or dissolution.

Any change in Board leadership triggers an obligation on the Association to file an updated BOI disclosure with FinCEN within 30 days of the event. The same is true for any changes to Board members' information, like a name change or an updated driver's license or passport—changes their fellow Board members likely are not privy to. The failure to report these events

exposes the Community Association and potentially all its Board members—individually and collectively—to a civil penalty of at least $500 per day, or a $10,000 fine and two years' imprisonment for a criminal violation. Exh. A-1, ¶ 27; Exh. A-2, ¶ 20; Exh. A-3, ¶ 15; Exh. A-4, ¶ 16; Exh. A-5, ¶ 19; Exh. A-6, ¶ 32.

Likewise CTA compliance creates an undue burden on Board members to be responsible for collecting and maintaining their fellow Board members' personal identifying information, and tracking changes to it. If just one Board member or "beneficial owner" fails to provide these updates for purposes of report it to FinCEN, the Association and the individual Board members are subject to steep penalties. Exh. A-1, ¶ 25; Exh. A-2, ¶ 21; Exh. A-3, ¶¶ 15-16; Exh. A-4, ¶ 16; Exh. A-5, ¶ 19; Exh. A-6, ¶ 32. Thus, CTA compliance will exacerbate homeowners' general reluctance to serve on Community Boards.

Congress has long recognized the significant deterrent effect personal liability has on volunteerism. Nearly thirty years ago, Congress enacted the Volunteer Protection Act to protect against "liability abuses related to volunteers serving nonprofit organizations." 42 U.S.C. § 14501(b). It acknowledged volunteers' "legitimate fears… about frivolous, arbitrary, or capricious lawsuits" and noted that the "willingness of volunteers to offer their services is deterred" by potential liability actions against them. *Id*. § 14501(a)(7)(A), (a)(1). To avoid that risk, volunteers simply withdraw from service or avoid service altogether, thereby diminishing nonprofit groups' valuable impact on their communities because it increases operating costs to hire people to perform the organizations' functions, increases litigation costs, and increases insurance costs. *Id*. § 14501(a)(2), (3), (6).

**F.     The CTA's vague definitions of "beneficial ownership" are irrelevant as applied to Community Associations.**

The CTA also poses significant burdens on Community Associations because their volunteer Community Board members must navigate the CTA's definitions of beneficial ownership, which have no application in the context of Community Associations. Plaintiffs and their Board members will be required to determine which individuals qualify as "beneficial owners" in the CTA's vague terminology, including the provision that any individual who "indirectly" by any "understanding" exercises "substantial control" over an entity must report. 31 U.S.C. § 5336(a)(3)(A).

For example, a single homeowner may own 25% of the units or "beneficial interest" in the Community Association, but not be on the Board. By definition, the CTA would make that homeowner a "beneficial owner" required to file a BOI disclosure with FinCEN, but he would have no authority to manage the Association's operations whatsoever. That power is vested only in elected Board members. If that 25% owner refused to file a BOI disclosure, that would subject the Board and the Association to steep penalties for non-compliance, and possibly require adjacent litigation to enforce the CTA provision against the owner.

**G.     The CTA Compels Speech and Chills the Freedom to Associate.**

The CTA also has the very real consequence of compelling Board members' speech and chilling their freedom of association. Community Associations and their Boards have regular, ongoing communication with local, state, and federal government officials about various topics, including land use, zoning, environmental matters, real estate development, taxes, crime, poverty, social services, or other issues that may affect them and their communities. Exh. A-1, ¶ 11; Exh. A-2, ¶ 12; Exh. A-3, ¶ 17; Exh. A-5, ¶ 11; Exh. A-6, ¶¶ 12-13. Because the CTA requires volunteer homeowners to disclose personal information and risk criminal prosecution or incur fines as a

condition of Board service, it will cause homeowners to resign from serving on the Board and deter others from volunteering. Exh. A-1, ¶¶ 23, 26; Exh. A-2, ¶¶ 18-19; Exh. A-3, ¶¶ 11-13; Exh. A-4, ¶ 16; Exh. A-5, ¶¶ 16-19; Exh. A-6, ¶ 35. Thus, it necessarily violates their constitutional rights by compelling certain speech or facing criminal and civil penalties for refusing to do so. Plaintiffs' free association rights are also violated because, as they have attested, they will resign from Board service rather than disclose their personal identifying information pursuant to the CTA. Exh. A-1, ¶¶ 23, 26; Exh. A-2, ¶¶ 18-19; Exh. A-3, ¶¶ 11-13; Exh. A-4, ¶ 16; Exh. A-5, ¶¶ 16-19; Exh. A-6, ¶ 35. Furthermore, without a properly functioning Board, Community Associations cannot participate as an entity in their local government. Exh. A-1, ¶ 11; Exh. A-2, ¶ 12; Exh. A-3, ¶ 17; Exh. A-5, ¶ 11; Exh. A-6, ¶¶ 12-13.

### H.    Another federal court has already ruled that the CTA is unconstitutional

Earlier this year, the United States District Court for the Northern District of Alabama ruled that the CTA "is unconstitutional because it cannot be justified as an exercise of Congress' enumerated powers." *National Small Business United (NSBU) v. Yellen*, No. 5:22-cv-01448, 2024 WL 899372, at *21 (N.D. Ala. Mar. 1, 2024). The *NSBU* court permanently enjoined the Department of the Treasury and FinCEN from enforcing the CTA against the plaintiffs in that case.[3] FinCEN has announced that other reporting companies are still required to comply with the law and file beneficial ownership reports as provided in FinCEN's regulations.[4]

---

[3] On March 11, 2024, the United States Department of the Treasury and FinCEN appealed that Judgment to the 11th Circuit Court of Appeals.

[4] *See* Fin. Crimes Enforcement Network, *UPDATED: Notice Regarding Nat'l Small Business United v. Yellen, No. 5:22-cv-01448 (N.D. Ala.)* (March 11, 2024), available at https://www.fincen.gov/news/news-releases/updated-notice-regarding-national-small-business-united-v-yellen-no-522-cv-01448.

**ARGUMENT**

Without an exemption, Plaintiffs and all Community Associations must comply with the CTA reporting requirements on or before January 1, 2025. CAI has been unsuccessful in obtaining an exemption from the CTA through administrative channels or otherwise. But as demonstrated below, Community Associations are entitled to an exemption from the CTA as nonprofit, tax-exempt entities or because collection of Community Board members' personal identifying information will not serve the public and will not be highly useful in national security, intelligence, and law enforcement efforts to prevent financial crimes. FinCEN's decision to effectively deny CAI's exemption request was arbitrary and capricious and its FAQs issued in lieu of a well-reasoned decision were issued improperly in violation of the APA.

The CTA is also unconstitutional as applied to Plaintiffs and all Community Association Board members. First, the statute is a stark violation of the Fourth Amendment's protection from illegal searches and seizures, as FinCEN's then-Director testified to Congress. The CTA also infringes on Plaintiffs' and Community Association Board Members' First Amendment rights to freedom of speech and freedom of association. They are being compelled to disclose sensitive, non-public information that may be used in investigations by federal, state, or foreign governments or face criminal or civil penalties for refusing to do so. Plaintiffs have attested they will resign their Board positions rather than provide their personal identifying information to FinCEN, denying them the opportunity to continue serving their community and advocating on its behalf in violation of their free association rights. Finally, the CTA is unconstitutional on its face because Congress lacked the power to enact the CTA.

