# GROUP EXHIBIT A

**Index – Group Exhibit A**

| Exhibit Number | Exhibit Title |
|---|---|
| Exhibit A-1 | Declaration of Senya Ehrstein |
| Exhibit A-2 | Declaration of Nancy Wiegand |
| Exhibit A-3 | Declaration of Nick Kornuta |
| Exhibit A-4 | Declaration of Cheri Heaton |
| Exhibit A-5 | Declaration of Kathi Robinson |
| Exhibit A-6 | Declaration of Thomas M. Skiba |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| COMMUNITY ASSOCIATIONS INSTITUTE,  ) | |
| ) | |
| Plaintiffs,  ) | |
| ) | |
| v.  ) | Case No. _____ |
| ) | |
| JANET YELLEN, in her official capacity as the  ) | |
| Secretary of the United States Department of the  ) | |
| Treasury, UNITED STATES DEPARTMENT OF  ) | |
| THE TREASURY, and ANDREA GACKI, in her  ) | |
| official capacity as Director of the Financial Crimes  ) | |
| Enforcement Network,  ) | |
| ) | |
| Defendants.  ) | |

## **AFFIDAVIT OF SENYA EHRSTEIN**

Now Comes the Affiant, Senya Ehrstein and deposes on oath and states the following:

1. My name is Senya Ehrstein, I own a condominium unit within the Canterbury Crossing Condominium in Holbrook, Massachusetts, which is where I currently reside.

2. I am over eighteen (18) years old, and I am competent to attest to the facts set forth herein.

3. For the last twenty-eight ("28") years, I have served as Trustee on the Board of Trustees for the Canterbury Crossing Condominium Trust ("Condominium Trust"), which is the organization of unit owners for the Canterbury Crossing Condominium, which is a is a sixty-six (66) unit residential condominium located at 610 S Franklin St., Holbrook, MA. I am currently the Chairperson/President of the Board of Trustees.

4. The Canterbury Crossing Condominium was created by the recording of a Master Deed recorded with the Registered Land Division of the Norfolk County Land Court on November 25, 1986 as document number 138687 and certificate number 7337, pursuant to and in accordance with Massachusetts General Laws, Chapter 183A § 1, et seq.

5. The Declaration of Trust for the Canterbury Crossing Condominium was registered sequentially after the filing of the Master Deed, also on November 25, 1986.

Exhibit A-1

Docusign Envelope ID: 49C61D0B-08C4-4424-A624-D329C5B4EA28

6. Together the Master Deed and Declaration of Trust contain various restrictions, rules and by-laws for the operation of the Condominium.

7. The Condominium Trust is responsible for the maintenance, repair and replacement of the common area of the Condominium, as well as enforcement of the restrictions and rules and regulations of the Condominium. The Condominium Trust also responds to various complaints and concerns lodged by unit owners, on a variety of possible issues. Unit Owners of the Condominium pay monthly assessments based on an annual budget adopted by the Condominium Trust.

8. The Condominium Trust establishes a budget every year for the operation of the Condominium, which includes among other things, the estimated cost for the maintenance and repair of the Condominium areas, insurance for the property and its operation, as well as reserves for future capital replacement projects, professional fees, etc.

9. Once the budget is established, the unit owners are assessed their proportionate share of common expenses, which are paid monthly.  Once received, the Condominium Trust pays vendors and allocates reserves for future capital improvements.

10. The purpose of the Condominium Budgeting process is to ensure the effective maintenance of common areas of the Condominium and to reserve funds for future capital replacements.  The Condominium Trust is a not-for-profit entity that owns no real property. The common areas of the property are owned by the unit owners as tenants in common.  The Condominium Trust's primary function and reason for its existence is to maintain, repair and replace the common elements of the condominium, as required by Massachusetts General Laws c. 183A § 10(b)(4).

11. In addition to the concerns internal to our community, the Condominium Trust also from time to has communications and dealings the Town of Holbrook and the Commonwealth of Massachusetts on matters that touch and concern the Condominium, such as zoning and public health and/or safety matters.

12. The Condominium Trust files its federal tax return under the "homeowners association" designation under Section 528 of the Internal Revenue Code

13. The Condominium Trust is operated by and through its Board of Trustees, which currently consists of myself and four (4) other unit owners.

14. The Board of Trustees for the Canterbury Crossing Condominium Trust are elected by our fellow unit owners to serve a three (3) year term, which terms are staggered to ensure continuity of Board representation.  Elections are conducted during the Condominium's annual meeting.

Exhibit A-1

15. The position of Trustee is volunteer in nature (unit owners volunteer to nominate themselves to be elected by their fellow unit owners) and is uncompensated.

16. Unit owners at the Condominium have the legal right to attend all open Board meetings. Many owners do attend to observe our meetings and also to raise the kinds of concerns about our community noted above, which we address during board meetings or the annual meeting.

17. Turnover of the Board of Trustees occurs at least annually in conjunction with elections and sometimes more frequently, due to death, incapacitation, resignation, or the selling of a unit by a member of the current Board. In such situations, an election is held or an appointment of another unit owner is made to maintain the required number of Trustees pursuant to the Declaration of Trust.

18. Every time there is a change in the constituency of the Board, an appropriate certificate identifying the change (sometimes a certificate of resignation but more frequently a certificate of appointment) is recorded at the Registered Land Division of the Norfolk County Land Court, as required by Massachusetts General Laws, Chapter 183A § 8(i).

19. The Condominium's financial information and statements are available to every unit owner on demand, as well as prospective purchasers, and every lender or first mortgagee on a unit pursuant to Massachusetts General Laws, Chapter 183A § 10(c). Financial records are reviewed annually by a certified public accountant.