Plaintiffs now seek injunctive relief here to enjoin the CTA from being enforced against them and causing them irreparable harm. Rule 65 of the Federal Rules of Civil Procedure provides for preliminary injunctive relief where Plaintiffs can demonstrate: "(1) they are likely to succeed

14

on the merits of their case; (2) they are likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of the equities tips in their favor; and (4) an injunction would be in the public interest." *Id.* (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The deprivation of constitutional rights unquestionably constitutes irreparable injury." *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F.Supp.3d 444, 461 (E.D. Va. 2019). Here, all factors weigh strongly in favor of Plaintiffs and they are entitled to injunctive relief.

I.      **Plaintiffs are Likely to Succeed on the Merits of their Claims.**

   A.      **Plaintiffs are entitled to a declaration that they are not "reporting companies" under the CTA and are exempt from compliance with BOI reporting requirements because they are nonprofit organizations as contemplated by the CTA and the Internal Revenue Code.**

Plaintiffs are likely to succeed on the merits of their claim seeking a declaration that they are not subject to the CTA's beneficial ownership reporting requirements because they are not "reporting companies" as contemplated by the statute. A declaratory judgment claim is the appropriate vehicle to seek a statutory construction of the CTA and a preemptive declaration that Plaintiffs have no reporting obligations under the CTA where, in the absence of such a declaration, they may face harsh civil and/or criminal penalties for wrongful non-compliance. *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 197 (2014); *Sharp Corp. v. Hisense USA Corp.*, 292 F.Supp.3d 157, 168 (D.D.C. 2017).

The CTA broadly applies to any corporation, LLC, or similar entity simply by virtue of being "created by the filing of a document" with a secretary of state or similar state office—without qualification and virtually without limitation. 31 U.S.C. § 5336(a)(11)(A). The sole purpose of the CTA is to force these "reporting companies" to disclose to FinCEN the personal identifying information of each "beneficial owner" who "exercises substantial control" of the entity and each "applicant" who files the application to form or register the entity—including their full legal name,

date of birth, residential address, passport or driver's license number, and a picture of that identification document, which necessarily includes a facial image. 31 U.S.C. § 5336(b)(2)(A); C.F.R. 1010.380(b)(ii)(E). Although the reporting company is subject to regulation under the CTA, any person who fails to timely and accurately disclose this information—including the beneficial owner or the applicant—faces severe civil and/or criminal penalties, up to a $10,000 fine and two years' imprisonment. 31 U.S.C. § 5336(h). The Government's stated purpose for indiscriminately collecting and indefinitely storing this personal information is to root out organizational havens for money laundering, terrorist financing, and other illegal financial activity. *See* 31 U.S.C. § 5336.

But Congress also chose to exclude certain entities from having to comply with the CTA. Specifically, Congress excluded nonprofit organizations ("NPOs") from the CTA's reach: "[t]he term 'reporting company' does not include… any organization that is described in section 501(c) of the Internal Revenue Code… and exempt from tax under section 501(a) of such Code." 31 U.S.C. § 5336(a)(11)(B)(xix) ("NPO Exemption"). This should come as no surprise. For the last decade, Treasury and FinCEN (the "Agencies") have published the National Terrorist Financing Risk Assessment Report in which they have steadfastly declared that "the vast majority" of domestic NPOs "face little or no risk of being abused for [terrorist financing]." 2024 National Terrorist Financing Risk Assessment, p. 23-25.[5] As the Agencies have publicly stated, this is largely because NPOs abide by stringent internal due diligence standards, including self-governance, transparency, and other accountability and compliance measures that mitigate any risk they will engage in illicit financial activity. *Id*.; *see also* 31 U.S.C. § 5336(a)(11)(B)(xxiv) (generally excluding from CTA compliance entities for which collection of BOI "would not be

---

[5]   Available at https://home.treasury.gov/system/files/136/2024-National-Terrorist-Financing-Risk-Assessment.pdf (last accessed July 8, 2024).

highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes").

Plaintiffs are also tax-exempt NPOs and should be excluded from the CTA's regulatory scheme. Prior to 1976, homeowners and condominium management associations largely qualified for tax-exempt status under section 501(c). With the passage of the Tax Reform Act of 1976, Congress created section 528 of the Internal Revenue Code to provide a tax-exemption classification unique to "homeowners associations."[6] 26 U.S.C. § 528. Importantly, in enacting section 528, Congress expressly stated that "[a] homeowners association shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. § 528(a).

Reading section 528 together with the NPO Exemption, Plaintiffs are "exempt from tax under section 501(a)" be excluded from the definition of a "reporting company" under the CTA, just as NPOs tax-exempt under section 501(c) are. First, section 528 specifically states that they "shall be considered" a tax-exempt organization "for the purpose of any law" that refers to tax-exempt organizations. Second, there is a presumption that Congress uses the same term consistently in different statutes. *United to Protect Democracy v. Presidential Advisory Comm'n*

---

[6] "Homeowners association" is defined as "an organization which is a condominium management association, a residential real estate management association, or a timeshare association," if (A) it is organized and operated "to provide for the acquisition, construction, management, maintenance, and care of association property"; (B) 60% or more of its gross income for the taxable year "consists solely of amounts received as membership dues, fees, or assessments" from owners of residential units, residences, lots, or timeshare rights; (C) 90% or more of its expenditures for the taxable year are for the "acquisition, construction, management, maintenance, and care of association property" or activities for members of the timeshare association; (D) no part of its net earnings inures to the benefit of any private shareholder or individual (with limited exceptions); and (E) it elects to have this section apply for the taxable year. 26 U.S.C. § 528(c).

*on Election Integrity*, 288 F.Supp.3d 99, 112 (D.D.C. 2017). Indeed, the U.S. Supreme Court has held that when two statutes contain the same language, it is a "strong indication" that "they should be interpreted 'pari passu,' that is, on equal footing." *Id*., quoting *Northcross v. Bd. of Ed. of Memphis City Sch*., 412 U.S. 427, 428 (1973) (per curiam). Thus, under circumstances where statutes parallel one another, ordinarily a "common term should be construed consistently under each statute." *Id*. It also bears noting that HR 9045 was introduced in the House of Representatives six weeks ago and would expressly include section 528 entities within the NPO Exemption. Exh. C.