20. Given the requirements of the Federal Corporate Transparency Act, I am likely to resign as a volunteer Trustee now that I understand I have to provide private information to the Federal Government, including a copy of my Massachusetts driver's license or passport, both of which contain a photograph of my face.

21. I am particularly concerned that the Federal Corporate Transparency Act permits the Federal Government to share my personal information, including a photograph of my face, with other federal and state agencies as well as foreign governments for law enforcement purposes, in most cases without requiring a showing of reasonable suspicion of criminal activity or judicial oversight.

22. I anticipate that the Corporate Transparency Act's filing requirements will result in resignations by other members of our Board of Trustees for the same reasons and will stifle future volunteerism at the Condominium. . Serving as a volunteer on a Condominium Trust in a 66-unit community is time consuming and can often be a thankless task.  It is an uncompensated position.  Examples of some of the issues that the Condominium Trust deals with on a day to day basis include but are not limited to:

    a.   Complaints about owners or their tenants smoking in the common areas;

    b.   Complaints about certain owners being too noisy or a nuisance;

    c.   Unit owners causing damage to other owner's units or the common areas, often times through their toilets;

    d.   Complaints by owners alleging discriminatory treatment;

    e.   Complaints by owners relative to pets or service or emotional support animals;

    f.   Requests by owners for reasonable accommodations due to disability;

    g.   Claims by owners relative to harassment by other owners;

    h.   Processing of insurance claims;

    i.   Issues with vendors; and

    j.   Complaints relative to building or grounds maintenance;

23. Requiring condominium board members to file their private personal information with the Federal Government will discourage rather than encourage participation in our community.

24. Without a functioning Board of Trustees, it is my understanding the Condominium Trust will go into receivership. In my view, this will create instability and inconsistency in the operation of the Board and will impact our Unit Owners.

25. Also, the Corporate Transparency Act's requirement that the Condominium Trust report ongoing changes in the composition of our Board is burdensome and will surely be costly for the Condominium Trust and the Condominium Unit Owners. By way of example only, we do not keep track or record of when fellow board members renew their Massachusetts driver's license, which is a trigger under the Federal Corporate Transparency Act for an amendment to a Trustee's filing an updated beneficial owner report. Under the Act, we will now be required to keep track of when a Trustee's driver's license is set to expire, to ensure that they make their filing, so the rest of us and the organization do not get penalized, fined or imprisoned.

26. It is already difficult for us to recruit volunteers from the Condominium to serve on our Board. The Condominium Trustees have concerns about the significant civil and criminal penalties that could be imposed upon volunteer Trustees or on the Trust itself for violations of the Corporate Transparency Act, which we understand could be as high as $500 per day or even imprisonment. Penalties and imprisonment by the Federal

Exhibit A-1

Government are far beyond what any of us could have expected as a possibility when volunteering to serve as Condominium Trustees.

27. I am particularly concerned about what could happen if one Trustee deemed to be a "beneficial owner" fails to comply with the Federal Corporate Transparency Act's filing requirements, as it may subject the other Trustees or the Condominium Trust as an entity to penalties, fines or imprisonment.

28. I believe that the reporting requirements of the Corporate Transparency Act will harm the operation of our Condominium Trust in a meaningful way, as it may lead to fewer Trustees than required by our governing documents. The result of this circumstance would result in our Board of Trustees being unable to meet their obligations and responsibilities to maintain the condominium, ultimately leading to a decline in the value of our homes.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS ___ TH DAY OF SEPTEMBER, 2024.

Senya Ehrstein

Exhibit A-1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| _____ )<br>COMMUNITY ASSOCIATIONS )<br>INSTITUTE )<br>          Plaintiff, )<br> )<br>v. )<br> )<br>JANET YELLEN, in her official capacity )<br>as the Secretary of the United States )<br>Department of the Treasury, UNITED )<br>STATES DEPARTMENT OF THE )<br>TREASURY, and ANDREA GACKI in )<br>her official capacity as Director of )<br>Financial Crimes Enforcement Network, )<br>          Defendants. )<br>_____ ) | Case No.: _____ |

## **DECLARATION OF NANCY WIEGAND**

1. My name is Nancy Wiegand, and I reside in Fairfax, Virginia.

2. I am over eighteen (18) years old, and I am competent to attest to the facts set forth herein.

3. Since 2023, I have served on the Board of Directors for the Farrcroft Homeowners Association, Inc. ("Farrcroft") and currently serve as the Association's President.

4. Farrcroft is comprised of just under 300 single family homes in suburban Northern Virginia. Farrcroft was created by its developer in 1998 and is located just adjacent to historic Old Town Fairfax in Virginia.

5. In addition to the nearly 300 homes in Farrcroft, the Association owns a historic residence (the Farr House) which houses the Association's office and is also available to its members for use for meetings and social functions. The Association also owns an outdoor pool and pool house for use by its members and their guests.

6. Farrcroft is a nonstock corporation created by Articles of Incorporation filed by the original developer with the Virginia State Corporation Commission and is also a Property Owners' Association formed pursuant to the Virginia Property Owners' Association Act. The Association owns the common area within the community and is charged with maintaining and administering the grounds and common facilities.

Exhibit A-2

7. The Association files its federal tax return under the "homeowners association" designation under Section 228 of the Internal Revenue Code and is a not-for-profit entity.

8. Farrcroft is comprised of a variety of demographic groups, including primarily upper middle class Virginia citizens, with most of the owners in the community living in their homes. The ownership encompasses a range of young families to those who are retired.

9. The Association Board of Directors ("Board") is the "executive organ" of the Association.  The Board is comprised of volunteer directors who own homes within Farrcroft and serve on the Board to "give back" to their community and ensure that it is properly and efficiently run for the lot owners in the community. While the Association itself is an incorporated entity created by a filing with a state agency, all the homes in Farrcroft are subject to a Declaration of Covenants, Conditions, and Restrictions recorded in the local land records division, with lot owners subject to the Declaration by virtue of owning a lot in the community.