Moreover, like other NPOs, Plaintiffs abide by stringent internal due diligence standards, including self-governance, transparency, and other accountability and compliance measures, meaning they "face little or no risk" that they will engage in financial crimes, as the Agencies have declared. Indeed, the transparency and accountability requirements on Community Associations may be more stringent than those pertaining to section 501(c) entities. Every state requires Community Associations to make their financial records available to other homeowners on request. Exh. E, National State Law Community Association Transparency and Disclosure Requirements. Community Associations are required by law in 30 states to make their financial records available to prospective buyers and their lenders to document the value of the investment and protect buyers from misrepresentations; virtually all others provide this access as a matter of industry standard. *Id*. In 23 states, Community Associations are required to have their financial records audited or inspected by an independent auditor on an annual basis; most others choose to have their finances audited as a matter of best practices. *Id.*

Accordingly, Plaintiffs are likely to succeed in establishing that they are exempt from the CTA under the NPO Exemption, the result of which is to relieve Plaintiffs of any reporting requirements under the CTA.

**B.      FinCEN violated the Administrative Procedures Act when it issued FAQs definitively classifying Community Associations as "reporting companies" subject to the CTA and defining who their "beneficial owners" are without following the mandatory notice-and-comment procedures.**

Under the Administrative Procedures Act ("APA"), agencies must follow notice-and-comment procedures when proposing new rules, except where the agency is merely promulgating "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 5(b). If an agency does not follow proper rule-making procedures where required, a court can "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Here, FinCEN improperly issued Frequently Asked Questions ("FAQs") on its website that altered Community Associations' obligations under the CTA without following the notice-and-comment procedures required by the APA.

In a December 28, 2023, letter to FinCEN, CAI requested that Community Associations be exempt from the CTA's reporting requirements under the NPO Exemption (31 U.S.C. § 5336(A)(11)(B)(xix)). *See* Exh. B. The letter explained that Community Associations are tax-exempt nonprofit organizations that observe state-mandated transparency and accountability practices just as section 501(c) NPOs do. Because Community Associations provide the same assurances as section 501(c) NPOs that they present "little or no risk" of engaging in financial crimes, CAI requested that Community Associations be included within the NPO Exemption.

Without responding to CAI's letter, FinCEN issued the FAQs, which definitively classified homeowners association as reporting companies and defined who their beneficial owners are. FAQ

C.10 states that homeowners associations are generally considered reporting companies:

> *C. 10. Are homeowners associations reporting companies?*
>
> It depends. Homeowners associations (HOAs) can take different forms. As with any entity, if an HOA was not created by the filing of a document with a secretary of state or similar office, then it is not a domestic reporting company. An incorporated HOA or other HOA that was created by such a filing also may qualify for an exemption from the reporting requirements. For example, HOAs recognized by the IRS as section 501(c)(4) social welfare organizations (or that claim such status and meet the requirements) may qualify for the tax-exempt entity exemption. An incorporated HOA that is not a section 501(c)(4) organization, however, may fall within the reporting company definition and therefore be required to report BOI to FinCEN.

[Updated June 10, 2024].[7]

Further, FAQ D.13 details who the "beneficial owner" of a homeowners association is under the CTA, stating:

> There may be instances in which no individuals own or control at least 25 percent of the ownership interests of an HOA that is a reporting company. However, FinCEN expects that at least one individual exercises substantial control over each reporting company. Individuals who meet one of the following criteria are considered to exercise substantial control over the HOA:
>
> - the individual is a senior officer;
> - the individual has authority to appoint or remove certain officers or a majority of directors of the HOA;
> - the individual is an important decision-maker; or
> - the individual has any other form of substantial control over the HOA.

[Issued April 18, 2024].[8]

By issuing these FAQs, FinCEN violated the APA's requirement that agencies must engage in a notice-and-comment period before issuing substantive changes to Community Associations' obligations under the CTA and deprived CAI of the opportunity to engage in any meaningful

---

[7] Available at https://www.fincen.gov/boi-faqs#C_10 (last accessed September 9, 2024).

[8] Available at https://www.fincen.gov/boi-faqs#D_13 (last accessed September 9, 2024).

discussion before it created these new regulatory parameters. FinCEN's actions were arbitrary and capricious because they improperly issued these FAQs as a *de facto* denial of CAI's exemption request without engaging the substance of its request or providing any rationale for effectively denying it.

### 1.    The FAQs are final and binding agency actions subject to the APA's notice-and-comment requirements.

Courts have authority to review "final agency action[s]" under the APA. 5 U.S.C. § 704. An agency action is considered "final" under the APA if the action is a consummation of the agency's decision-making process and if it is one in which rights or obligations have been determined, or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

Only legislative rules have the force and effect of law. *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1021 (D.C. Cir. 2000). A legislative rule is one that the agency has duly promulgated in compliance with the procedures prescribed by the enabling statute or in the APA. *Id*. When determining whether an agency has made a rule legislative or interpretive, courts generally consider four factors:

> (1) [W]hether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties; (2) whether the agency has published the rule in the Code of Federal Regulations; (3) whether the agency has explicitly invoked its general legislative authority; and (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, we have a legislative rule.

*Am. Mining Cong. v. Mine Safety and Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

But courts also recognize that an agency's other pronouncements, as a practical matter, may have a "binding" effect, subjecting those pronouncements to judicial review. *See, e.g.*, *McLouth Steel Pros. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988). Where the agency

acts as if a document is controlling, treats it as a legislative rule, bases enforcement actions on the policies and interpretations contained in the document, and leads private actors to believe the agency will take adverse action if they do not comply with the pronouncement, then it is, for all practical purposes, "binding." *Appalachian Power Co.*, 208 F.3d at 1021 (citing Robert A. Anthony, *Interpretative Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?,* 41 DUKE L.J. 1311, 1328–29 (1992)).

Here, the FAQs issued by FinCEN are "binding" in a practical sense. They categorize Community Associations as reporting companies and define who their beneficial owners are. This will undoubtedly lead Community Associations to believe that the FAQs substantively control the categorization of their entities as it relates to the CTA. Exh. A-1, ¶ 20; Exh. A-2, ¶ 17; Exh. A-3, ¶ 11; Exh. A-5, ¶ 16; Exh. A-6, ¶ 31.

FAQs have previously been found to be final and binding administrative actions subject to the APA's notice-and-comment procedures. *Texas Children's Hosp. v. Azar*, 315 F.Supp.3d 322, 339 (D.D.C. 2018). In *Texas Children's Hospital*, the court compared the challenged FAQs to the language of the statute and the language of a subsequently-issued Final Rule when analyzing whether it was a newly promulgated legislative rule or an interpretation of an existing regulation. *Id*. at 331-333. The court concluded that the FAQ did not, in fact, interpret the existing statute and Final Rule. *Id.* Rather, the existing regulatory language discussed audit calculations involving subsidized or individually-paid medical costs. *Id.* The FAQ, on the other hand, included private insurance payments in the audit calculations that were not discussed anywhere in the other regulations. *Id.* In fact, it conflicted with the statutory and regulatory language and substantively changed the Final Rule's meaning. *Id*. As such, it was a final administrative decision that should have been subject to public review under the APA's notice-and-comment procedures. *See id.* The

22

court rejected the government's argument that the FAQ merely restated an interpretation of the governing statute because the subject FAQ was not sourced from the statutory authority or governing rule. *Id.* at 331. Similarly here, the FAQs do not merely interpret the language of the CTA or its regulations; they substantive change the regulations' meaning. This is particularly true as to FAQ D.13: neither the CTA nor the regulations mention a "senior officer," an individual who is authorized to "appoint or remove certain officers," or an "important decision-maker" within the definition of a "beneficial owner." FinCEN's statement on its website that the FAQs as "explanatory" does not control the inquiry. *See Appalachian Power Co.*, 208 F.3d at 1023 (rejecting the EPA's characterization that its Guidance merely explained existing Clean Air Act provisions and holding that it was a final administrative decision because it imposed legal consequences for non-compliance).