10. The Board is responsible for the administering, maintaining, managing and repairing the common area of the Association, as well as enforcement of the restrictions, rules, and regulations of the community. The Board also responds to the various complaints and concerns lodged by homeowners, ranging from issues with the Farr House and pool to concerns about the state of our landscaping and grounds maintenance. Addressing homeowner concerns and complaints is one of the necessities of doing our jobs as volunteer directors. Owners of lots in Farrcroft pay monthly assessments based on an annual budget adopted by the Board of Directors.

11. The Board is comprised of five lot owners, who are elected to their positions by their fellow homeowners. They serve three-year terms, which are staggered based upon when they were elected. Only lot owners in the community serve on the Board.  In addition, all lot owners in Farrcroft have the legal right to attend the Board meetings, pursuant to Section 55.1-1816 of the Virginia Property Owners' Association Act. To provide a mechanism in which to hear lot owners' concerns or issues, each Board meeting allots time for a residents' forum.

12. In addition to the concerns internal to our community, the Board of Directors also has ongoing communications with officials from our locality, the City of Fairfax, regarding the status and maintenance of our "public access" trails and streams that run through our Common Area, as well as storm water drainage issues affecting our two ponds. These ponds serve as a repository of all collected sediment that drifts downstream from the common waterway

13. Turnover of the Board occurs at least annually in conjunction with an election held at the Association's Annual Meeting. Turnover sometimes occurs more frequently if directors resign their positions, sell their homes or due to other circumstances. Currently, when there is a change in the Board's composition, the Association's management company notes this fact in the Association meeting minutes and records.

Exhibit A-2

14. By state law (Va. Code Section 55.1-1815) of the Property Owners Association Act, all Farrcroft books and records, including financial records, contracts and audits are available to every lot owner who requests to see them if they are in good standing. Virginia law requires that we provide access within five days of the request.

15. As provided for in our Association Bylaws, our financials are audited annually by an independent public accountant. In addition, the volunteer Board of Directors reviews the financials at each monthly meeting of the Board.

16. Per Article IV, Section 4 of our Association Bylaws, no director is permitted to receive compensation for serving on the Board. The positions are purely volunteer.  In addition, Board members serving our community have no different financial stake in Farrcroft than their fellow homeowners. We each own a lot in the community.

17. Given the intrusive requirements of the federal Corporate Transparency Act as applied to Homeowner Associations, I am seriously considering whether to continue to volunteer on my community's Board of Directors. As I understand it, the Act requires that I provide personally identifiable information (PII) to the United States Government, including a copy of my state-issued driver's license, which contains a photograph of my face. Moreover, my PII can be provided upon request to a wide range of other agencies, including foreign governments without my consent.

18. Other Board members have expressed similar concerns about continuing to volunteer on the Board of Directors both because of the requirement of filing of our private information with the Government and the ability for government agencies– even governments of other countries -- to request access to our personal information, as provided by the Act. In my view, this will create instability and inconsistency in the operation of the Board and will impact our homeowners.

19. The filing requirements will likely stifle the number of people in Farrcroft who will voluntarily serve on future Boards. As our positions are purely voluntary, this makes the filing requirements unduly burdensome.

20. It is already difficult for us to recruit volunteers from the community to serve on our Board. As part of our solicitation for volunteers to run for a position on the Board, we will now have to highlight the requirements of the Corporate Transparency Act. This will only make this situation more difficult, with fewer owners willing to serve given the requirement to upload your private data and the broad information sharing of this data. In addition, our Board has substantial concerns about the significant civil and criminal penalties that could be imposed upon Farrcroft's volunteer directors for violations of the Corporate Transparency Act, which we understand could be as high as $500 per day or even imprisonment. Again, this kind of civil/criminal risk is far beyond what any of us could have expected as volunteers in our community association.

Exhibit A-2

21. I believe the reporting requirements of the Corporate Transparency Act will harm the operation of our homeowners' association in a meaningful way, perhaps leading to an unstaffed Board of Directors, which I understand could result in receivership for our Association.

22. Finally, the intended purpose of the Corporate Transparency Act is to combat money laundering, tax fraud and terrorism financing, given the transparency of our financial records, to include the monthly review at our public meetings, and annual auditing, applying the Corporate Transparency Act to a non-profit HOA run by volunteers is clearly overreach and will be harmful to the effective management of our community.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

_____                    _____
Nancy Wiegand, President                              Date
Farrcroft Homeowners Association, Inc.

4

Exhibit A-2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| _____ ) | |
| COMMUNITY ASSOCIATIONS ) | |
| INSTITUTE ) | |
|         Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JANET YELLEN, in her official capacity ) | Case No. |
| as the Secretary of the Unit States ) | |
| Department of the Treasury, UNITED ) | |
| STATES DEPARTMENT OF THE ) | |
| TREASURY, and ANDREA GACKI in ) | |
| her official capacity as Director of ) | |
| Financial Crimes Enforcement Network, ) | |
|         Defendants. ) | |
| _____ ) | |

## <u>DECLARATION OF NICK KORNUTA</u>

1. My name is Nick Kornuta. I reside at 14534 Basalt Ln., Houston, TX 77077 within the Terraces on Memorial Homeowners Association, Inc. I currently serve in the role of President.

2. I am over eighteen (18) years old, and I am competent to attest to the facts set forth herein.

3. I have served on the Board of Directors for the Terraces on Memorial Homeowners Association, Inc. ("HOA" or "Terraces") since the Spring of 2009. The primary role of the Board of Directors (Board) is to enforce the Deed Restrictions to maintain the desirability of the community and to keep property values as high as possible for all our residents. One of our roles is reminding residents of the covenants that they agreed to follow when they purchased their homes. The next priority of the Board is to manage and maintain the assets owned by the HOA, which means that they belong to the entire community – all the owners -- in the aggregate.