The FAQs substantively change Community Associations' understanding of their obligations under the CTA because they indicate that FinCEN presumes Community Associations are "reporting companies" and they define who the "beneficial owners" are. *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) ("[t]he practical question inherent in the distinction between legislative and interpretive regulations is whether the new rule affects a substantive regulatory change to the statutory or regulatory regime"). In particular, the FAQs state that there are "direct and appreciable legal consequences" should a Community Association not comply with the reporting requirements as newly promulgated in FAQ C.10. *See Bennett*, 520 U.S. at 178. Significantly, should a Community Association fail to comply with the CTA's reporting requirements, it is subject to a penalty of up to $10,000, two years' imprisonment, or both. 31 U.S.C. § 5336(h)(1), (3).

As such, the FAQs are final and binding pronouncements that should have been

promulgated pursuant to the APA's notice-and-comment requirements. FinCEN's actions were arbitrary and capricious, first because they failed to observe the proper procedure for issuing the binding FAQs; and second, because it issued the FAQs as a *de facto* denial of CAI's exemption request without addressing the substance of the request or providing rationale for the denial, as required under the APA. FinCEN's letter response to CAI on July 25, 2024 (about two weeks after HR 9045 was introduced) does not alter this conclusion. The letter did little more than recite the administrative regulations for existing exemptions, including an exemption for certain entities if collecting beneficial ownership information from them "would not serve the public interest" and "would not be highly useful" in furthering the CTA's purpose. Exh. D, July 25, 2024, Letter from FinCEN to CAI. The letter concluded that FinCEN was "considering [CAI's] request to exempt a class of HOA entities," but that they should comply with the CTA reporting requirements in the meantime. The letter made no mention of the FAQs whatsoever. Accordingly, Plaintiffs are likely to prevail on their claim that the FAQs violate the APA and should be set aside.

> 2. **Even if the FAQs are valid, FinCEN's *de facto* denial of Plaintiffs' request for an exemption from the CTA's reporting requirements was arbitrary and capricious.**

Under section 706 of the APA, a reviewing court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency rule is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider [or] entirely failed to consider an important aspect of the problem." *Fox v. Clinton*, 684 F.3d 67, 74 (D.C. Cir. 2012), quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While arbitrary and capricious review is deferential, no deference is owed to an agency action "where [its] explanation for its action lacks any coherence." *Id*. Courts do not "simply accept whatever conclusion an agency proffers merely because the conclusion reflects the agency's judgment." *Id*. Here, even if the FAQs were validly

issued, FinCEN's *de facto* denial of Plaintiffs' request for an exemption under the CTA was arbitrary and capricious.

As explained above, the FAQs are final agency actions subject to judicial review under the APA. *See Texas Children's Hosp.*, 315 F.Supp.3d at 339. Under the APA, any action taken by the agency must be the product of reasoned decision-making. *Farrell v. Blinken*, 4 F.4th 124, 137 (D.C. Cir. 2021). The process by which the agency reaches its result must be "logical and rational." *Id.* The basis for the agency's action must be set forth "with such clarity as to be understandable." Courts should not be "compelled to guess at the theory underlying the agency's action," nor may they "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*

In its request for exemption, CAI outlined several reasons for FinCEN to consider when evaluating its request. First, it noted that Community Associations are overwhelmingly organized as nonprofit entities, although they generally are not tax-exempt under section 501(c) of the Internal Revenue Code. Exh. B. But, it explained, Community Associations are nevertheless entitled to an exemption because they are tax-exempt entities under section 528 of the Code and file Form 1120-H, which is specific to "homeowners associations" as defined by the statute. 26 U.S.C. § 528. The letter also explained the very limited mechanisms by which Community Associations collect and expend assessments, making them particularly ill-suited for financial crimes terrorist activities or money laundering. Indeed, it cited a report from the Department of Treasury in which it recognized that an organization with a limited source of funds and constrained ability to use them is unlikely to engage in money laundering or terrorism funding.[9] CAI also explained the administrative burden and detrimental impact these regulations would have on Community Associations' volunteerism. Exh. B.

---

[9] Department of the Treasury, "Anti-Money Laundering and Countering the Financing of Terrorism (AML/CFT) Programs; Effectiveness," available at https://home.treasury.gov/system/files/126/20180511_SAR_AboutUs.pdf.

FinCEN was required to consider all of the above when evaluating CAI's request. Yet rather than meaningfully respond, FinCEN issued FAQs that added more confusion about Community Associations' compliance obligations under the CTA. FinCEN did not provide any rationale for its *de facto* decision to deny CAI's exemption request, nor to Community Associations could there be any justification for that decision. First, section 528 of the Tax Code, under which the vast majority of Community Associations file, specifically states that organizations filing under that section "shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. § 528(a).

Additionally, as Treasury, FinCEN, and other agencies have recognized, NPOs abide by rules of self-governance, transparency, and external accountability that make them ill-suited to money laundering and terrorist financing. (AML/CFT Task Force Report, p. 23-25). The same principles apply to Community Associations, which regularly disclose their finances to other homeowners, prospective purchasers, and lenders. Exh. A-6, ¶¶ 25-27. FinCEN also failed to consider the significant burden these new regulations will have on homeowners associations when there is virtually no benefit to collecting this information, as it is required to do. Where a court "cannot discern precisely what the Board's decisional standard [is]," its "amorphous rule is, by definition, arbitrary and capricious" and must be set aside. *Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 314 (D.C. Cir. 2014). Because FinCEN did not address any of the arguments raised in CAI's exemption request and provided no rationale for denying it, Plaintiffs are likely to prevail on their claim that FinCEN's denial of CAI's exemption request was arbitrary and capricious.

**C.    The CTA is an unconstitutional invasion of privacy and an unreasonable search in violation of the Fourth Amendment.**

Plaintiffs are also likely to establish that the CTA is an unconstitutional invasion of privacy and an unreasonable search and seizure in violation of the Fourth Amendment. The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV. This protection "is not confined literally to searches and seizures as such but extends as well to the orderly taking under compulsion of process," including disclosures compelled by statute or regulation. *United States v. Morton Salt Co.*, 338 U.S. 632, 651-52 (1950). "When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause."  *Carpenter v. United States*, 585 U.S. 296, 304 (2018).

The CTA is an unconstitutional invasion of privacy and an unreasonable search and seizure because it requires a reporting company to disclose the personal information of its beneficial owners and applicants, such as legal names, birthdates, current addresses, and copies of those individuals' photo identification, to FinCEN to be used for law enforcement purposes without any individualized suspicion of wrongdoing. *See* 31 U.S.C. §§ 5336(b)(1)-(2). The CTA's disclosure requirements will apply to approximately 32.6 million "reporting companies" in 2024 and an estimated 5 million additional companies each year thereafter. *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59549. This data collection will build a financial-intelligence database easily accessible to federal and foreign law enforcement and security agencies—all without any suspicion of wrongdoing. *See id.* at § 5336(c)(5).