4. Our community consists of 273 homes in three sections. This community has an attractive central lake that includes a surrounding path for walking and leisure time outdoors. The community is gated, so we must maintain the gates and roads since these features are not managed by the City of Houston. We have a shared amenity relationship with the neighboring property owner's association whereby we pay them a fee to allow our residents to use their facilities. Those include a tennis court, basketball court, child's playground, and a swimming pool. These amenities further increase the desirability of our community and add to the overall property values in the eyes of future homeowners.

5. Our community association's Board is made up of five members. Three of the seats must be comprised of one resident from each of the three sections with the final two members coming from anywhere in the community (also known as our At-Large representatives). This composition is purposeful so that residents from the various sections can convey their unique concerns and so that fair representation can be achieved. The current Board is composed of three women and two men.

1

Exhibit A-3

6. The volunteer Board members serve two-year terms that are staggered so that an election never results in an entire slate of new individuals, ensuring institutional continuity. Each year at an annual meeting of all members, an election is held where candidates from throughout the community can run for the Board. Neither I nor my fellow volunteer directors receive compensation, as it is expressly prohibited by our governing documents. Furthermore, we are prohibited from providing any services to our HOA for compensation.

7. Terraces on Memorial Homeowners Association's original declaration of covenants, conditions and restricts were initially filed on October 11, 2005, and amended to its final version on November 10, 2005.  The Articles of Incorporation were executed on October 4, 2005.

8. The HOA is incorporated in Texas as a nonprofit corporation and is governed under the Texas Property Owners Association Act which requires the election of a volunteer board, access to the HOA financial statements, budget, and other books and records to all homeowners and prospective buyers. Texas statute mandates disclosure of community governing documents and financial statements, filing of management certificates, and additional member transparency mandates. Terraces records a management certificate with Harris County including the following information according to Section 209.04 of the Texas Property Code which requires the management certificate to contain the following information:
   - The name of the subdivision, and the association.
   - The recording data for the subdivision, along with recording data for the declaration and any amendments to the declaration.
   - The name and mailing address of the association.
   - The name, mailing address, telephone number, and e-mail address of the association's designated representative.
   - The web address of any website on which the HOA's dedicatory instruments are available (in accordance with Section 207.006, Texas Property Code).
   - The amount and description of a fee or fees charged by the association relating to a property transfer in the subdivision; and
   - Other information the association considers appropriate.

9. Terraces is responsible for paying all the community's bills, seeking competitive quotes for goods and services and billing residents for the annual fees that fund the HOA's operations. Our HOA has hired a Management Company to carry out our operations under the guidance of the Board. The Board meets monthly, and all decisions are managed through a majority vote. These meetings are held at regular times and announced in advance, as they are open to the membership. The Management Company helps to create minutes of each meeting and those are published on a website for all residents to access.

10. The HOA has an audit done each year by an independent auditor. At each annual meeting, the summary annual financial statement is shared with all community members. Terraces files an annual tax filing with the Internal Revenue Service using form 1120H tax return form as a "homeowners association" under section 528 of the Internal Revenue Code.

11. As President of the HOA, I serve as a representative and Vice President of the City of Houston's Super Neighborhood #17.   There are 25-28 homeowners associations within the Super Neighborhood. Super neighborhoods were created to encourage residents of neighboring communities to work together to identify, prioritize and address the needs and concerns of the broader community. This creates a manageable framework for community action and allows the city to provide services more efficiently. The Super Neighborhood program was initially launched

Exhibit A-3

under the city's Planning and Development department. The program was codified in the city's Municipal Code under Chapter 33, ARTICLE VIII.

12. In my role as President of the HOA and VP of the Super Neighborhood, I am engaged in civic duty, meeting regularly with the Houston Police Department, City Council, and Housing Authority.  The Super Neighborhood is often the first line of awareness and subsequent communication to city officials on issues like traffic snarls, emergency vehicle throughways, safety related to line painting on streets and roads, tree branch and other debris, etc.  Our work is that of the greater good for the greater community, City of Houston, Harris County, and the State of Texas.

13. The filing requirements and penalties under the Corporate Transparency Act causes several concerns. First, prospective volunteer directors will be dissuaded from serving by the necessity to share personal information with the federal government and possibly other state or foreign government agencies. We all know that even government agencies can be vulnerable to a data breach.  Second, and not a small issue, the penalties for not correctly reporting or managing one's records are very onerous. Daily fines and prison time are not a desirable potential consequence of holding a volunteer position.

14. Given the Corporate Transparency Act's filing requirements and penalties, I no longer wish to volunteer for this position and expect to see resignations of other members of our Board.  As beneficial as volunteering can be, the huge downside risk is palpable and a bit frightening. Even without the Corporate Transparency Act, our HOA has had several periods -- sometimes lasting years -- when we could not seat a full 5-member Board. Volunteers are very hard to find, given how busy people are, and these additional federal reporting requirements could shrink our already tiny pool of potential candidates to 0.

15. If we are actually required to follow this new law, there is also a near 100% likelihood that the Board would have to incur additional expense to hire a third party (either our management company or our attorney or some newly formed special purpose contractor) to manage the validity of every registration as our Board changes over time. And it will certainly change. This will come as an added expense to every homeowner that lives within our HOA.

16. And finally, living in Houston, which lacks true zoning laws, HOAs are the only form of community governance that allows for orderly communities and tidy neighborhoods, particularly gated communities, that do not get regular city services and code enforcement efforts. These new federal requirements will be one more barrier to ensuring that our neighborhoods remain attractive and well managed.