27

When analyzing whether other technological advancements violate the Fourth Amendment, the Court's analysis has been "informed by historical understandings of what was deemed an unreasonable search and seizure when the Fourth Amendment was adopted." *Carpenter*, 585 U.S. at 305 (internal quotation marks and citation omitted). These include understandings that the Fourth Amendment was intended to secure "'the privacies of life' against 'arbitrary power,'" *Boyd v. United States*, 116 U.S. 616, 630 (1886), and that "a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter*, 585 U.S. at 305 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). Applying these foundational understandings here, the CTA authorizes unlawful searches and seizures with respect to both reporting companies and individuals.

### 1. The CTA violates the Fourth Amendment rights of Community Associations and their Board members.

The CTA authorizes the government to intrude upon reporting companies' reasonable expectations of privacy by compelling them to provide non-public information about their operations. Commercial entities have Fourth Amendment rights. *See v. City of Seattle*, 387 U.S. 541, 543 (1967). That includes the right to be free from compelled disclosure of their business records to law enforcement officials. *See id.* at 544. The Supreme Court's decision in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), is instructive. In that case, the Court examined a Los Angeles city ordinance that required hotels to collect and make available to police officers on demand a "guest's name and address" and other sensitive information. *See id.* at 412. If guests did not have a previous reservation, the hotel also had to collect and provide on demand information from a photographic identification document. *See id.* at 413. Failure to comply with the ordinance was a misdemeanor. *See id.*

The Supreme Court held that the Los Angeles ordinance violated the Fourth Amendment. Observing that "modern hotel registries contain sensitive information, such as driver's licenses and credit card numbers," it instructed that "searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are per se unreasonable ... subject to only a few specifically established and well-delineated exceptions." *Id.* at 419, 426 (citations omitted). The Court found that the ordinance constituted an "administrative search" not in aid of ongoing criminal investigations but geared towards "ensur[ing] compliance with the recordkeeping requirement, which in turn deters criminals from operating on the hotels' premises." *Id.* at 420. While the law was not directed at criminal activity itself, it was unconstitutional because "absent consent, exigent circumstances, or the like," the subject of even an administrative search "must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.*

The Supreme Court affirmed the Ninth Circuit decision, which rejected the government's assertion that no "search" had even occurred. *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013) (*en banc*). As the *en banc* panel explained, the hotel's records were protected by the Fourth Amendment because business records are non-public "papers" protected by the plain text of the Fourth Amendment. *Id.* at 1062. Because law enforcement could only obtain those records by forcing hotels to produce them, that demonstrated the hotels had a reasonable expectation of privacy in those records. That is, "if the records were publicly accessible, the police of course would not need to rely on [the ordinance] to gain access to them." *Id.*

Similarly here, the CTA compels entities to disclose the name, birthdate, driver's license or passport information, and photo identification of any individual who exercises "substantial control" over the identity, despite the fact that none of those individuals has a true ownership

interest in the Community Association, as with a traditional corporate entity. While the composition of an Association's Board may or may not be public information, Board members' personal identifying information, including copies of their government-issued photo identification, is not.

Board members have a reasonable expectation of privacy in protecting their personal identifying information from disclosure, particularly to the federal government for law enforcement purposes. *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citing *Katz v. U.S.*, 389 U.S. 347, 351 (1967)). That information is not required to be disclosed to form an entity, nor does it need to be reported to any regulatory agency, much less to a law enforcement agency. That is precisely why the CTA must compel disclosure of this information from the entities themselves: it is not publicly available anywhere else. The fact that this compelled information can be used for law enforcement purposes is antithetical to the Fourth Amendment.

Every state requires Community Associations to disclose necessary information to necessary stakeholders as a matter of transparency and accountability. Exh. D. Community Associations also largely disclose financial information to potential buyers and their lenders, whether as a matter of state law or industry standard. Exh. A-6, ¶¶ 25-27. Many Community Associations also have annual audits or inspections performed by independent auditors. *Id.* But no state laws have ever required disclosure of the kind of highly sensitive information required by the CTA, to the government or to anyone else, least of all to law enforcement agencies.

### 2. No Fourth Amendment exceptions apply to the CTA.

Warrantless searches are unreasonable unless they fall within an exception that the Supreme Court has recognized, but no such exception applies here. The "special-needs" or administrative search exception is inapplicable. Government agencies may only conduct

warrantless searches when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989). The special needs exception does not apply here because the CTA collects beneficial owner information for general law enforcement and intelligence-gathering purposes. FinCEN's Director admitted that the agency views the CTA as a workaround to the "warrant" requirement, which "wastes" too much time and resources in investigating and prosecuting money laundering, terrorism financing, and other financial crimes. *See* 87 Fed. Reg. at 59504.

Rather, the CTA's warrantless searches for general law enforcement purposes are analogous to the warrantless searches of vehicles without individualized suspicion. The Supreme Court held such searches were not justified by the special-needs exception and declared them unconstitutional in *City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000). As the Court has stated, "where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing ... reasonableness generally requires the obtaining of a judicial warrant." *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 664-65 (1995). Accordingly, Plaintiffs are likely to prevail on their claim that the CTA violates the Fourth Amendment.

**D.    The CTA is unconstitutional because its disclosure requirements chill speech and impair associational rights in violation of the First Amendment.**

Plaintiffs are likely to prevail on their claim that the CTA violates their First Amendment rights of free speech and free association within their communities, particularly as it relates to participating in the political process to improve their communities. *See* U.S. Const. Amend. I. Community Associations perform a vital role in communities by allowing their members to speak with an organized, collective voice to government officials on issues of concern. *Rumsfeld v.*

*Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006). The CTA violates these First Amendment rights.

The First Amendment protects against regulations that compel speech. *Stuart v. Camnitz*, 774 F.3d 238, 245 (4th Cir. 2014). Even when the government seeks to compel disclosure of "factual, noncontroversial information," the mandated disclosure requirements cannot be "unjustified or unduly burdensome." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 776 (2018), citing *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). This standard requires that compelled disclosures "remedy a harm that is potentially real not purely hypothetical and to extend no broader than reasonably necessary." *Becerra*, 585 U.S. at 776. Otherwise, they risk "chilling" protected speech." *See id.*, citing *Zauderer*, 471 U.S. at 651. Importantly, the Government has the burden to prove that the compelled disclosures are neither unjustified nor unduly burdensome. *See Ibanez v. Florida Dept. of Business and Professional Regulation*, 512 U.S. 136, 146 (1994).