I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

_____                              _____

Nick Kornuta, President
Terraces on Memorial Homeowners Association, Inc.        Date

Exhibit A-3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| _____ ) | |
| COMMUNITY ASSOCIATIONS ) | |
| INSTITUTE ) | |
|         Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JANET YELLEN, in her official capacity ) | Case No. |
| as the Secretary of the Unit States ) | |
| Department of the Treasury, UNITED ) | |
| STATES DEPARTMENT OF THE ) | |
| TREASURY, and ANDREA GACKI in ) | |
| her official capacity as Director of ) | |
| Financial Crimes Enforcement Network, ) | |
|         Defendants. ) | |
| _____ ) | |

## DECLARATION OF CHERI HEATON,
## BOARD PRESIDENT, TOWNHOUSE GREEN COOPERATIVE

1. My name is Cheri Heaton, and I reside in Clinton Township, Michigan

2. I am over eighteen (18) years old, and I am competent to attest to and confirm the facts set forth herein.

3. Since 2015, I have served as vice president, secretary, and now President of the Townhouse Green Cooperative ("the Cooperative").

4. Townhouse Green Cooperative was established in 1968 as a housing cooperative, located in Clinton Township, Michigan. There are 255 townhome units in the community. The deed and articles of incorporation for the Cooperative are dated June 25, 1968. Townhouse Green Cooperative is a wonderful community with magnificent appeal and character and is one of the charter community members of the affordable housing movement in Michigan. The front courtyards and expansive recreational facility of our community create a peaceful and homey environment for our members and residents.

5. Townhouse Green Cooperative is a Michigan not-for profit corporation and operates accordingly. Organized under Michigan Statute 125.1473 Consumer housing cooperative; articles of incorporation.

        Sec. 73. In addition to other requirements of law, the articles of incorporation of a consumer housing cooperative shall provide all of the following:

1

Exhibit A-4

(a) That the consumer housing cooperative has been organized exclusively to provide authority-aided housing facilities for persons of low and moderate income, or for persons whose income does not exceed limits established in this act, and for social, recreational, commercial, and communal facilities necessary to serve and improve a residential area in which authority-aided or federally-aided housing is located or is planned to be located thereby enhancing the viability of the housing or that the consumer housing cooperative has been organized to provide nonauthority aided housing for persons of low and moderate income or persons whose income does not exceed limits established in this act, and at least 50% of the cooperative's assets are in housing with the remaining assets being utilized to meet other consumer needs.

An owner's membership certificate represents one share of stock in the Corporation and is bought and sold like other shares of stock in a corporation but with one critical difference: any outgoing member sells the membership certificate to the incoming member. The Certificate of Stock (Membership Certificate) entitles that member to live within a specific unit under a renewing lease arrangement, which roughly is equivalent to owner a home. When the share of stock is sold, the Membership Certificate transfers to the incoming member for the designated resale fee, with the new incoming member now able to reside in the unit.

6. Owners of shares of stock in Townhouse Green Cooperative entitles those owners to one vote in deciding issues facing the Cooperative, as well as to live here and participate in the Board Meetings. Like other community associations, the Board of our cooperative is responsible for arranging for the maintenance of the building exterior, hot water heaters, plumbing and electrical wiring, all of which benefit the members and residents of the Cooperative.  The Cooperative also maintains the common areas used by our residents, such as lawns, trees and shrubs, the parking lots, etc.  Of course, each resident is encouraged to landscape their area near their home and to keep a beautiful, well-groomed lawn.

7. Townhouse Green Cooperative is a self-governing body where the member/shareholders help to set the rules, guidelines and limitations related to residency. Members are expected to read and follow the rules. Members are also encouraged to become active in some phase of our "volunteer" programs. Fortunately, the Cooperative thrives on the talents and ideas of our members, and our "carrying charges" (the assessed dues that pay for our common expenses) are considerably less than rent or house payments because of the "gift" of members who volunteer to serve the Cooperative. Along with these things also comes a pride of ownership.

8. Townhouse Green Cooperative files annual tax form 1120-C.

9. The community is comprised of various groups of owners, many of whom are over 50 years old and are generally middle class.

2

Exhibit A-4

10. The Board is comprised of five shareholders, who are elected to their positions by their fellow shareholders. They serve three-year terms and are volunteers. The State of Michigan requires that a Board be established for the Cooperative, with only members serving on the Board.

11. As with most other community associations, turnover ono our Board occurs at least annually in conjunction with elections. This sometimes occurs more frequently, if a board member resigns or sells their share.

12. Our financial reports are completed monthly by our management company and reviewed by the Board.  There is also an annual audit carried out by a CPA, and copies of the annual audited financial statements, and other books and records; including budget and meeting minutes are available to all shareholders.

13. Neither I, nor my fellow board members are compensated to run our housing cooperative, as it is a volunteer position.

14. Unlike a traditional corporation or limited liability company, the Board members have no different financial stake in Townhouse Green than their fellow shareholders. We all own shares that entitle us to reside in the Cooperative.

15. Given the CTA's filing requirements and penalties, I no longer wish to serve in this volunteer position.  With the filing requirements, I understand that I have to provide personal and private information to a database of the United Sates Government. With the penalties, I understand that I could be civilly or criminally prosecuted if I or another Board member make a mistake in failing to update our filing.  This is too big a burden to bear given that we are just volunteers trying to make our community better.

16. The CTA's filing requirements and penalties will result in resignations of other members of our Board, will create instability and inconsistency in the operation of the Board, and will negatively impact our shareholders and our community. It is already difficult to find five GOOD volunteers to take on the responsibility of running a cooperative, and the CTA will only make this more difficult and lead to dire consequences for our nonprofit Cooperative.