The Government cannot meet that burden here. As applied to Community Associations, the CTA is an unjustified and unduly burdensome means of achieving its stated ends of curtailing money laundering, terrorism financing, and financial crimes. *See* 31 U.S.C. § 5336. As a condition of Board service, the CTA compels Board members to disclose personal identifying information to FinCEN that may be used in law enforcement proceedings without any requirement that the government demonstrate a reasonable suspicion that the Association or its Board members have engaged in the type of criminal activity it targets. Failure to comply with the CTA's disclosure requirements subjects Board members and/or the Association itself to draconian civil and criminal penalties. As a result, as Plaintiffs and other Board members surveyed by CTA have stated, they will resign their Board positions rather than making these forced disclosures or facing the severe

penalties involved for refusing to do so, and it will dissuade others from volunteering for Board service as well.

The "dragnet" application of CTA's disclosure requirements to virtually any entity simply by virtue of filing an entity formation document, without qualification, is untethered from the Government's stated purpose of eradicating specific forms of financial crime. The CTA recognizes that there are certain types of entities that pose such a low risk of committing these types of crimes that they are exempt from the CTA due to their transparency and accountability practices, including section 501(c) nonprofit organizations. 31 U.S.C. § 5336(a)(11)(B); 26 U.S.C. § 501(c). Community Associations observe the same rigorous transparency practices and also pose a low risk of financial crimes, and yet they cannot escape the CTA's requirements because they obtain their tax-exempt status under a different section of the Internal Revenue Code—even though they "shall be considered" tax-exempt entities "for the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. § 528(a).

The Government cannot demonstrate that the CTA's invasive disclosure requirements are not unjustified nor unduly burdensome because less burdensome alternatives are available to accomplish the Government's stated goals. Collecting personal information about a select group of homeowners—specifically volunteers merely serving their communities—does not serve the CTA's stated aims, especially given that Community Associations have a low risk profile for engaging in illicit financial transactions. Thus, Plaintiffs are likely to prevail in demonstrating that the CTA's disclosure requirements are unjustified and unduly burdensome.

The CTA also chills Plaintiffs' First Amendment rights of association and collective communication. The First Amendment protects individuals' rights to privately associate with one another, free from government intrusion. *See NAACP v. Alabama*, 357 U.S. 449, 460 (1958). "The

right to speak is often exercised most effectively by combining one's voice with the voices of others." *Rumsfeld v. FAIR*, 547 U.S. 47, 68 (2006). "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). To protect this right, the Supreme Court has "held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity." *Rumsfeld*, 547 U.S. at 69 (collecting cases). These laws "ma[k]e group membership less attractive" and violate the First Amendment by "affecting the group's ability to express its message." *Id.* "When it comes to 'a person's beliefs and associations,' '[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution.'" *Bonta*, 594 U.S. at 610 (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6, 91 (1971) (plurality opinion)).

In *Bonta*, the Supreme Court clarified that the "exacting scrutiny" standard applies to compelled disclosures of group affiliations. 594 U.S. at 607. In that case, the Court invalidated the California Attorney General's policy of requiring nonprofits to disclose a list of major donors as a condition of registering with the State. *Id.* at 616. The Court concluded that the disclosure requirement was unconstitutional as applied to the petitioner and on its face because "a substantial number of its applications [we]re unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615 (citing *United States v. Stevens*, 559 U.S. 460, 473 (2010)). Under exacting scrutiny, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 596 (citing *Doe v. Reed*, 561 U.S. 186, 196 (2010)). "To withstand this scrutiny, the strength of the governmental interest must reflect the

seriousness of the actual burden on First Amendment rights." *Doe*, 561 U.S. at 196. "Where exacting scrutiny applies, the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end." *Bonta*, 594 U.S. at 609-10.

The CTA's disclosure requirements do not satisfy exacting scrutiny because, as to Community Associations, there is a not a substantial relation between the requirements and the CTA's stated purpose in curtailing financial crimes. The CTA's disclosure requirements are likewise overbroad and unduly burdensome because Community Associations and their Board members are left with two troubling options: (i) continue as a volunteer Board member, acquiesce to CTA's requirement to provide personal information and identification documents to the government, and assume the risk of government prosecution and penalties for non-compliance; or (ii) resign from the Board along with most others, which leave Community Associations with no one to provide necessary services or communicate in a collective way with government officials. Under the first scenario, the government is unconstitutionally compelling speech; under the second, the government is unconstitutionally chilling speech. Neither can be reconciled with the First Amendment, and Plaintiffs are likely to prevail on their claim that the CTA, on its face and as applied to them, violates the First Amendment.

## E.   Because the CTA was already found unconstitutional in *NSBU v. Yellen*, Plaintiffs are likely to succeed on the merits on the same grounds.

On March 1, 2024, the CTA was declared unconstitutional in *NSBU v. Yellen*, on the ground that it exceeded Congress' authority under the Commerce Clause, Foreign Affairs and National Security Powers, and the Taxing Power & Necessary and Proper Clause. 2024 WL 899372, *7-21 (No. 22-cv-01448, N.D. Ala.). Plaintiffs are likely to succeed on these grounds as well.

1.      **Congress lacks constitutional authority to enact the CTA under the Commerce Clause.**

Under the Constitution, Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I § 8, cl. 3. Congress has the power to regulate "(1) the channels of interstate and foreign commerce; (2) the instrumentalities of, and things and persons in, interstate and foreign commerce; and (3) activities that have a substantial effect on interstate commerce." *United States v. Morrison*, 529 U.S. 598, 608-09 (2000).

While Congress's authority to regulate under the Commerce Clause is broad, it is not without limit. *United States v. Lopez*, 514 U.S. 549, 553 (1995). The CTA does not regulate the channels of interstate and foreign commerce or activities that substantially affect interstate commerce. Instead, the CTA seeks to regulate corporate entity formation, performed under state law and is an entirely ministerial act. Additionally, the CTA seeks to regulate state-formed entities, like Community Associations, from the moment of inception, regardless of whether the entity has engaged, or is likely to engage, in interstate commerce. The CTA also does not contain an express "jurisdictional hook" element that limits its reach to a "discrete set of activities" that have "an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562. This violates the principles of federalism and retained state powers. As such, the CTA falls outside the scope of Congress' Commerce Clause powers and unconstitutionally usurps the states' power to manage intrastate entity formation and commerce.

a.      **The CTA does not regulate the channels of interstate and foreign commerce.**

The CTA seeks to regulate entities upon their formation and not based on any commercial activity. Thus, the CTA does not regulate either the "channels" or the "instrumentalities" of interstate commerce. *See* 31 U.S.C. § 5336. The "channels" of interstate commerce are "the interstate transportation routes through which persons and goods move." *Morrison*, 529 U.S. at

36

613 n. 5. The "instrumentalities" of interstate commerce are "the people and things themselves moving in commerce, including automobiles, airplanes, boats, and shipments of goods," along with "pagers, telephones, and mobile phones." *United States v. Ballinger*, 395 F.3d 1218, 1226 (11th Cir. 2005) (citations omitted). Because the CTA, on its face, does not regulate the channels and instrumentalities of commerce, or any commercial activity it cannot be justified as a valid regulation of those channels and instrumentalities pursuant to Congress' powers under the Commerce Clause.