    I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

*Cheri Heaton*
_____                              _____
Cheri Heaton, Board President                         Date
Townhouse Green Cooperative

3

Exhibit A-4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| _____ )<br>COMMUNITY ASSOCIATIONS )<br>INSTITUTE )<br>　　　　　Plaintiff, )<br> )<br>v. )<br> )<br>JANET YELLEN, in her official capacity )<br>as the Secretary of the United States )<br>Department of the Treasury, UNITED )<br>STATES DEPARTMENT OF THE )<br>TREASURY, and ANDREA GACKI in )<br>her official capacity as Director of )<br>Financial Crimes Enforcement Network, )<br>　　　　　Defendants. )<br>_____ ) | Case No.: _____ |

### DECLARATION OF KATHI ROBINSON

1. My name is Kathi Robinson, and I reside in Ashburn, Virginia.

2. I am over eighteen (18) years old, and I am competent to attest to the facts set forth herein.

3. Since 2022, I have served on the Board of Directors for the Regency at Ashburn Greenbrier Condominium Unit Owners Association ("Greenbrier") and currently serve as the Association's President.

4. Greenbrier is a 55-and-older active adult community developed by national builder Toll Brothers. It is comprised of 142 condominium units in Loudoun County, Virginia. Greenbrier was created by its developer in 2017 and is part of a larger adult community called Regency at Ashburn Community Association, which has a pool and clubhouse.

5. The owners in our condominium are comprised primarily of retired Americans who have "downsized" from a single-family homes so we could take advantage of condominium-style living, with the Association maintaining the grounds and exterior of our homes, leaving us free to pursue our hobbies, volunteer in our communities and enjoy our lives.

6. Greenbrier is an unincorporated condominium association created by the filing of a Declaration in Loudoun County land records and is a condominium association created pursuant to the Virginia Condominium Act. The Association manages, administers and

1

Exhibit A-5

Docusign Envelope ID: F626D657-6F82-4B14-8783-993309CB613C

maintains the common elements within the community and enforces the rules and regulations that binds all of us as owners in the complex.

7. The Association files its federal tax return under the "homeowners association" designation under Section 528 of the Internal Revenue Code and is a not-for-profit entity.

8. The Association's Board of Directors ("Board") is the elected governing body of our Association, also known as an "executive organ" under the Virginia Condominium Act. Our Board is made up of volunteers who own units at Greenbrier and is comprised of owners with a variety of skills and backgrounds. In essence, we volunteers are trying to give back to our community.

9. Our Greenbrier Board is responsible for the maintaining, managing and repairing the common elements of the Association, as well as enforcement of the restrictions, rules, and regulations of the community. We also respond to complaints and concerns raised by our residents, ranging from the types of plantings our landscapers use to leaks that sometimes occur between units. While these responsibilities are difficult enough given that we are volunteers, it is part of our fiduciary duty to our members, all of whom pay monthly assessments based on an annual budget adopted by the Board of Directors.

10. The Board is made up of five unit owners, who are elected by the homeowners. We serve two-year terms depending when we were elected. In addition, all unit owners in Greenbrier have the legal right to attend our open Board meetings, pursuant to Section 55.1-1949 of the Virginia Condominium Act. Our BOD meeting agenda always has a Homeowner's Open Forum at the beginning and end of every meeting – also a legal requirement – to hear owners' concerns or issues at each Board meeting.

11. In addition to the concerns wholly internal to our community, the Board also has regular communications with officials from Loudoun County and a neighboring association regarding the status the trail system that runs through our community. In addition, we worked closely with our local County officials regarding the bond release process when our developer was trying to finish our development.

12. Our Board turns over at least annually in conjunction with our Annual Meeting and election. Turnover sometimes happens more often if directors resign their positions (or have health issues, not uncommon in a retirement community). Currently, when there is a change in the Board roster or any of our committees, the Association's management company notifies all residents at the beginning of each month. Our board Secretary will note these changes in our meeting minutes and records.

13. By state law (Va. Code Section 55.1-1945) of the Virginia Condominium Act), all Greenbrier books and records (financial records, contracts, audits, invoices, etc.) are available to every unit owner who requests to see them if they are in good standing. Virginia law requires that we provide access within five days of the request. Our governing documents, budget, and all Para.12 anouncements can be downloaded by residents from our community website, TownSq.io

Exhibit A-5

14. As provided for in our Bylaws, our financial accounts are audited annually by an independent public accountant. In addition, the volunteer Board of Directors reviews the financial, including our expenditures and income, at each monthly meeting. Owners also can review that information at the same meeting.

15. Per Section 3.9 of our Bylaws, no directors are permitted to receive compensation for serving on the Board. The positions are purely volunteer, with our Board members having no different financial stake in Greenbrier than their fellow homeowners. We each own a unit in the community.

16. Given the requirements of the federal Corporate Transparency Act as applied to condo associations, I and other members of my Board are unlikely to continue volunteering on my community's Board of Directors. As I understand it, the Act requires that I provide personally identifiable information (PII) to the United States Government, including a copy of my state-issued driver's license, which contains a photograph of my face. Moreover, my PII can be provided upon request to a wide range of other agencies for law enforcement purposes, including foreign governments without my consent.

17. I believe the Corporate Transparency Act's requirements will result in resignations by members of our Board of Directors.  This is due to the requirement of furnishing our private information with the federal government, not to mention the fact that various individuals are able to request access to our personal information, as provided by the CTA. The resulting reduction of volunteerism in our community could prove devastating for Greenbrier, as we are retired Americans who are in no way interested in sharing so much personal data with the world.  Our recent election was the first time in 4 years that we have finally had a full board. We recently amended our bylaws to reduce the director's term from three years to two.

18. I also believe the filing requirements will reduce the number of owners who will voluntarily serve on future Boards. Our positions are purely volunteer, yet these filing requirements are burdensome and intrusive.  Again, trying to convince our neighbors to run for a Director's seat has been less than satisfactory. In the four years I have lived here, we have never had more nominees than seats we needed to fill.