Here, the CTA seeks to regulate entities merely upon their formation and not based upon any commercial activity. Community Associations are created wholly through intrastate action, entity formation is in accord with the laws of the states in which they are located. <u>Exh. A-6</u>, ¶ 24. The creation, organization and management of condominiums in the United States and its territories is in each case governed by a statute. <u>Exh. A-6</u>, ¶ 8. As such, state entity formation is not a commercial activity. *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 91 (1987).

The CTA likewise contains no language that would permit Congress to regulate state-entity formation pursuant to its power to regulate the "channels and instrumentalities" of interstate commerce. Instead, the CTA imposes obligations on Community Associations by the mere act of entity formation, without any commercial activity by them, and without any interstate commercial activity by them. This exceeds Congress's Commerce Clause power.

> **b.    The CTA does not regulate activities that have a "substantial effect" on interstate and foreign commerce.**

The CTA also does not fall within Congress' power to regulate activities that have a "substantial effect" on interstate and foreign commerce. Under the "substantial effects" doctrine, Congress has the "power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on intrastate commerce." *See Gonzales v. Raich*, 545 U.S.

1, 17 (2005); *see also Wickard v. Filburn*, 317 U.S. 11, 128-129 (1942). Importantly, the intrastate activity sought to be regulated by Congress still must have a "commercial character" or be "economic in nature" and "exert a substantial economic effect on interstate commerce." *Morrison*, 529 U.S. at 611-13; *see also Lopez*, 514 U.S. at 559; *Wickard*, 317 U.S. at 125. This power also has its limits, and it "may not be extended so far as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectively obliterate the distinction between what is national and what is local[.]" *Lopez*, 514 U.S. at 556-57.

 *United States v. Lopez* is instructive. In *Lopez*, the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), made it a federal crime "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." *Lopez*, 514 at 551. Respondent challenged his conviction based on the claim that § 922(q) exceeded Congress' Commerce Clause power. *Id.* at 552. The Government argued that § 922(q) was a valid exercise of its Commerce Clause power because firearm possession in a local school zone substantially affected interstate commerce. *Id.* at 563. In support of its argument, the Government posited that gun possession in school zones would result in more violent crime, which would increase insurance costs, reduce travel to dangerous neighborhoods, and threaten the learning environment. *Id.* at 564. However, the Court held that § 922(q) exceeded Congress's authority under the Commerce Clause, explaining that "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567. The Court added that § 922(q) had no "express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* at 562. Under

38

the theories posited by the Government, there would be no limit on Congress's authority to regulate areas where states historically have been sovereign. *Id.* at 564.

Here, the creation and operation of Community Associations are wholly intrastate functions performed entirely under state law. Community Associations exist primarily for the purpose of ensuring that the common areas of the property are maintained. Exh. A-1, ¶ 7; Exh. A-2, ¶ 6; Exh. A-3, ¶ 3; Exh. A-4, ¶¶ 4,6; Exh. A-5, ¶ 6; Exh. A-6, ¶ 8. Like in *Lopez*, there are no commercial or economic activities by Community Associations that substantially effect interstate commerce. Likewise, there is no threat that formation of Community Associations under state law, even if repeated, would have a substantial effect on interstate commerce. The mere formation of a Community Association, which the CTA seeks to regulate, is a ministerial and non-economic act that has no substantial economic effect on interstate commerce.

The CTA is also not a valid exercise of Congress's Commerce Clause power because, as in *Lopez*, it has no express jurisdictional element that shows the "requisite nexus with interstate commerce." *Lopez*, 514 U.S. at 562 (citing *United States v. Bass*, 404 U.S. 336, 357 (1995)). Here, the CTA applies to entities that are "created by the filing of a document with a secretary of state[.]" 31 U.S.C. § 5336(a)(11). Again, there is no requirement that any such entities even engage in commercial activity before the CTA applies. As such, the CTA lacks any "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce," thus limiting "its reach to a discrete set of [activities] that additionally have an explicit connection with or effect on interstate commerce. *Lopez*, 514 U.S. at 561-62.

### 2. The CTA was not passed pursuant to Congress's Taxing Power and the Necessary and Proper Clause.

The CTA is also not a constitutional exercise of Congress's Taxing Power pursuant to the Necessary and Proper Clause. Under U.S. Const. Art. I, § 8, cl. 1; Amend. XVI, Congress has the

power to "lay and collect taxes." Under the Necessary and Proper Clause, Congress is authorized to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." Art. I, § 8, cl. 18. While the Necessary and Proper Clause "gives Congress authority to legislate on that vast mass of incidental powers which must be involved in the constitution, it does not license the exercise of any great substantive and independent powers beyond those specifically enumerated." *Nat'l Federation of Independent Business (NFIB) v. Sebelius*, 567 U.S. 519, 559 (2012) (citations omitted). Congress's "exercises of authority" under the Necessary and Proper Clause must be "derivative of, and in service to, a granted power." *Id.* at 521 (citing *United States v. Comstock*, 560 U.S. 126, 130 (1949)). Any laws that compromise "essential attributes of state sovereignty" will be struck down as unconstitutional. *Id.* at 559-60.

Here, Congress can find no authority pursuant to its Taxing Power and the Necessary and Proper Clause to justify the CTA. First, the CTA imposes civil penalties, which are not a tax. *See NSBU v. Yellen*, 5:22-cv-1448-LCB (N.D. Ala. 2024); 2024 WL 899372; *NFIB*, 567 U.S. at 564. The CTA also includes a "'scienter requirement'" which is "typical of punitive statutes, not taxes." *Id.* Second, the CTA has nothing whatsoever to do with collecting federal income taxes; it exists solely to collect personal identifying information from individuals that will be used to investigate and prosecute financial crimes.

### 3.   The CTA was not passed pursuant to Congress's Foreign Affairs Powers and the Necessary and Proper Clause.

Nor could the CTA be deemed a proper exercise of Congress's Foreign Affairs Power. Under Congress's Foreign Affairs Power, U.S. Const. Art. 1, § 8 & Art. II, § 2, "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). However, this power, "like every other governmental power, must be

exercised in subordination to the applicable provisions of the Constitution." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

The CTA was enacted to collect beneficial ownership information because Congress determined that it was "needed to ... protect vital United States national security interests; better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards." Beneficial Ownership Information Reporting Requirements, 87 F.R. 594498-01, 59582.

Despite the CTA's stated purpose of national security, it is beyond Congress's Foreign Affairs Power because it seeks to regulate the purely intrastate, local activity of entity formation. Congress cannot establish that there is a rational relationship between the CTA's stated purpose of protecting national security interests and its requirements imposed on State entities that voluntarily incorporate under State law. "Congress is bound by the Constitution's enumerated powers limitation here, because incorporation is an internal affair. It is blackletter law that '[c]orporations are creatures of state law." *Cort v. Ash*, 422 U.S. 66, 84 (1975); *see also Bond v. United States*, 572 U.S. 844 (2014). To stretch Congress's Foreign Affairs Powers to the purely intrastate activity of entity formation would be a substantial overreach into the province of the states, which is beyond what is necessary and proper to accomplish the CTA's stated goals.