19. As part of our internal process for solicitation of volunteers to run for the Board, we will have no choice but to highlight the requirements of the Corporate Transparency Act. We anticipate very few owners will be willing to serve given the requirement to upload so much private data. My Board also has concerns about the significant penalties (civil and criminal) that could be imposed upon Greenbrier volunteer directors for violations of the Corporate Transparency Act, which we understand could be as high as $500 per day or even imprisonment. This risk is far beyond what any of us could have expected as volunteers in our community association.

Exhibit A-5

20. The reporting requirements of the Corporate Transparency Act will harm the operation of our homeowners' association in a meaningful way, perhaps leading to an unstaffed Board of Directors, which I understand could result in receivership for our Association.

21. Finally, we do understand that the intended purpose of the CTA is to combat money laundering and terrorism financing.  However, given the transparency of our financial records, including monthly review at meetings (open to the membership), as well as our annual audit, the CTA's applicability to a non-profit condo association run by volunteers is clearly overreach and will be harmful to the effective management of our community.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Signed by:

*Kathi H Robinson*

Kathi Robinson, President
Regency at Ashburn Greenbrier Condominium
Unit Owners Association

9/9/2024

Date

4

Exhibit A-5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| _____ ) | |
| COMMUNITY ASSOCIATIONS ) | |
| INSTITUTE ) | |
|         Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JANET YELLEN, in her official capacity ) | Case No. |
| as the Secretary of the Unit States ) | |
| Department of the Treasury, UNITED ) | |
| STATES DEPARTMENT OF THE ) | |
| TREASURY, and ANDREA GACKI in ) | |
| her official capacity as Director of ) | |
| Financial Crimes Enforcement Network, ) | |
|         Defendants. ) | |
| _____ ) | |

## **DECLARATION OF THOMAS M. SKIBA**

1. My name is Thomas M. Skiba, and I reside in Alexandria, VA.

2. I am over eighteen (18) years old and I am competent to attest to the facts set forth herein.

3. Since 2002, I have served as the Chief Executive Officer for Community Associations Institute ("CAI").

4. CAI is an international membership organization dedicated to building better communities through supporting and educating residents who live in communities with homeowners associations, condominium associations, cooperatives, trusts, and other planned communities (collectively, "Community Associations").

5. In total, there are more than 365,000 Community Associations in America, with more than 75.5 million Americans residing in these Community Associations. All Community Associations strive to preserve the nature and character of the community, provide services and amenities to residents, protect property values, and meet established expectations of the other homeowners in their communities.

6. CAI's members include Community Association Board members and other homeowner leaders, community managers, association management firms, and other professionals who provide products and services to associations.

7. CAI currently has more than 47,000 members representing Community Associations across the country.

1

Exhibit A-6

8. The typical Community Association is governed by an all-volunteer Board of residents elected by their fellow homeowners to manage the Association and its finances, operate and maintain the common areas of the property, administer the rules and restrictions for the community, set policy, and oversee the professionals and businesses hired to assist in operating and maintaining the property.

9. CAI provides information, education, and resources to the homeowner volunteers who serve on Community Association Boards and the professionals who support them.

10. CAI has created information and learning centers and other educational resources to assist Community Association members in running their respective communities effectively and efficiently.

11. Among these resources is a Toolkit that provides Community Association members with guidance on recruiting and retaining volunteers to serve on boards and committees. Recruiting volunteers for Board service has long been a challenge for Community Associations due to the fact that these are time-consuming unpaid positions that sometimes requires volunteers to handle unpleasant tasks, like resolving disputes between residents.

12. CAI also assists Community Association members in their efforts to advocate effectively for issues that directly impact their communities at the federal, state, and local levels.

13. CAI compiles information on state and federal legislation that impacts Community Associations. Members can monitor that legislation through the Legislative and Policy Tracking Map on CAI's website. The Legislative and Policy Tracking Map is updated daily with new legislation and updates on pending legislation to ensure CAI members have the most current information available to assist them in their local advocacy efforts.

14. Advocacy efforts typically involve issues related to risk management, disaster response and recovery, building safety, and environmental sustainability.

15. Over the past year, CAI and its members have been intently focused on the Corporate Transparency Act ("CTA") because of the devastating impact it will have on volunteerism in Community Associations throughout the country and their ability to carry on as functioning entities for the benefit of their communities.

16. The CTA is designed to "prevent and combat money laundering, terrorist financing, corruption, tax fraud, and other illicit activity," which is often accomplished through the use of shell corporations and other methods of concealment that are incompatible with state laws and guidelines that govern Community Association operations. *See* Federal Register, "Beneficial Ownership Information Reporting Requirements."[1].

---

[1] Available at https://www.federalregister.gov/ documents/2022/ 09/30/2022-21020/beneficial-ownership-information-reporting-requirements (last accessed September 9, 2024).

Exhibit A-6

17. The CTA applies to any "reporting company," which is an entity that was simply "created by the filing of a document with a secretary of state" or similar office. 31 U.S.C. § 5336(a)(11)(A).

18. Any "beneficial owner" of the reporting company must file "beneficial ownership information reports" ("BOI reports") with the Financial Crimes Enforcement Network ("FinCEN"), the law enforcement arm of the U.S. Department of Treasury. 31 U.S.C. § 5336(b)(2).

19. A "beneficial owner" is defined as an individual who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A).

20. BOI reports require individuals to disclose personal identifying information, including their full legal name, address, date of birth, and a "unique identifying number," such as a driver's license or passport number, along with a photograph of that document that includes the individual's photograph. 31 U.S.C. § 5336(b)(2). The information will be stored in a federal government database for at least five years after dissolution of the reporting company, which, for Community Associations, is more or less indefinitely. 31 U.S.C. § 5336(c)(1). Failure to comply with the reporting requirements results in steep civil penalties of $500 per day and/or criminal penalties of a $10,000 fine and up to two years' imprisonment, or both. 31 U.S.C. § 5336(h)(3)(A).