Furthermore, because powers not specifically granted to the federal government are reserved to the states, the CTA also violates the Ninth and Tenth Amendments of the Constitution. Community Associations are created and governed strictly by state law. They engage in wholly intrastate, non-commercial activity. Because the federal government seeks to regulate the

formation of Community Associations under state law, the CTA is an unconstitutional usurpation of the states' powers as to them, and Plaintiffs are likely to prevail on their claim that the CTA is unconstitutional, on its face and as applied, because it exceeds the scope of Congress' enumerated powers .

## II.   Plaintiffs will be Irreparably Harmed Absent Injunctive Relief.

Preliminary injunctive relief is critical to prevent irreparable harm to Plaintiffs. The CTA is set to take effect on December 31, 2024. As demonstrated above, the statute is an unnecessary and unconstitutional intrusion on Community Associations' and Board members' First Amendment freedom to associate and free speech rights and Fourth Amendment rights against unreasonable search and seizure. There is virtually no likelihood that the personal identifying information of volunteer Board members whose primary function is to maintain the common areas of the property will produce information "highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism," or other financial crimes. See 31 U.S.C. § 5336(a)(11)(B)(xxiv). Where, as here, Plaintiffs have succeeded in establishing that their constitutional rights are being threatened or violated, a finding of irreparable harm is required. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Additionally, without immediate relief on their claims, Community Associations will see an immediate mass resignation of their volunteer Board members opposed to providing their personal identifying information, including photo identification, to FinCEN—and potentially other foreign and domestic government agencies—for law enforcement purposes. If they remain on the Board, they will subject themselves and the Association to civil and criminal liability for any non-compliance with the BOI reporting requirements. Nor are any other already-reluctant homeowners likely to volunteer for these positions. Given the severe penalties Board members face for running afoul of the CTA—personally or as inflicted on the Association—it simply is not worth the risk

42

these volunteers would absorb. Without the requisite number of Board members, Community Associations will cease to operate as required by state law, which may force them into receivership at great disruption and cost to these nonprofit organizations for no discernible benefit to the CTA's objectives. Exh. A-1, ¶ 24; Exh. A-2, ¶ 22; Exh. A-3, ¶ 16; Exh. A-4, ¶ 16; Exh. A-5, ¶ 20; Exh. A-6, ¶ 38. This irreparable harm is neither speculative nor remote, but is actual and imminent. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).

Congress has long recognized the significant deterrent effect personal liability has on volunteerism. Nearly thirty years ago, Congress enacted the Volunteer Protection Act to protect against "liability abuses related to volunteers serving nonprofit organizations." 42 U.S.C. § 14501(b). It acknowledged volunteers' "legitimate fears… about frivolous, arbitrary, or capricious lawsuits" and noted that the "willingness of volunteers to offer their services is deterred" by potential liability actions against them. *Id*. § 14501(a)(7)(A), (a)(1). To avoid that risk, volunteers simply withdraw from service or avoid service altogether, thereby diminishing nonprofit groups' valuable impact on their communities because it increases operating costs to hire people to perform the organizations' functions, increases litigation costs, and increases insurance costs. *Id*. § 14501(a)(2), (3), (6).

As noted in Plaintiffs' declarations and in response to CAI's member survey, this very real risk exists today. Volunteer Board members not only risk incurring personal or associational liability for legitimate or inadvertent noncompliance with the CTA's reporting requirements. Exh, A-6, ¶ 36. They also risk having their personal identifying information and photo identification included in FinCEN's database and used for any law-enforcement purpose, by the federal government and other foreign and domestic governments, without fundamental constitutional protections in place to justify the governments' collection of that information or monitor its use.

Exh. A-6, ¶ 35. And as their declarations and other CAI members' survey responses make clear, these risks far outweigh the noblest desire to volunteer in service to their communities. Exh. A-6, ¶ 38. Because the resulting resignations will prevent Community Associations from operating as state laws require, the harm is irreparable, concrete, and highly likely to occur. *See Air Vac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (holding that where a state law would effectively cause a company to shut down, the company demonstrated irreparable harm and was entitled to injunction preventing enforcement of the law).

## III. The Balance of Hardships Weighs in Plaintiffs' Favor, and Granting an Injunction Serves the Public Interest.

The third and fourth prongs for issuing a preliminary injunction—the balance of harms and whether the requested injunction is in the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both factors favor Plaintiffs and issuance of the injunction requested by Plaintiffs.

CAI has more than 47,000 members, which include homeowners, board members, association managers, community management firms, and other professionals who provide services to Community Associations. Exh. A-6, ¶ 7. CAI serves more than 75.5 million homeowners who live in more than 365,000 community associations in the United States. Exh. A-6, ¶ 5. These residents constitute roughly 30% of the population of the United States.

Those who participate in Community Associations include an elected Board of volunteer homeowners, as well as other fellow homeowners. Because the CTA is unconstitutional and would effectively cause Community Association operations to cease operating in violation of state law, the balance of equities leans heavily in Plaintiffs' favor. *Air Vac EMS*, 37 F.4th at 103; *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("In contrast, a stay will do OSHA no harm whatsoever. Any interest OSHA may claim in enforcing an unlawful (and likely

unconstitutional) [regulation] is illegitimate"). At the same time, the final prong of the preliminary injunction analysis is met because the public interest is clearly "served by maintaining our constitutional structure." *BST Holdings*, 17 F.4th at 618.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction and declare that they and Community Associations are exempt from complying with the CTA and/or enjoin enforcement of the CTA as to them on the ground that it is unconstitutional as applied to them.

Dated: September 10, 2024

/s/ Brendan Bunn
Brendan Bunn, No. 38461
Chadwick, Washington, Moriarty,
Elmore & Bunn, P.C.
3201 Jermantown Road, Suite 600
Fairfax, VA 22030
Tel: 703-352-1900
Fax: 703-352-5293
bpbunn@chadwickwashington.com

*Attorneys for Canterbury*
*Crossing Condominium Trust,*
*Townhouse Green Cooperative Inc.,*
*Terraces on Memorial Homeowners*
*Association, Farrcroft Homeowners*
*Association, Regency at Ashburn Greenbrier*
*Condominium Association*

Edmund Allcock (*Pro Hac Vice* forthcoming)
Allcock Marcus
10 Forbes Road, Suite 400W
Braintree, MA 02184
Tel: 781-884-1660
ed@amcondolaw.com

*Attorneys for Canterbury Crossing*
*Condominium Trust*

Respectfully submitted,

/s/ Damon W.D. Wright
Damon W.D. Wright, No. 40319
Clair E. Wischusen, No. 99174
Stephanie Bortnick, No. 87216
Gordon Rees Scully Mansukhani LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Tel: 202-399-1009
Fax: 202-800-2999
dwright@grsm.com
cwischusen@grsm.com
sbortnick@grsm.com

Gretchen Harris Sperry (*Pro Hac Vice*
forthcoming)
Mary J. Goers (*Pro Hac Vic*
forthcoming)
Gordon Rees Scully Mansukhani LLP
One North Wacker, Suite 1600
Chicago, IL 60606
Tel: 312-565-1400
Fax: 312-565-6511
gsperry@grsm.com
mgoers@grsm.com

*Attorneys for Community Associations*
*Institute*