21. Under the CTA, FinCEN can disclose personal identifying information obtained through BOI reports to any federal national security, intelligence, or law enforcement agency upon request. There is no requirement that the request be related to enforcement of the CTA. 31 U.S.C. § 5336(c)(2)(B)(i)(I).

22. FinCEN may disclose personal identifying information to state, local, or Tribal law enforcement agencies for use in any criminal or civil investigation, with no requirement if authorized by a court of competent jurisdiction or an officer of the court. 31 U.S.C. § 5336(c)(2)(B)(i)(II). Again, there is no requirement that the investigation be related to the CTA.

23. FinCEN may also disclose personal identifying information from BOI reports to a law enforcement agency, prosecutor, or judge of a foreign country under an international treaty, agreement, or convention, or upon request from a "trusted foreign countr[y]" when no treaty, agreement, or convention is available. 31 U.S.C. § 5336(c)(2)(B)(ii).

24. Community Associations do not operate like the traditional corporations and small businesses that are the focus of the CTA's regulations. They are volunteer-run, non-profit entities created and regulated by state law that serve primarily to manage the maintenance and operating expenses for the common elements of the community, which are funded through pro rata contributions collected from fellow homeowners.

3

Exhibit A-6

25. Community Associations are required by state law to allow any resident to inspect their books and records on request. Some states even require that financial records be audited or inspected by an independent auditor on an annual basis.

26. Community Associations also provide financial data to prospective homebuyers and their lenders as an industry standard to demonstrate the financial strength of the organization, which is correlated with home value.

27. These transparency and accountability practices, which are either state-mandated or industry-standard, put Community Associations at a very low risk of engaging in the types of financial crimes that are the subject of the CTA.

28. FinCEN, Treasury, and other relevant agencies have publicly recognized that the "vast majority" of domestic nonprofit organizations ("NPOs") "face little or no risk" of being used in terrorist financing schemes, for example, because of their due diligence in practicing transparency and accountability measures. 2024 National Terrorist Financing Risk Assessment, p. 23-24.[2]

29. Indeed, nonprofit organizations that are tax exempt under section 501(c) of the Internal Revenue Code are exempt from the CTA's reporting requirements ("NPO Exception"). 31 U.S.C. § 5336(a)(11)(B)(xix).

30. Most Community Associations are also tax-exempt, nonprofit organizations organized under section 528 of the Internal Revenue Code applicable to "certain homeowners associations."  Under that section, a homeowners association "shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. § 528.

31. In December 2023, CAI requested that FinCEN recognize Community Associations under the NPO Exception or under the "catch-all" provision that exempts entities where the collection of BOI information would not serve the public interest and would not be highly useful in national security, intelligence, and law enforcement efforts to detect, prevent, or prosecute the financial crimes targeted by the CTA.

32. CAI's rationale for this request was clear: applying the CTA's unduly burdensome reporting requirements on Community Associations, and subjecting them and their unpaid volunteer Board members to the significant civil and criminal penalties, will cause the mass resignation of sitting Board members and deter other already-reluctant residents to volunteer for Board service.

33. FinCEN did not respond to our request, but instead, issued FAQs confirming that Community Associations are reporting companies under the CTA and defining who their beneficial owners are.

---

[2] Available at: https://home.treasury.gov/system/files/136/2024-National-Terrorist-Financing-Risk-Assessment.pdf (last accessed Sept. 9, 2024).

Exhibit A-6

34. In August of 2024, CAI released a survey to its Community Association members to gather data on the effect the CTA is having on their communities. More than 850 CAI members, overwhelmingly sitting Board members, responded to the survey.

35. Sixty percent of those who responded reported being somewhat or very uncomfortable furnishing their personal identifying information to FinCEN in BOI reports. Over 70% of respondents reported being somewhat or very uncomfortable with how FinCEN is permitted to use their personal identifying information.

36. Members cited the following specific concerns about the CTA's reporting requirements, among others:

    a. Potential legal consequences for the Association or for Board members personally (79%);

    b. Providing personal identifying information to be stored in a federal government database (77%);

    c. Potential data breach or identity theft (76%);

    d. Ongoing recordkeeping requirements and impact on business operations (69%);

    e. Compliance concerns due to complicated and/or ambiguous reporting requirements (66%);

    f. Financial penalties and increased compliance costs (64%).

37. Each of these concerns demonstrates the critical impact the CTA filing requirements will have on Community Associations and their ability to function. Significantly, 80% of respondents said they believe the BOI filing requirements will cause Board members to resign, and 88% believe the BOI filing requirements will affect their ability to recruit volunteers for future Board service. Twenty-two percent of respondents said they would not have the requisite number of Board members to serve in needed roles after the CTA takes effect on January 1, 2025; another 50% said they were unsure whether they could fill all necessary roles.

38. The survey data makes clear that the disclosure of sensitive personal information that can be shared among federal, state, and foreign law enforcement agencies, and the personal risk of incurring civil or criminal penalties for failing to disclose that information will cause Board members to resign and deter already-reluctant homeowners from volunteering for future Board service. Without functioning Boards, Community Associations will not be able to fulfill their statutory obligations to homeowners; some may even fall into receivership. The CTA will cause great harm to Community Associations nationwide.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Thomas M. Skiba    _Digitally signed by Thomas M. Skiba Date: 2024.09.09 17:17:18 -04'00'_

_____      _____

Thomas M. Skiba, CEO                  Date
Community Associations Institute

Exhibit A-6