**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| COMMUNITY ASSOCIATIONS INSTITUTE, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 1:24cv1597 (MSN/LRV) |
| JANET YELLEN, Secretary of the United States Department of the Treasury, *et al.*, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiffs, a diverse group of community associations and a community-association interest group, have not shown their entitlement to the extraordinary remedy of a preliminary injunction. To be sure, they passionately argue that community associations should not be subject to the reporting requirements of the Corporate Transparency Act ("CTA"), 31 U.S.C. § 5336, a component of Congress' broader statutory scheme aimed at money laundering and other illicit financial activities, because (in Plaintiffs' view) community associations are unlikely to engage in financial crimes. But Plaintiffs' opinion about the policy wisdom of the CTA is beside the point. Any policy fix lies with Congress, not with this Court. Indeed, Plaintiffs continue to advance their policy preferences to the political branches: They are currently seeking a regulatory exemption from the CTA's requirements under the procedure Congress established in the statute, 31 U.S.C. § 5336(a)(11)(B)(xxiv), and they are supporting proposed legislation to exempt community associations from the CTA's reporting requirements. Plaintiffs might obtain the relief they seek here through either avenue.

1

The claims Plaintiffs bring in this Court, however, are a thinly veiled attempt to achieve their policy objectives through the judicial process, rather than these legislative and regulatory mechanisms. In fact, Plaintiffs are trying to leapfrog even the ordinary course of the judicial process by seeking a preliminary injunction. But Plaintiffs are not likely to succeed on the merits of any of their claims, nor can they satisfy the other prerequisites for preliminary injunctive relief.

As an initial matter, the CTA's plain language belies Plaintiffs' contention that the statute *already* exempts community associations. By its terms, the exemption Plaintiffs claim applies only to Section 501(c) organizations.[1] It makes no reference to the separate provision of the tax code applicable to homeowners associations (26 U.S.C. § 528) on which Plaintiffs rely. Perhaps recognizing this weakness in their statutory argument, Plaintiff Community Associations Institute ("CAI") has requested, pursuant to the procedure set forth in the CTA, that the Financial Crimes Enforcement Network ("FinCEN") *create* such an exemption. This request alone undercuts Plaintiffs' claim that the statute already does not apply to community associations; unless and until that exemption is granted, community associations that otherwise meet the CTA's definition of "reporting company" and are not exempt on another ground remain subject to the CTA's reporting requirements. FinCEN has been absolutely clear that CAI's exemption request is still pending. And despite Plaintiffs' insistence to the contrary, they seem to understand this indisputable fact—they have continued to press FinCEN for approval of the request even during this litigation. In any event, the answers to FinCEN's Beneficial Ownership Information "Frequently Asked Questions" ("FAQs") that Plaintiffs challenge have no impact on the exemption request, and, thus, under binding Fourth Circuit authority, there is no final agency action to challenge under the Administrative Procedure Act ("APA"). But even if there were, the FAQs merely restate existing statutory and regulatory requirements. The FAQs therefore

---

[1] 26 U.S.C. § 501(c).

were not required to undergo notice and comment rulemaking, nor are they arbitrary or capricious.

Plaintiffs' constitutional arguments are on similarly weak footing. The CTA falls well within Congress' enumerated commerce, foreign affairs, and taxing powers. Accepting Plaintiffs' First and Fourth Amendment challenges, meanwhile, would draw into question the many disclosure requirements the federal government already imposes on regulated individuals and entities. The Supreme Court has rejected this argument in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), a case that Plaintiffs conspicuously fail to even acknowledge.

Nor can Plaintiffs show the risk of imminent, irreparable harm required for a preliminary injunction. The failure of their constitutional claims means that no such right is being violated, and the evidence Plaintiffs have submitted fails to carry their burden to show either that the claimed injury to membership of community associations' governing bodies will occur, or that any such harm would be irreparable. The very nature of Plaintiffs' claims highlights the *de minimis* nature of the alleged harm —individual taxpayers *already* disclose to the federal government much of the same information the CTA requires every time they file an annual tax return. Especially compared to any harm Plaintiffs may suffer from re-reporting this information, the public and governmental interests of combatting money laundering, terrorism financing, and other serious financial crimes are indisputably strong. Enjoining enforcement of the CTA would hamstring Congress' ability to tackle these complex problems. For all these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

## STATUTORY AND REGULATORY BACKGROUND

### I.   Financial Crime and the Lack of Corporate Ownership Transparency

Federal law has long prohibited money laundering, *see* 18 U.S.C. §§ 1956, 1957, financing terrorism, *see id.* § 2339C, evading taxes, *see* 26 U.S.C. § 7201, and a number of other harmful economic activities, *see*, *e.g.*, 18 U.S.C. §§ 1341, 1343. According to one estimate, "domestic financial crime, excluding tax evasion, generates approximately $300 billion of proceeds" each year. *Beneficial Ownership*

*Information Reporting Requirements*, 87 Fed. Reg. 59,498, 59,579 (Sept. 30, 2022). Because financial crime is complex, easily concealed, and facilitated by an interconnected financial system, Congress has adopted various measures to aid enforcement. *See, e.g., Shultz*, 416 U.S. 21 (discussing certain provisions of the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* ("BSA")).[2]

Despite these efforts, a significant gap remained in the government's ability to detect and prosecute financial crime. Under state law, "corporations, limited liability companies, [and] other similar entities" are generally not required to report "information about the[ir] beneficial owners." National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 6402(2), 134 Stat. 3388, 4604 (2021) ("NDAA").[3] "A person forming a corporation or limited liability company within the United States" thus "typically provides less information at the time of incorporation than is needed to obtain a bank account or driver's license." H.R. Rep. No. 116-227, at 2 (2019). This enables "malign actors" to "conceal their ownership" of such organizations and use those anonymous entities to engage in "money laundering," "financing of terrorism," and "serious tax fraud." NDAA § 6402(3).

Congress and the Executive Branch identified "[t]his lack of transparency" as "a primary obstacle to tackling financial crime in the modern era." H.R. Rep. No. 116-227, at 10. When investigators trace illicit funds to an organizational entity, they often cannot identify the entity's owners from available sources because ownership records "do not exist." 87 Fed. Reg. at 59,504. Instead, investigators must pursue "human source information, grand jury subpoenas, surveillance operations, witness interviews, search warrants, and foreign legal assistance requests to get behind the outward

---

[2] Parts of the Currency and Foreign Reporting Act of 1970, Pub. L. No. 91-508, 121, 84 Stat. 1114 (1970), its amendments, and other statutes, are referred to as the Bank Secrecy Act, codified at 12 U.S.C. §§ 1829b, 1951–60, and 31 U.S.C. §§ 5311–14, and 5316–36.

[3] Division F of the NDAA is the Anti-Money Laundering Act of 2020, which includes the CTA. Section 6403 of the CTA, among other things, amends the BSA by adding a new section 5336, Beneficial Ownership Information Reporting Requirements, to subchapter II of chapter 53 of title 31, United States Code.

facing structure of the[] shell companies[.]" *Id.* The "strategic use" of such entities by criminals thus "makes investigations exponentially more difficult and laborious." *Id.* at 59,505. And because criminals may "layer" multiple shell companies, even the most thorough investigation may not yield results. NDAA § 6402(4).

Criminals frequently exploit this enforcement gap. Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies." 87 Fed. Reg. at 59,503. Likewise, drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [drug traffickers] to launder their drug proceeds." *Id.*

In addition to facilitating domestic crime, the absence of beneficial ownership information threatens U.S. national-security and foreign-policy interests. For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to use U.S. and non-U.S. shell companies to evade sanctions[.]" *Id.* at 59,498; *see id.* at 59,502 (discussing use of shell companies by the Government of Iran). And more broadly, the absence of such ownership information in the United States undermines the federal government's longstanding diplomatic efforts to combat cross-border financial crime by "mak[ing] the United States a jurisdiction of choice for those wishing to create shell companies that hide their ultimate beneficiaries" and "a weak link in the integrity of the global financial system." *Id.* at 59,506. Because it did not collect ownership information, the United States fell out of "compliance with international anti-money laundering and countering the financing of terrorism standards." NDAA § 6402(5)(E).

For similar reasons, criminals can use the government's lack of information about the ownership of organizational entities to obscure their income and assets and thus perpetrate "serious tax fraud." NDAA § 6402(3). A "[Department of the] Treasury study based on a statistically significant sample of adjudicated [IRS] cases from 2016-2019 found legal entities were used in a substantial

proportion of the reviewed cases to perpetrate tax evasion and fraud." 87 Fed. Reg. at 59,503.

## II.     The Corporate Transparency Act

To address this enforcement gap, Congress enacted beneficial ownership reporting requirements. The NDAA adopts various provisions designed to "modernize" federal laws concerning money laundering and terrorism financing. NDAA § 6002(2). Among those is the CTA, which aims to ensure that the United States uniformly collects beneficial ownership information notwithstanding the disparate corporate-formation requirements imposed by states. *Id.* § 6002(5).

In enacted findings accompanying the CTA, Congress determined that "the collection of beneficial ownership information" is "needed" to "protect interstate and foreign commerce" and "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity[.]" *Id.* § 6402(5). Congress further determined that the reporting requirements would "facilitate important national security, intelligence, and law enforcement activities[,]" *id.* § 6402(6)(A), assist in improving "tax administration[,]" 31 U.S.C. § 5336(c)(5)(B), and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards[,]" NDAA § 6402(5)(E). And Congress described the reported information as "highly useful to national security, intelligence, and law enforcement agencies and Federal functional regulators." *Id.* § 6402(8)(C).

In furtherance of its goals, the CTA requires that certain organizations ("covered entities") report information about their beneficial owners and applicants (beneficial ownership information, or "BOI") to FinCEN. Subject to enumerated exceptions, a "beneficial owner" is "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise[] (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A); *see id.* § 5336(a)(3)(B) (establishing exceptions). An "applicant" is an individual who files documents to form or register the covered entity.

6

*See id.* § 5336(a)(2). A covered entity must report each applicant's and beneficial owner's legal name, date of birth, residential or business address, and driver's license number or other "unique identifying number[.]" *Id.* § 5336(a)(1), (b)(2)(A); *see also* 31 C.F.R. § 1010.380(b)(1)(ii)(E) (requiring submission of image of document from which identifying number was obtained), (b)(2)(iv) (exempting entities created before January 1, 2024, from reporting applicant information).

In addition to providing that covered entities file reports when they first become subject to the CTA, the statute also requires that those entities submit updated reports when ownership information changes. In particular, when "there is a change with respect to any" ownership information, a covered entity must "submit to FinCEN a report that updates the information relating to the change." *Id.* § 5336(b)(1)(D). A person who willfully violates either the initial or ongoing reporting requirements is subject to civil and criminal penalties. *See id.* § 5336(h). *But see id.* § 5336(h)(3)(C) (providing certain safe harbors).

The CTA refers to covered entities subject to these requirements as "reporting compan[ies]." *Id.* § 5336(a)(11), (b)(1)(D). That term generally includes any "corporation, limited liability company, or other similar entity that is" either "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe[,]" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe[.]" *Id.* § 5336(a)(11)(A).

Congress exempted from the reporting requirements 23 categories of legal entities, such as banks, public accounting firms, and other businesses already subject to reporting or recordkeeping requirements. *Id.* § 5336(a)(11)(B). Relevant here, it exempts any "organization that is described in section 501(c) of the Internal Revenue Code of 1986 … and exempt from tax under section 501(a) of such Code." *Id.* § 5336(a)(11)(B)(xix)(I). Charitable organizations described in 26 U.S.C. § 501(c)(3) and non-profit civic organizations described in 26 U.S.C. § 501(c)(4) (commonly known as social

welfare organizations) both qualify under this CTA exemption ("the Non-Profit Organization Exemption" or "NPO Exemption"). The CTA also contains a procedure by which "the Secretary of the Treasury, with the written concurrence of the Attorney General and the Secretary of Homeland Security" may exempt "any entity or class of entities" after determining that reporting BOI "would not serve the public interest" *and* "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." *Id.* § 5336(a)(11)(B)(xxiv). Such an exemption may only be granted "by regulation." *Id.*

Consistent with Congress' purposes, the CTA generally contemplates that reported information be used for limited purposes, including to facilitate the investigation and prosecution of financial crimes. For example, FinCEN may share ownership information with federal agencies "engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity[.]" 31 U.S.C. § 5336(c)(2)(B)(i)(I). FinCEN may share the same information with state and local law enforcement agencies when a court "authorize[s] the law enforcement agency to seek the information in a criminal or civil investigation[.]" *Id.* § 5336(c)(2)(B)(i)(II). Notably, the CTA establishes serious penalties for the unauthorized disclosure or use of information in a report to FinCEN, including daily civil penalties, a fine of up to $250,000, and up to five years' imprisonment. 31 U.S.C. § 5336(h)(2), (3)(B).

## III.    FinCEN's Implementation of the CTA

The CTA directs FinCEN to implement certain aspects of the statute by regulation, including the CTA's reporting requirements. *See, e.g., id.* § 5336(b)(4). FinCEN accordingly gave notice of a rule it proposed pursuant to the statutory mandate to implement the CTA's reporting requirements, and solicited comments pursuant to 5 U.S.C. § 553(b). *Beneficial Ownership Information Reporting Requirements*, 86 Fed. Reg. 69,920 (Dec. 8, 2021). None of the Plaintiffs submitted comments on the proposed rule.

Ex. 1 ("Martinelli Decl.") ¶ 8. In fact, FinCEN received few comments on the NPO Exemption at all, and none specifically related to community associations. *Id.* FinCEN issued its final rule on BOI reporting in September 2022. *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59,498, 59,509 (Sept. 30, 2022).

The implementing reporting regulation, 31 C.F.R. § 1010.380, does not add any additional exemptions to those already set forth in the CTA. The rule defines "beneficial owner" to include individuals who exercise substantial control over the covered entity by, among other things, serving as a senior officer, having the authority to appoint or remove a senior officer or majority of the board of directors, or exercising "substantial influence over important decisions" by the covered entity. *Id.* § 1010.380(d)(1). The rule, as amended, also establishes the deadlines by which covered entities must comply with the statute. For entities created or registered before 2024, compliance is required by January 1, 2025. *See* 31 C.F.R. § 1010.380(a)(1)(iii). Notably, Plaintiffs do not challenge the substance of the rule or the procedures used to promulgate it.

FinCEN has published a range of guidance documents to assist the public in understanding and complying with the CTA. Martinelli Decl. ¶ 9. Among other guidance materials, FinCEN published FAQs on its website. *See id.* FinCEN published the first set of FAQs in March 2023 and has updated them periodically since. *Id.* ¶ 12. The FAQs cover a wide range of topics raised in multiple inquiries to FinCEN, are generally applicable to a large population, or are valuable due to the nature of the topic. *Id.* ¶ 13. Two FAQs directly address the reporting obligations of community associations under the CTA: FAQ C.10 and D.13, both originally published on April 18, 2024. *Id.* ¶ 14.[4] Like all FAQs, C.10 and D.13 do not impose any additional duties on covered entities, but merely explain existing statutory and regulatory requirements in readily understandable language. *See id.* ¶ 10.

---

[4] FAQ C.10 was later amended in June 2024. Martinelli Decl. ¶ 14.

## FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit is brought by several individual community associations and CAI, an organization that provides "education, guidance and advocacy" for community associations. Compl. (Dkt. 1) ¶ 4. Some, but not all, community associations qualify as tax-exempt under 26 U.S.C. § 501(c)(4), and thus are exempt from the CTA's reporting requirements pursuant to the NPO Exemption. But according to the complaint, none of the community association Plaintiffs qualify under 26 U.S.C. § 501(c)(4). Instead, several are considered tax-exempt "homeowners associations" under 26 U.S.C. § 528,[5] Compl. ¶¶ 5, 7-9, and one appears not to be tax-exempt at all, *see id.* ¶ 6; Dkt. 14-1, Ex. A-4 ¶ 8 (attesting that Plaintiff Townhouse Green Cooperative files form 1120-C).[6] Section 528 status is an

---

[5] A "homeowners association" is defined in Section 528 as "an organization which is a condominium management association, a residential real estate management association, or a timeshare association if—

    (A) such organization is organized and operated to provide for the acquisition, construction, management, maintenance, and care of association property,

    (B) 60 percent or more of the gross income of such organization for the taxable year consists solely of amounts received as membership dues, fees, or assessments from--

        (i) owners of residential units in the case of a condominium management association,

        (ii) owners of residences or residential lots in the case of a residential real estate management association, or

        (iii) owners of timeshare rights to use, or timeshare ownership interests in, association property in the case of a timeshare association,

    (C) 90 percent or more of the expenditures of the organization for the taxable year are expenditures for the acquisition, construction, management, maintenance, and care of association property and, in the case of a timeshare association, for activities provided to or on behalf of members of the association,

    (D) no part of the net earnings of such organization inures (other than by acquiring, constructing, or providing management, maintenance, and care of association property, and other than by a rebate of excess membership dues, fees, or assessments) to the benefit of any private shareholder or individual, and

    (E) such organization elects (at such time and in such manner as the Secretary by regulations prescribes) to have this section apply for the taxable year." 26 U.S.C. § 528(c).

[6] Plaintiffs use the term "community associations" broadly to encompass "condominium associations, homeowner associations, housing cooperatives, business trusts, planned unit developments, and similar entities." Compl. ¶ 4. Not all such groups are treated alike for purposes of the Internal Revenue Code. Community associations often primarily operate for the benefit of their members rather than the general public, and thus cannot qualify for Section 501(c)(4) status. For example, Section 501(c)(4)

annual election exclusively available to homeowners associations and confers fewer tax benefits than those offered under Section 501(c)(4).[7] Because Section 528 community associations are not "described in section 501(c)," such organizations are not covered by the plain language of the NPO Exemption. 31 U.S.C. § 5336(a)(11)(B)(xix).

Apparently recognizing Section 528 organizations' potential reporting obligations under the CTA, in a letter dated December 28, 2023, CAI submitted a formal request to FinCEN, pursuant to 31 U.S.C. § 5336(a)(11)(B)(xxiv), seeking to exempt all community associations from those requirements. Martinelli Decl., Ex. A.[8] On July 25, 2024, FinCEN sent CAI a letter acknowledging receipt of the exemption request and reiterating the statutory reporting requirements and the exemption approval process. Dkt. 14-4. The letter also informed CAI:

> FinCEN is considering your request to exempt a class of [homeowners association (HOA)] entities, pursuant to the above legal requirements. In the meantime, however, as stated previously, unless an entity qualifies for an exemption found at 31 CFR

---

generally does not encompass gated communities closed to the public or allow organizational funds to be used for the maintenance of private, rather than community, property—common features of community associations. *See* Rev. Rul. 74-99, 1974-1 C.B. 131, Rev. Rul. 80–63, 1980–1 C.B. 116; *Flat Top Lake Ass'n v. United States*, 868 F.2d 108 (4th Cir. 1989).

The parties agree that community associations that qualify under Section 501(c)(4) are entitled to the NPO Exemption. Section 501(c)(4) organizations would not have standing to challenge the CTA. *E.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) ("'[T]he plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." (citation omitted)). Accordingly, this brief addresses the sole subgroup of community associations Plaintiffs advance in their complaint, namely, those that are tax-exempt under Section 528.

On this note, one individual community association Plaintiff, Townhouse Green Cooperative, is a cooperative association that does not qualify as a Section 501(c)(4) organization *and* is not covered by Section 528. *See* Compl. ¶ 6 (noting Townhouse Green Cooperative's status as a cooperative association that files an IRS Form 1120-c). Housing cooperatives do not qualify under any Section 501(c) provision. *See* Rev. Rul. 65-201, 1962-5 C.B. 170; *Commissioner v. Lake Forest, Inc.*, 305 F.2d 814 (4th Cir. 1962).

[7] For example, Section 528 organizations must pay tax on net investment income (as a type of non-exempt-function income), whereas Section 501(c)(4) organizations are exempt from tax on most forms of investment income.

[8] Curiously, Plaintiffs have attached to the brief in support of their preliminary injunction motion a letter dated December 20, 2023. Dkt. 14-2. Because the letter that FinCEN actually received is dated December 28, 2023, Defendants use that date in this brief.

> 1010.380(c)(2), it may be considered a reporting company that must report its BOI to FinCEN. Additional information may be found on FinCEN's BOI website at https://www.fincen.gov/boi.

*Id.* FinCEN and CAI representatives last discussed CAI's pending request on August 20, 2024, Martinelli Decl. ¶ 16, and Plaintiffs have continued to reach out to FinCEN to advocate for approval of the request, Ex. 2. FinCEN has not notified CAI of any change in its position on the exemption request since the July letter.

Plaintiffs filed this suit on September 10, 2024, attacking the CTA's reporting requirements from all angles. *See generally* Compl. They seek a declaration that the BOI reporting requirements do not apply to community associations (Count I); that FinCEN violated the APA's notice and comment rulemaking procedures, 5 U.S.C. §§ 553(b)-(c), 706(2)(D), in issuing the FAQs (Count II); that the FAQs are arbitrary and capricious under the APA, *id.* § 706(2)(A) (Count III); that the CTA violates the Fourth Amendment to the Constitution (Count IV); that the CTA compels speech and impairs individuals' freedom of association in violation of the First Amendment to the Constitution (Count V); and that the CTA exceeds Congress' enumerated powers (Count VI).[9] Along with their complaint, Plaintiffs filed a motion for preliminary injunction, seeking to enjoin enforcement of the CTA against community associations. Dkts. 13, 14 ("Pl. Br"). Defendants now timely oppose Plaintiffs' motion for preliminary injunction.

## DISCUSSION

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted). To obtain a preliminary injunction, Plaintiffs must make a "clear showing" of each of the four factors: (1) a likelihood of success on the merits;

---

[9] The complaint contains additional counts on which Plaintiffs do not rely in their motion for preliminary injunction.

(2) irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in their favor; and (4) that the public interest favors the requested equitable relief. *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Doe v. Hanover Cnty. Sch. Bd.*, 2024 WL 3850810, at *5 (E.D. Va. Aug. 16, 2024). Plaintiffs cannot make this clear showing on any of the four factors.

## I.  Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims.

### A.  Congress Had the Constitutional Authority to Pass the CTA.

Three separate constitutional grants of power to Congress authorized passage of the CTA and its reporting requirements: (1) the Commerce Clause, (2) Congress' authority over foreign affairs and national security, and (3) the taxing power. Indeed, another district court recently held, in denying a preliminary injunction, that the reporting requirements were likely a valid exercise of these powers. *Firestone v. Yellen*, 2024 WL 4250192, at *6-8 (D. Or. Sept. 20, 2024). This Court should do the same.

#### 1.  Commerce Clause

The Constitution empowers Congress "[t]o regulate commerce with foreign nations, and among the several states." U.S. Const., art. I, § 8, cl. 3. Applied to interstate commerce, this power "is very broad," *Fry v. United States*, 421 U.S. 542, 547 (1975), and permits congressional regulation of "three broad categories of interstate activity: (1) 'the use of the channels of interstate commerce,' (2) 'the instrumentalities of interstate commerce, or persons or things in interstate commerce,' and (3) 'activities that substantially affect interstate commerce,'" *United States v. Hill*, 927 F.3d 188, 195-96 (4th Cir. 2019) (citation omitted). Regarding the third category, "[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States." *Fry*, 421 U.S. at 547. In analyzing a challenge to Congress' exercise of this broad power, therefore, a court must not focus on "any specific effect upon interstate commerce" "in individual cases," but rather must look to "the individual activity when multiplied into a general practice." *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236

(1948). As long as "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (citation omitted).

The regulatory authority of the Commerce Clause is amplified by the Necessary and Proper Clause, which authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" an enumerated power, such as the power to regulate interstate commerce. U.S. Const., art. I, § 8, cl. 18. This clause "grants Congress broad authority to enact federal legislation" and "makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *United States v. Comstock*, 560 U.S. 126, 133-34 (2010) (citation omitted). The only question, therefore, is "whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134. The CTA easily passes this test.

The CTA's reporting requirements fit comfortably within the third permissible category of Commerce Clause regulation because the statute regulates activities that substantially affect interstate commerce. Within this category, "regulations have been upheld when the regulated activities 'arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.'" *Gibbs v. Babbitt*, 214 F.3d 483, 491 (4th Cir. 2000) (citation omitted). Again, the Court's task here "is a modest one": the Court "need not determine whether [Plaintiffs'] activities, taken in the aggregate, substantially affect interstate commerce *in fact*, but only whether a 'rational basis' exists for so concluding." *Raich*, 545 U.S. at 22 (emphasis added) (citation omitted).

Such a rational basis exists here. "Although the connection to economic or commercial activity plays a central role in whether a regulation will be upheld under the Commerce Clause, economic activity must be understood in broad terms." *Gibbs*, 214 F.3d at 491. There can be no doubt that the CTA is connected to economic activity. As explained, the statute is a critical component of the federal

government's comprehensive "larger scheme," *Raich*, 545 U.S. at 22, aimed at money laundering, among other illicit financial activities, NDAA § 6402(3). And it is indisputable that "[m]oney laundering is a quintessential economic activity." *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997). "Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity." *Id.* And in fact, Congress has routinely passed legislation prohibiting money laundering and other harmful forms of economic activity. *See* 18 U.S.C. §§ 1956, 1957 (prohibiting money laundering); *id.* § 2339C (prohibiting financing for terrorism); 26 U.S.C. § 7201 (prohibiting tax evasion).[10]

The CTA's reporting requirements are rationally related to Congress' permissible exercise of its interstate-commerce power to combat harmful economic activity. A corporate entity, by its nature, has legal authority to conduct transactions in its own name, including by "[m]ak[ing] contracts," "borrow[ing] money[,]" "incur[ring] liabilities," and transferring "real or personal property." *E.g.*, Del. Code Ann. tit. 8, § 122. But as Congress expressly recognized in enacting the CTA, "most or all States do not require information about the beneficial owners of the corporations, limited liability companies, or other similar entities formed under the laws of the State." NDAA § 6402(2). This dearth of required disclosures allows "malign actors seek[ing] to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity," such as "money laundering, the financing of terrorism, . . . serious tax fraud, [and] human and drug trafficking." *Id.* § 6402(3). To fill this "gaping hole," *Raich*, 545 U.S. at 22, in its measures to "protect interstate . . . commerce," Congress therefore determined that "[f]ederal legislation providing for the collection of

---

[10] The non-binding district court decision on which Plaintiffs rely erroneously concluded that the CTA was "a 'single-subject statute whose single subject is itself non-economic.'" *Nat'l Small Bus. United v. Yellen*, 2024 WL 899372, at *17 (N.D. Ala. Mar. 1, 2024) (citation omitted) ("*NSBU*"). *But see Firestone*, 2024 WL 4250192, at *7 (acknowledging CTA's role in targeting money laundering, "drug and human trafficking, fraud, sanctions evasion, and other financial crimes").

beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States [wa]s needed," NDAA § 6402(5)(C).

Plaintiffs resist this sensible conclusion in three ways. First, they mischaracterize the CTA as "regulat[ing] corporate entity formation," which, they argue, is a purely intrastate function even when aggregated. Pl. Br. 36, 39. Second, Plaintiffs argue that community associations do not engage in commercial or economic activities that have a substantial effect on interstate commerce. *Id.* at 39. And third, Plaintiffs contend that the CTA lacks an "express jurisdictional element" establishing a nexus to interstate commerce. *Id.* On each point, Plaintiffs are wrong.

 i. Plaintiffs' first argument simply misunderstands the statute. The CTA does not, and does not purport to, regulate corporate-entity formation. Indeed, the statute says nothing about such topics as what form(s) a covered entity may take, or who may serve in an officer role. Rather, the CTA governs the conduct of a covered entity *as a going concern.* To serve this function, the statute necessarily must apply to such an entity from the time it begins operating, *i.e.*, at its formation. *See* 31 U.S.C. § 5336(b)(1)(C). But the CTA's reporting requirements continue to apply for as long as the covered entity continues to operate as such, thus dispelling the notion that the CTA regulates the formation of a corporation under state law. *Id.* § 5336(b)(1)(A), (D); 31 C.F.R. § 1010.380(c)(1), (c)(2)(xxiii); *see* 31 U.S.C. § 5336(a)(11)(xxiii)(II), (V) (excluding certain entities "not engaged in active business" or that "do[] not otherwise hold any kind or type of assets"). Further undercutting Plaintiffs' argument, the same reporting requirements apply to covered entities already in existence before the reporting requirements' effective date. 31 U.S.C. § 5336(b)(1)(B); 31 C.F.R. § 1010.380(a)(1)(iii). A statute regulating corporate formation would, of course, have nothing to say about a corporation whose formation has long since passed.[11] Properly understood, therefore, the CTA regulates covered entities'

---

[11] The *NSBU* court appeared to accept this characterization of the CTA as governing only corporate-

conduct, not their formation.

  ii. This failure of Plaintiffs' first argument dovetails with their second, which is that the CTA cannot constitutionally apply to community associations because they do not engage in commercial activity substantially affecting interstate commerce. Pl. Br. 39.[12] Two fatal flaws sink this argument.

  *First*, as a factual matter, Plaintiffs point to no evidence supporting their contention. Although the declarations they cite indicate that community associations' primary function is to ensure maintenance of their properties' common areas, *see id.*, notably absent is evidence of *how* community associations discharge this duty. Almost certainly they must hire employees or contractors—landscapers, handymen, and so on—to perform the necessary maintenance, something that is undoubtedly "an economic endeavor." *Gibbs*, 214 F.3d at 492 (citation omitted). Even if those transactions are entirely "[i]ntrastate"—a doubtable assumption in this age of ubiquitous electronic payment and banking options—they still have a "meaningful connection with [a] particular, identifiable economic enterprise or transaction." *Id.* (citation omitted). Indeed, the maintenance of common areas is, at base, "[t]he protection of commercial and economic assets." *Id.*; *see* Dkt. 14-1, Ex. A-3 ¶¶ 3-4 (attesting that community's amenities, which community association is tasked with providing, "increase the desirability of our community and add to the overall property values"). This evidentiary gap means Plaintiffs cannot carry their burden to justify the extraordinary relief sought.

  *Second*, as a legal matter, Plaintiffs' emphasis on the commerce *vel non* of only community associations is exactly the sort of myopic focus on individual entities subject to general regulation that

---

entity formation, further compounding its erroneous analysis of the statute as an exercise of the Commerce Clause power. *See* 2024 WL 899372, at *17 ("[T]he CTA regulates entities, owners, and applicants that incorporate an entity with their state, an 'isolated, discrete act[ ]'" (citation omitted)).

[12] This contention underscores the as-applied nature of Plaintiffs' constitutional challenge, which is relevant "to the breadth of the remedy employed by the Court" should it find Plaintiffs entitled to relief. *Citizens United v. FEC*, 558 U.S. 310, 331 (2010).

is categorically improper under the Commerce Clause. *See Raich*, 541 U.S. at 17-22. Even if Plaintiffs could show that they, or even community associations in general, do not engage in interstate commerce, they would be no different from the plaintiffs in *Raich*, one of whom grew marijuana for her own use and the other who received locally grown marijuana at no charge, 545 U.S. at 7, or the farmer in *Wickard v. Filburn*, who grew wheat in excess of a federal allotment solely for his farm's own consumption and "not intended in any part for commerce," 317 U.S. 111, 118 (1942). In both cases, the Supreme Court upheld the laws at issue in their application to entirely intrastate, non-commercial activity. What mattered was not the plaintiffs' particular circumstances, but rather the aggregate effect of the conduct of all regulated entities. *See Raich*, 545 U.S. at 18-19; *Wickard*, 317 U.S. at 127-28. Here, there can be no argument, and Plaintiffs advance none, that the activities of the regulated covered entities—especially the harmful economic practices the CTA is specifically designed to combat—do not have a substantial effect on interstate commerce in the aggregate.

      iii.      Plaintiffs' final argument—that the CTA lacks a "jurisdictional element" establishing a nexus to interstate commerce—fails along the same lines. Pl. Br. 39. The CTA expressly applies to identified covered entities formed under state law. 31 U.S.C. § 5336(a)(11). And while Plaintiffs complain that the statute does not "require[] that any such entities even engage in commercial activity before [it] applies," Pl. Br. 39, that is not the relevant test. As even Plaintiffs' own cited authority makes clear, a statute need only be drawn in such a way as to "ensure . . . that the [*regulated activity*] *in question* affects interstate commerce." *United States v. Lopez*, 514 U.S. 549, 561 (1995) (emphasis added). There is no requirement, and Plaintiffs can point to none, that *each regulated entity* must engage in interstate commerce, or even in commercial activity, before a regulation may be upheld under the Commerce Clause. Indeed, *Raich* and *Wickard*, among other cases, put the notion of any such requirement to rest. Because the CTA is already appropriately linked to interstate commerce, there is no need for an additional "jurisdictional element."

At bottom, when evaluating legislation passed under the Commerce Clause, the Supreme Court has "never required Congress to legislate with scientific exactitude." *Raich*, 545 U.S. at 17. Rather, "[w]hen Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate *the entire class.*" *Id.* (emphasis added) (citation omitted). Congress made just such a decision regarding the conduct of covered entities when it enacted the CTA, meaning that it may regulate the entire class of entities engaging in such conduct—including community associations.

### 2.   Foreign Affairs

In addition to the Commerce Clause, Congress was authorized to enact the CTA in the exercise of its powers to regulate foreign affairs and protect national security. *See, e.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017) ("National-security policy is the prerogative of the Congress and President."); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963) ("Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs."). Indeed, the "strong presumption of constitutionality due to an Act of Congress," *United States v. Di Re*, 332 U.S. 581, 585 (1948), takes on even more force when the statute in question "implicates sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010) ("[W]hen it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is marked[.]'" (citation omitted)).

Here, Congress found that "malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity," thereby "harming the national security interests of the United States and allies of the United States." NDAA § 6402(3). From these factual findings, Congress concluded that collecting BOI "is needed to" (1) "protect vital Unite[d] States national security interests"; (2) "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity"; and (3) "bring the United States into compliance with international

anti-money laundering and countering the financing of terrorism standards." *Id.* § 6402(5)(B), (D)-(E). The Executive Branch concurred with that assessment. *See, e.g.*, 87 Fed. Reg. at 59,498. The elected branches' foreign-affairs and national-security powers—which, like other enumerated powers, are amplified by the Necessary and Proper Clause—accordingly authorize the CTA.

Plaintiffs dispute the CTA's grounding in these constitutionally delegated powers because, allegedly, the statute "seeks to regulate the purely intrastate, local activity of entity formation." Pl. Br. 41.[13] For the reasons already discussed, this is not what the CTA does or is intended to do. *Supra* at 13-19. The statute seeks to address the *conduct* of covered entities, from the time of formation on (or, in the case of existing entities, starting on a date certain). Here again, once Plaintiffs' mischaracterization is corrected, the argument that the regulated conduct—including such indisputably harmful activities as money laundering and terrorism financing—is unrelated to the United States' national security or foreign affairs falls apart.[14] That the CTA is a lawful exercise of these powers likewise disposes of Plaintiffs' additional argument, unsupported by any legal authority, that the statute violates the Ninth and Tenth Amendments. Pl. Br. 41-42.

### 3.   Taxing Power

A third source of constitutional authority for the CTA is Congress' power "to lay and collect

---

[13] The *NSBU* court made the same mistake, as it did in its Commerce Clause analysis. *See* 2024 WL 899372, at *8 ("Congress is bound by the Constitution's enumerated powers limitation here, because incorporation is an internal affair.").

[14] The two cases on which Plaintiffs rely for this argument do them no good. The first, *Cort v. Ash*, had nothing to do with Congress' powers over foreign affairs and national security; rather, the Supreme Court merely declined to imply a federal damages cause of action by shareholders against corporate directors who allegedly violated a criminal statute prohibiting the use of corporate funds in certain elections. 422 U.S. 66, 68-70, 85 (1975). The second, *Bond v. United States*, was a statutory construction case that held only that a criminal statute aimed at chemical warfare was not intended *by Congress* to reach a jilted wife's amateur use of a chemical compound on certain items belonging to her husband's lover, such that the latter received "a minor chemical burn on her thumb, which she treated by rinsing with water." 572 U.S. 844, 852, 866 (2014). Here, by contrast, the CTA expressly applies to community associations that meet the statutory criteria.

taxes." U.S. Const., art. I, § 8, cl. 1. This power enables Congress to enact legislation requiring the disclosure of certain information to facilitate collection of taxes. *E.g.*, *Helvering v. Mitchell*, 303 U.S. 391, 399 (1938); *see CIC Servs., LLC v. IRS*, 593 U.S. 209, 213 (2021) (acknowledging IRS's "broad power" under statute "to require the submission of tax-related information that it believes helpful in assessing and collecting taxes"). With respect to the CTA, Congress determined that information gleaned from the reporting requirements at issue could be "highly useful" in enabling investigators to detect "serious tax fraud," 31 U.S.C. § 5336(a)(11)(B)(xxiv), and in improving "tax administration" generally, *id.* § 5336(c)(5)(B); *see* 87 Fed. Reg. at 59,501 ("[C]riminals . . . use shell companies to evade taxes, hide their illicit wealth, and defraud employees and customers."), 59,503 ("A Treasury study based on a statistically significant sample of adjudicated IRS cases from 2016-2019 found legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud."). Consequently, the CTA is a lawful exercise of Congress' taxing power, as amplified by the Necessary and Proper Clause. *See Jinks v. Richland Cnty.*, 538 U.S. 456, 462 (2003) (no requirement that statute be "*absolutely* necessary" to regulatory regime to uphold under Necessary and Proper Clause (citation omitted)); *Comstock*, 560 U.S. at 133-34 (sufficient if statute is "convenient, or useful" (citation omitted)); *see also Shultz*, 416 U.S. at 26 (upholding BSA reporting requirements that "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings" (citations omitted)).

Plaintiffs' counterargument, that the CTA cannot be an exercise of the taxing power because the statute's civil penalties are not a tax, is unavailing. Pl. Br. 40. As even Plaintiffs' own authority notes, the civil-penalty label is not dispositive of whether a financial exaction is a tax for taxing-power purposes. *See Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012). More fundamentally, Plaintiffs' argument misconstrues the scope of this power as *only* the authority to levy taxes; as just explained, the taxing power also authorizes legislation designed—as the CTA expressly is—to facilitate the

collection of taxes and, correspondingly, to defeat tax evasion.[15] Tellingly, Plaintiffs' bald insistence that the CTA "has nothing whatsoever to do with collecting federal income taxes" is unsupported by any authority, factual or legal. Pl. Br. 40.[16]

For these reasons, Plaintiffs are unlikely to succeed on the merits of their claim that the CTA exceeds the scope of Congress' enumerated powers.

B.      Section 528 Community Associations Are Not Generally Exempt from the CTA's Reporting Requirements Under the Plain Language of the Statute.

Plaintiffs are similarly unlikely to succeed on their request for a declaration that Section 528 community associations are exempt from the CTA's reporting requirements. At its core, Plaintiffs' challenge raises a policy argument—in their view, community associations *should* be exempt from the CTA for a variety of public policy reasons, not for any reason rooted in the statutory language. Plaintiffs seek a declaration that an exemption in the CTA applicable to non-profit organizations described in Section 501(c) of the Internal Revenue Code *also* applies to community associations covered by a different provision of the Internal Revenue Code, *i.e.*, Section 528. *See* 31 U.S.C. § 5336(a)(11)(B)(xix). The problem with Plaintiffs' argument is straightforward—most community associations simply are not Section 501(c) organizations and, under the plain text of the CTA, do not qualify for the NPO Exemption.

The ultimate goal of statutory interpretation is "to ascertain and implement the intent of Congress." *Broughman v. Carver*, 624 F.3d 670, 674-75 (4th Cir. 2010) (citation omitted). In furtherance

---

[15] That the CTA contains a scienter requirement, which is more characteristic of a punitive statute than a tax (Pl. Br. 40), is likewise of no moment, since the validity of the CTA as an exercise of Congress' taxing power in no way hinges on the statute's civil penalties being a tax.

[16] On this question, the *NSBU* court appeared to misunderstand the government to be arguing that the compelled collection of *any* information is justifiable under the taxing power as long as that information is disclosed to tax officials. *See* 2024 WL 899372, at *21. This is not, and was not, the government's position; rather, the CTA permits disclosure to tax officials of the information collected through the statute's reporting requirements *because* that information is relevant to and will facilitate tax collection and combat tax evasion—as Congress expressly found.

of this end, as with all statutes, interpretation of the CTA must begin with the plain meaning of the statutory language. *United States v. Ide*, 624 F.3d 666, 668 (4th Cir. 2010). When the statutory language is unambiguous on its face, the interpretive inquiry ends. *FERC v. Powhatan Energy Fund, LLC*, 286 F. Supp. 3d 751, 758 (E.D. Va. 2017). This inquiry is simple here.

Plaintiffs do not dispute that they are "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe," and thus qualify as a "reporting company" under the CTA, absent an applicable exemption. 31 U.S.C. § 5336(a)(11)(A). No enumerated exemption to the CTA's reporting requirements by its terms applies explicitly to community associations as such. *See generally id.* § 5336(a)(11)(B)(i)-(xxiii) (setting forth enumerated exemptions to the definition of "reporting company"). Instead, Plaintiffs rely on the NPO Exemption, which applies to any "organization that is described in section 501(c) of the Internal Revenue Code of 1986 . . . and exempt from tax under section 501(a) of such Code." 31 U.S.C. § 5336(a)(11)(B)(xix)(I). Plaintiffs admit that most community associations are not "described in section 501(c) of the Internal Revenue Code." Pl. Br. 17. This should be the end of the matter. The plain text of the NPO Exemption does not encompass these community associations covered by a different provision of the Code.

Despite this clear statutory language, Plaintiffs—which are a set of *different entities*—argue that they are nevertheless entitled to the NPO Exemption because they are "tax-exempt NPOs," albeit ones described in a provision of the Internal Revenue Code other than Section 501(c). *Id.* That provision—Section 528—applies specifically to homeowners associations and provides that they "shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. § 528(a). In Plaintiffs' view, because they are exempt from income taxes under Section 528(a), they should be considered tax exempt for *all* purposes, including the NPO Exemption. The language of the CTA forecloses this argument. The

NPO Exemption does not apply to "tax-exempt organizations" generally. By its terms, it applies *only* to organizations "described in section 501(c) of the Internal Revenue Code," which Plaintiffs indisputably are not, based on their own complaint. The Internal Revenue Code thus treats these two types of entities differently. Reading the CTA to do the same is not an absurd result. *See In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir. 2004).

Although not necessary to reject Plaintiffs' position, the legislative history of the CTA further counsels against a broad reading of the NPO Exemption. This history suggests that the Exemption should be given a "narrow construction and careful review in light of past evidence of wrongdoers misusing charities, foundations, and other nonprofit entities to launder funds and advance criminal and civil misconduct." 166 Cong. Rec. S7311 (2020) (Statement of Sen. Brown). The Department of the Treasury noted this position when it adopted the CTA's implementing regulation, highlighting that the agency, too, had observed "instances where criminals and terrorist groups have abused charitable organizations." *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59,498, 59,542 (Sept. 30, 2022).

At bottom, Plaintiffs disagree with this policy assessment by Congress, arguing that community associations are not susceptible to illegal activity and should be treated like Section 501(c) non-profits. Pl. Br. 18.[17] In support of this policy argument, Plaintiffs repeatedly point to legislation

---

[17] Plaintiffs argue that they should be treated like Section 501(c) organizations in part because both are required to abide by similar due diligence and accountability standards. Although this policy argument is not relevant to the statutory construction analysis, Plaintiffs are mistaken. Section 501(c) organizations are generally subject to specific public disclosure requirements not applicable to Section 528 organizations or other community associations. *See, e.g.*, 26 U.S.C. § 6104. Moreover, except in the case of small organizations, Section 501(c) organizations must file IRS Form 990 or Form 990-EZ annually, which include reporting of all "officers, directors, trustees" and certain employees. *See* IRS Form 990, Return of Organization Exempt from Income Tax, *available at* https://www.irs.gov/pub/irs-pdf/f990.pdf (last visited Sept. 24, 2024); IRS Form 990-EZ, Short Form - Return of Organization Exempt From Income Tax, *available at* https://www.irs.gov/pub/irs-pdf/f990ez.pdf (last visited Sept. 28, 2024). In contrast, Section 528 organizations and housing

currently pending in Congress that would add to the CTA an explicit exemption for entities "subject to taxation under section 528 of the Internal Revenue Code of 1986." *Community Association Reporting Exemption Act*, H.R. 9045, 118th Congress (2024); *see* Pl. Br. 9, 18; Dkt. 14-3. Far from helping Plaintiffs, however, this fact undercuts their argument. The basis for this proposed amendment is that, without the amendment, community associations covered by Section 528 are *not exempt* from the CTA's reporting requirements. Plaintiffs' recourse is therefore with Congress, not this Court. *Thaler v. Hirshfeld*, 558 F. Supp. 3d 238, 248 n.5 (E.D. Va. 2021) ("Matters of policy are for Congress, not the courts, to decide." (citation omitted)).

C.  Plaintiffs' APA Claims Fail Because the FAQs Are Not Final Agency Action and Merely Explain the Statute and Implementing Regulation.

For many of the same reasons, Plaintiffs' APA claims are without merit. As an initial matter, Plaintiffs' argument is based on a faulty premise—that FinCEN's FAQs denied CAI's request for an exemption. That is simply incorrect. The record is clear that CAI's request for an exemption is still pending, and that the FAQs had no effect on Plaintiffs' duties under the CTA. Martinelli Decl. ¶¶ 10, 15-16. Knowing that any challenge to a (potential) future rejection of their exemption request is not ripe, Plaintiffs try to circumvent the ripeness doctrine by characterizing the FAQs as a final agency action that effectively denies their exemption request. Yet, under well-settled Fourth Circuit authority, the FAQs are not a final agency action and thus are not subject to judicial review under the APA. The FAQs merely restate the requirements of the CTA and its implementing regulation and do not alter Plaintiffs' existing obligations under the statute. Under the current language of the statute, Plaintiffs must comply with the reporting requirement as applicable unless and until FinCEN grants an

---

cooperatives file a return that requires no such reporting or public disclosures. *See* IRS Form 1120-H, U.S. Income Tax Return for Homeowners Associations, *available at* https://www.irs.gov/pub/irs-pdf/f1120h.pdf (last visited Sept. 24, 2024); IRS Form 1120-C, U.S. Income Tax Return for Cooperative Associations, *available at* https://www.irs.gov/pub/irs-pdf/f1120c.pdf (last visited Sept. 28, 2024).

exemption.

Even if their challenges to the FAQs were reviewable, Plaintiffs' APA claims are without merit. Because the FAQs only explain the existing statutory and regulatory requirements, without altering any obligations, the FAQs are not subject to notice and comment procedures, nor are they arbitrary and capricious. Plaintiffs are thus unlikely to succeed on the merits of their APA claims.

### 1. Plaintiffs' Attempt to Circumvent the Ripeness Doctrine by Challenging the FAQs Fails.

Plaintiffs' APA claims crumble once their flawed—indeed, factually incorrect—premise is rejected. Defendants have not yet acted on Plaintiffs' request for an exemption and any challenge to such a rejection is not ripe for judicial review. The ripeness doctrine, rooted in the case or controversy requirement of Article III, requires courts "to avoid taking premature judicial action, thereby preventing them from becoming entangled in abstract disagreements." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (cleaned up). "[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* (citation omitted). Plaintiffs' challenge, at its core, is dependent on a future event that may or may not occur.  Any challenge must await FinCEN's final decision.

CAI submitted its exemption request in a letter dated December 28, 2023. Martinelli Decl., Ex. A. On July 25, 2024, FinCEN notified CAI by letter that the request was under consideration. Dkt. 14-4. In the letter, FinCEN explained that because community associations "are not specifically listed within [the statutory and regulatory] exemptions," community associations that qualify as reporting companies and do not otherwise meet the criteria for an enumerated exemption must comply with the CTA's reporting requirements. *Id.* The letter also explained the process for obtaining from the Director of FinCEN an exemption from these requirements pursuant to 31 U.S.C. § 5336(a)(11)(B)(xxiv). The letter explained that the exemption process requires issuance of a regulation and the concurrence of the Attorney General and Secretary of Homeland Security. Notably,

the letter informed CAI that

> FinCEN is considering your request to exempt a class of HOA entities, pursuant to the above legal requirements. In the meantime, however, as stated previously, unless an entity qualifies for an exemption found at 31 CFR 1010.380(c)(2), it may be considered a reporting company that must report its BOI to FinCEN.

*Id.* FinCEN and CAI representatives discussed this pending request on August 20, 2024, but FinCEN has issued no further notice to CAI regarding the status of the exemption request, and the request remains pending. Martinelli Decl. ¶ 16.

The record is thus absolutely clear—FinCEN has neither approved nor denied CAI's request for an exemption. Plaintiffs themselves seem to recognize this fact; during the pendency of this litigation, CAI has continued to press FinCEN for a decision on the exemption request. Ex. 2. Any challenge to a potential denial that has not yet occurred would fall at the heart of the ripeness doctrine, "rest[ing] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Scoggins*, 718 F.3d at 270 (citation omitted).[18]

### 2.     The FAQs Are Not Final Agency Action and Thus Are Not Subject to Review Under the APA.

Perhaps appreciating that a challenge to the *actual* outcome of their exemption request is not ripe, Plaintiffs refashion their claim as a challenge to the FAQs. In Plaintiffs' view, the FAQs operate as a de facto denial of their exemption request by requiring them to comply with the CTA. This Court should reject Plaintiffs' transparent attempt to shoehorn their disagreement with the substance of the CTA into a challenge to the FAQs. These informal FAQs do not represent a final determination by the agency regarding Plaintiffs' rights or obligations and are not subject to judicial review.

Only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. To qualify as "final," an agency action must "mark the 'consummation' of the agency's decisionmaking process," meaning

---

[18] Plaintiffs do not challenge the process FinCEN is using to consider their pending exemption request or assert a claim that a decision has been unduly delayed.

it is not "of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). The action must also "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (cleaned up); *see Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 431-32 (4th Cir. 2010) (holding that FAQs were not final agency action where they "attempt[ed] to restate or report what already exists in the relevant body of statutes, regulations, and rulings"). Neither requirement is met here.

The "decisionmaking process" Plaintiffs challenge is FinCEN's use of the FAQs to (ostensibly) deny CAI's request for an exemption from the CTA. Plaintiffs are mistaken about the nature of the FAQs. The FAQs do not represent the "consummation of the agency's decisionmaking process" with respect to CAI's exemption request. As discussed above, FinCEN has notified CAI that the request is pending and under consideration. Martinelli Decl. ¶ 16. The FAQs do not address the points raised in CAI's exemption request because the FAQs are not directed toward, nor do they resolve, that request. *Id.* ¶ 15. Rather than purporting to adjudicate CAI's exemption request, the FAQs were issued as informal guidance after FinCEN received questions seeking clarification of the applicability of the CTA's provisions to community associations in the first instance. *Id.*

Because the FAQs do not resolve CAI's exemption request, the contents of the FAQs do not determine Plaintiffs' rights or obligations, nor do new legal consequences flow from them. *Bennett*, 520 U.S. at 177. Plaintiffs were required to comply with the CTA both before and after the FAQs were issued. As FinCEN has repeatedly stated—including in the FAQs themselves and in the July 2024 letter to CAI—community associations that qualify as reporting companies, and are not otherwise exempt, are required to report BOI *by statute. See supra* Section I.B. The FAQs did not—and could not—alter Plaintiffs' statutory obligations. The only process that could alter the obligations of community associations is the one outlined by Congress, namely, promulgation of a regulation with the concurrence of the Attorney General and Secretary of Homeland Security, pursuant to 31 U.S.C.

§ 5336(a)(11)(B)(xxiv). *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (explaining that "[t]he decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue." (quoting *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018)).

At bottom, the FAQs do not change the status quo. They merely explain the pre-existing statutory and regulatory requirements in layman's terms directly to community associations. Martinelli Decl. ¶ 10. This is not final action under the APA. *See Golden & Zimmerman*, 599 F.3d at 431-32. The FAQs themselves clearly state that they "are explanatory only and do not supplement or modify any obligations imposed by statute or regulation."[19] *See Jake's Fireworks*, 105 F.4th 633 (looking to whether the agency itself characterized the challenged action as final). "If the APA made informal advice like these [FAQs] subject to judicial review, it seems likely that many voluntary and helpful comments from agency staff would be withheld altogether." *Id.* at 634 (cleaned up). Plaintiffs' position "would quickly muzzle any informal communications between agencies and their regulated communities— communications that are vital to the smooth operation of both government and business." *Id.* (cleaned up). The FAQs impose no new obligations, nor do they have any impact whatsoever on Plaintiffs' request for an exemption. Indeed, the CTA's application to most community associations is the very *premise* of the exemption request that Plaintiffs now claim the FAQs somehow resolved. For these reasons, the FAQs are not final agency action subject to judicial review under the APA. 5 U.S.C. § 704.

### 3.   Even If the FAQs Were Reviewable, They Are Interpretative Rules and Thus Were Not Required to Undergo Notice and Comment Rulemaking.

Even if the FAQs constituted final agency action (they do not), they were not required to

---

[19]   *Beneficial Ownership Information*, Financial Crimes Enforcement Network, *available at* https://www.fincen.gov/boi-faqs (last visited Sept. 21, 2024).

undergo notice and comment rulemaking for many of the same reasons discussed above—the FAQs merely explain the CTA and its implementing regulation. Under the APA, agencies generally must provide notice of proposed rules and an opportunity for interested persons to submit comments before rules are promulgated. 5 U.S.C. § 553(b), (c). However, "[n]ot all 'rules' must be issued through the notice-and-comment process." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). The APA contains an exception for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b).

Interpretive rules are "merely a clarification or explanation of an *existing statute or rule*," and "only 'remind' affected parties of existing duties." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) (brackets and citations omitted). In contrast, a substantive rule is required to undergo notice and comment rulemaking and "creates new law or imposes new rights or duties." *Id.* (citation omitted).

Plaintiffs challenge two FAQs: C.10 and D.13, which provide as follows:

**C. 10. Are homeowners associations reporting companies?**

It depends. Homeowners associations (HOAs) can take different forms. As with any entity, if an HOA was not created by the filing of a document with a secretary of state or similar office, then it is not a domestic reporting company. An incorporated HOA or other HOA that was created by such a filing also may qualify for an exemption from the reporting requirements. For example, HOAs recognized by the IRS as section 501(c)(4) social welfare organizations (or that claim such status and meet the requirements) may qualify for the tax-exempt entity exemption. *An incorporated HOA that is not a section 501(c)(4) organization, however, may fall within the reporting company definition and therefore be required to report BOI to FinCEN.*

[Updated June 10, 2024][20]

(Emphasis added).

\*        \*        \*

---

[20] *Available at* https://www.fincen.gov/boi-faqs#C_10 (last visited Sept. 17, 2024).

### D. 13. Who is the beneficial owner of a homeowners association?

*A homeowners association (HOA) that meets the reporting company definition and does not qualify for any exemptions must report its beneficial owner(s).* A beneficial owner is any individual who, directly or indirectly, exercises substantial control over a reporting company, or owns or controls at least 25 percent of the ownership interests of a reporting company.

There may be instances in which no individuals own or control at least 25 percent of the ownership interests of an HOA that is a reporting company. However, FinCEN expects that at least one individual exercises substantial control over each reporting company. Individuals who meet one of the following criteria are considered to exercise substantial control over the HOA:

- o   the individual is a senior officer;
- o   the individual has authority to appoint or remove certain officers or a majority of directors of the HOA;
- o   the individual is an important decision-maker; or
- o   the individual has any other form of substantial control over the HOA.

[Issued April 18, 2024][21]

(Emphasis added).

Plaintiffs argue that these FAQs "substantively change Community Associations' understanding of their obligations under the CTA," because (1) the FAQs "indicate that FinCEN presumes Community Associations are 'reporting companies,'" and (2) the FAQs define the term "beneficial owner" as applicable to community associations. Pl. Br. 23. Even taken as true, neither rationale renders the FAQs anything more than an interpretive rule.

First, the FAQs' statement that some community associations may be covered by the CTA is merely an explanation of the statutory requirements. As described *supra* Section I.B, community associations' potential status as reporting companies under the CTA is controlled by the language of the statute itself. FAQ C.10 correctly explains that unless a community association is a Section 501(c)(4) organization, it "*may* fall within the reporting company definition" and be subject to the CTA's requirements (emphasis added). FAQ C.10 thus does nothing more than restate the

---

[21] *Available at* https://www.fincen.gov/boi-faqs#D_13 (last visited Sept. 17, 2024).

requirements set forth in the statute.

The first sentence of FAQ D.13 is even less substantive; it merely reiterates the generic proposition that any community association "that *meets the reporting company definition and does not qualify for any exemptions*" must comply with the statute (emphasis added). Put differently, FAQ D.13 states only that entities covered by the statute must comply with its terms. This statement thus "remind[s] affected parties of existing duties." *Children's Hosp. of the King's Daughters, Inc.*, 896 F.3d at 620.

Plaintiffs' contention that FAQ D.13 imposes new substantive obligations through its definition of "beneficial owners" fares no better. Pl. Br. 23. Plaintiffs claim that "neither the CTA nor the regulations mention" the terms "senior officers," individuals who are authorized to "appoint or remove certain officers," or "important decision-makers" in the definition of "beneficial owner." Pl. Br. 23. Once again, Plaintiffs are mistaken. The guidance in FAQ D.13 is drawn directly from the CTA's implementing regulation, 31 C.F.R. § 1010.380.[22] The regulation defines "beneficial owner" to include an individual who "[s]erves as a *senior officer* of the reporting company," has "*authority over the appointment or removal* of any senior officer or a majority of the board of directors (or similar body)," or "[d]irects, determines, or has substantial influence over *important decisions* made by the reporting company." *Id.* § 1010.380(d) (emphasis added). FAQ D.13 merely translates these regulatory concepts into laymen's terms, using much of the same language as the regulation—the definition of an "interpretive rule."

Accordingly, Plaintiffs' heavy reliance on *Texas Children's Hospital v. Azar*, 315 F. Supp. 3d 322 (D.D.C. 2018), does not help them, leaving aside that the court there did not address whether the FAQs were final agency actions. Pl. Br. 22-23. In that case, "neither the text of the governing statute nor the text of the governing rule support[ed]" the FAQ in question and, indeed, the FAQ was "in

---

[22] Plaintiffs do not challenge 31 C.F.R. § 1010.380 as arbitrary or capricious under the APA.

conflict with the plain text" of the regulation. *Id.* at 335. Because that FAQ made a "substantive change" by attempting to amend a prior regulation, the FAQ should have undergone notice and comment rulemaking. *Id.* at 339; *see also Children's Hosp. of the King's Daughters, Inc.*, 896 F.3d at 623 (reaching same result). That is not the case here. Both FAQ C.10 and D.13 were drawn directly from the language of the statute and implementing regulation and impose no new obligations on Plaintiffs. The FAQs are a quintessential example of an informal agency action that "remind[s] affected parties of existing duties." *Id.* at 620 (citation omitted). Because the FAQs are, at most, interpretive rules, they are not subject to the APA's notice and comment procedures.

### 4. Even If the FAQs Were Reviewable Final Agency Action, They Are Not Arbitrary and Capricious.

Even if the FAQs constituted final agency action subject to judicial review, Plaintiffs' contention that the FAQs are arbitrary and capricious is without merit. This Court's review under the APA is circumscribed, *see Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), as the APA authorizes the Court to "set aside" an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). This standard is extraordinarily "narrow" and does not authorize a district court "to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). This Court "perform[s] only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment." *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 263 (4th Cir. 2006) (cleaned up).

The FAQs would easily satisfy the APA's deferential standard. As discussed, the FAQs track the language of the CTA and its implementing regulation. *See supra* Section I.B. Informal guidance directly applying statutory and regulatory language by its nature cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Rather than disputing this basic point, Plaintiffs argue that the FAQs are arbitrary and capricious because they amount to a "*de facto* denial" of CAI's exemption request without addressing the policy-based reasons CAI raised in that request. Pl. Br. 24-25. For the reasons discussed above, however, Plaintiffs fundamentally misunderstand the role of the FAQs. They did not—nor did they purport to—deny CAI's exemption request. Martinelli Decl. ¶ 15. The FAQs did not address the points CAI raised because they had no relationship to that request.

This disconnect highlights the rationale for the final agency action requirement. Plaintiffs were not entitled to a reasoned basis for denying their request in informal guidance that did not, in fact, deny their request. Ultimately, the substance of the FAQs—which merely reiterate community associations' current statutory and regulatory duties—is not arbitrary and capricious.

In sum Plaintiffs are unlikely to succeed on the merits of any of their APA claims—the FAQs are not reviewable by this Court and, in any event, are not arbitrary or capricious and were not required to undergo the notice and comment process.

D.  The CTA Does Not Violate the First or Fourth Amendments of the Constitution.

Faced with a statute passed pursuant to Congressional authority and FAQs that do not affect their rights, Plaintiffs turn to a series of alarmist claims about the CTA, arguing that the reporting requirements violate the First and Fourth Amendment rights of community associations and their board members. Yet the CTA does just what countless other statutes do, and what has been approved by the Supreme Court—it imposes a reporting requirement on certain business and similar entities. Plaintiffs are not likely to succeed on their First and Fourth Amendment claims.

1.  **Fourth Amendment**

Plaintiffs' Fourth Amendment claim is meritless. The Supreme Court has long recognized that reporting requirements of the kind at issue here raise no Fourth Amendment concern. Yet Plaintiffs conspicuously fail to even cite, much less substantively address, the controlling case on this question.

In *California Bankers Ass'n v. Shultz*, the Court upheld a statute requiring banks to report transactions over a specified dollar amount to the government. 416 U.S. at 67; *see* 31 U.S.C. § 5313. For each covered transaction, a bank must disclose the name, address, and social security number of the person making the transaction. *See Shultz*, 416 U.S. at 39 n.15; *see also, e.g.*, 31 C.F.R. § 1010.312. Congress explained that this information would be "highly useful" in "criminal, tax, or regulatory investigations." 31 U.S.C. § 5311(1). Because the relevant "information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type," the Court concluded that the reporting requirements were reasonable and sustained them under the Fourth Amendment. *Shultz*, 416 U.S. at 67. That conclusion reflects the well-established principle that when the government does not seek to make "non-consensual entries into areas not open to the public," and instead merely requires regulated entities to divulge certain records, the Fourth Amendment is more readily satisfied. *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).

Consistent with these precedents, Congress has routinely enacted reporting requirements. For example, federal law requires (i) taxpayers to file tax returns and various entities to file tax information returns, 26 U.S.C. §§ 6012, 6031-60; (ii) employers to collect and make available information about new employees' eligibility to work, *see* 8 U.S.C. § 1324a; and (iii) political campaigns to report contributions and expenditures, *see* 52 U.S.C. § 30104. As the Supreme Court has explained, "reporting requirements are by no means *per se* violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States." *Shultz*, 416 U.S. at 59-60.

The CTA falls comfortably within the category of reasonable reporting requirements that have long been understood to be constitutional. *See Firestone*, 2024 WL 4250192, at *10 (citing *Shultz* to conclude that "the Supreme Court . . . has recognized that reporting requirements of the kind at issue

[in the CTA] are not prohibited by the Fourth Amendment"). As with the statute at issue in *Shultz*, the CTA directs the disclosure of information that Congress identified as "highly useful" to combatting serious crimes. *See* NDAA § 6402(8)(C); 31 U.S.C. § 5311(1). And with respect to the CTA in particular, Congress found that corporate ownership reporting requirements were "needed" to combat "the financing of terrorism" and to "protect vital United States national security interests." NDAA § 6402(5)(B), (D). The CTA therefore serves government interests of the highest order.

Despite Plaintiffs' protestations to the contrary, their privacy interest in the requested information is modest. Indeed, to take one example, every taxpayer reports similar information— name, social security number, etc.—to the IRS with their annual tax return. And board members' involvement with the community associations they serve is, by definition, not closely held information—their leadership roles are known to their communities. In any event, any asserted privacy interest would be minimized by detailed safeguards within the CTA. When FinCEN receives beneficial ownership information, it may disclose that information only to law enforcement and other governmental entities in specified circumstances that sometimes require court authorization. *See* 31 U.S.C. § 5336(c)(2). And those circumscribed entities that receive ownership information from FinCEN must restrict access, implement security measures, and comply with many similar protocols. *See id.* § 5336(c)(3). Any individual who violates those protocols is subject to serious criminal and civil penalties. *See id.* § 5336(c)(4). Moreover, Congress exempted 23 types of entities from the beneficial ownership reporting requirements.

Plaintiffs make no attempt to reconcile their Fourth Amendment argument with *Shultz* or with the many reporting requirements that have long been understood as constitutional. Plaintiffs' theory, if adopted, would subject vast swaths of state and federal law to Fourth Amendment challenge, and this Court would have to declare *Shultz* wrongly decided. That is fatal to Plaintiffs' argument. But rather than grapple with cases addressing reporting requirements, Plaintiffs chiefly rely (Pl. Br. 28-29)

on *City of Los Angeles v. Patel*, which addressed an ordinance that permitted police officers to enter hotels and inspect their guest registers at any time of the day or night, as often as they liked, 576 U.S. 409, 421 (2015). That decision casts no doubt on the constitutionality of a statute that requires certain businesses to self-report their beneficial owners.

Alternatively, even as to cases that establish a warrant requirement in some contexts, the CTA falls within the "special needs" exception to such a requirement. *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989). The CTA addresses a need "beyond the normal need for law enforcement," *id.*—that is, the advancement of U.S. national security and foreign policy interests, *see Klayman v. Obama*, 805 F.3d 1148, 1149 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc). The compelling need to address threats to "U.S. national security and foreign policy interests," 87 Fed. Reg. at 59,500, outweighs any privacy interest in the limited disclosures required by the CTA, *cf. United States v. Gordon*, 2016 WL 11668976, at *3 (D. Mass. Aug. 30, 2016).

### 2. First Amendment

Plaintiffs next allege that the CTA violates their First Amendment rights in two ways. Plaintiffs first argue that the CTA constitutes impermissible compelled speech and, second, that the CTA impairs their rights of association. Neither argument is likely to prevail. *See Firestone*, 2024 WL 4250192, at *9.

***Compelled Speech***. As to Plaintiffs' first argument, *see* Pl. Br. 31-33, the compelled-speech doctrine typically applies only when the government requires an individual (1) to convey a "particular message" publicly, *see, e.g.*, *McClendon v. Long*, 22 F.4th 1330, 1336 (11th Cir. 2022) (doctrine applied where sheriff placed sign in front yards of sex offenders warning public not to trick or treat there); *United States v. Sindel*, 53 F.3d 874, 877-78 (8th Cir. 1995) ("A First Amendment protection against compelled speech . . . has been found only in the context of governmental compulsion to disseminate a particular political or ideological message."), or (2) to publicly disclose certain factual information

intertwined with controversial or issue-based matters, *see, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (law requiring clinics to notify women of certain state-provided medical services, including abortion); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797-98 (1988) (statute requiring fundraisers to disclose financial information to potential donors). There can be no dispute that the CTA lacks any such requirement. Rather, the information the CTA requires entities to disclose is "not for publication, nor is it a matter of considerable controversy, such as compelling political, ideological or religious speech." *MA LEG Partners 1 v. City of Dallas,* 442 F. Supp. 3d 958, 968 (N.D. Tex. 2020).

The CTA requires only the disclosure of a narrow set of facts about an organization itself, as well as its beneficial owners and, in some cases, applicants: legal names, dates of birth, addresses, and an identifying number from a government issued document, *e.g.,* a driver's license. 31 U.S.C. § 5336(b)(2)(A); *see also* 31 C.F.R. § 1010.380(b)(1)(ii)(E) (requiring submission of image of identifying document from which identifying number was obtained). Requiring organizations "to disclose purely factual and uncontroversial information," as the CTA does here, "does not contravene the First Amendment." *Ass'n of Priv. Sector College & Univs. v. Duncan*, 110 F. Supp. 3d 176, 199-200 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016). Indeed, given the law enforcement, national security, and foreign policy objectives of the CTA, the reporting of such information is "essential to the maintenance of effective government and orderly society[,]" *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring), such that the compelled speech doctrine is not implicated, *Sindel*, 53 F.3d at 878 ("The IRS summons requires Sindel only to provide the government with information which his clients have given him voluntarily, not to disseminate publicly a message with which he disagrees."); *Doe v. Trump*, 2020 WL 5492994, at *3 (C.D. Cal. Sept. 2, 2020) (compelled-speech doctrine does not apply to IRS requirement that individual select filing status). Thus, rational

basis review applies, *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011), and the CTA readily withstands that review.

Plaintiffs argue that the government instead must "prove that the compelled disclosures are neither unjustified nor unduly burdensome." Pl. Br. 32. These terms appear in Supreme Court precedent analyzing burdens on commercial speech. *See Ibanez v. Fl. Dep't of Bus. & Prof Reg.*, 512 U.S. 136, 146 (1994); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) ("[U]njustified or unduly burdensome disclosure requirements *might* offend the First Amendment by chilling commercial speech."). Even if those requirements applied here, the CTA's obligations—which require covered entities to disclose limited facts about themselves and their beneficial owners and, in some cases, applicants—are certainly neither unjustified nor unduly burdensome. Plaintiffs' brief, by advancing only the simple position that at least some community associations may fall within the scope of entities that are not exempt from the requirement, fails to show otherwise. The CTA's requirements are not unjustified, as explained above, as the CTA was enacted to strengthen the government's ability to detect and prosecute financial crime. *See supra* at 3-8. And in imposing these reporting requirements, Congress was acutely aware of—and took steps to minimize—the potential burden associated with compliance. 31 U.S.C. § 5336(b)(1)(E)(ii); *id.* § 5336(b)(1)(F)(iii); *id.* § 5336(b)(4)(B)(i); *see also* 166 Cong. Rec. at H6928 (statement of Rep. Luetkemeyer); *id.* at H6932 (statement of Rep. McHenry); 166 Cong. Rec. at S7312 (statement of Sen. Brown).

***Freedom of Association.*** Plaintiffs' argument that the CTA chills their association rights is no more likely to prevail. At the outset, the covered entities at issue here—community associations— are ones generally engaged in commerce to benefit their members, and "[a]ctivities and services that are primarily commercial rather than communicative do not qualify as expressive association that is protected under the First Amendment." *Edmondson v. Velvet Lifestyles, LLC*, 2016 WL 7048363, at *10 (S.D. Fla. Dec. 5, 2016) (citation omitted); *see also, e.g., City of Dallas v. Stanglin*, 490 U.S. 19, 24-25

(1989); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 631-40 (1984) (O'Connor, J., concurring in part and concurring in the judgment); *Rivers v. Campbell*, 791 F.2d 837, 840 (11th Cir. 1986). Accordingly, their freedom of association claim fails at the outset.[23]

Even if the Court were to hold that Plaintiffs may properly invoke the protection of the First Amendment's right to free association, Plaintiffs' theory fails on the merits. Plaintiffs speculate that the prospect of complying with the CTA will cause board members to resign, but they offer no evidence that any such board members have, as of yet, declined to become part of the management of a covered entity because that fact (known within the communities they serve) will also be known to the federal government, which may use that information only for a circumscribed set of purposes. More importantly, however, even crediting Plaintiffs' assertions about the possibility that some board members will resign their duties as a result of the CTA's disclosure requirements, such claims "surely . . . [are]n't sufficient" *Gardner v. Mutz*, 962 F.3d 1329, 1341 (11th Cir. 2020), as they fall far short of the concretized showing of threats, harassment, or other significant harm that courts look for when assessing these claims. *See Citizens United*, 558 U.S. at 370 (as-applied challenge to a disclosure requirement can succeed only when there is a "reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed"); *Laird v. Tatum*, 408 U.S. 1, 13 (1972); *Ala. State Fed'n of Tchrs., AFL-CIO v. James*, 656 F.2d 193, 197 (5th Cir. 1981). Indeed, a First Amendment freedom of association claim may lie only when a plaintiff can show that a disclosure requirement "will result in threats, harassment, or reprisals to specific individuals." *Master Printers of*

---

[23] Plaintiffs argue that part of the services they offer is "communicat[ing] in a collective way with government officials" about matters of concern, including "traffic snarls, emergency vehicle throughways, safety related to line painting on streets and roads . . . and debris." Pl. Br. 35; Dkt. 14-1, Ex. A-3 ¶ 12. Notably, Plaintiffs do not allege that they are a political organization as defined in 26 U.S.C. § 527(e)(1), as such organizations are exempt from the CTA's disclosure requirements, 31 U.S.C. § 5336(a)(11)(B)(xix)(II), or that they are seeking to advance a specific set of political beliefs. Moreover, Plaintiffs have not argued or shown that the CTA's requirements restrict or limit their ability to engage with local government as needed.

*Am. v. Donovan*, 751 F.2d 700, 704 (4th Cir. 1984) (holding plaintiffs had failed to make a showing of a requisite level of potential harm from the disclosure requirement); *see also Am. for Prosp. Found. v. Bonta*, 594 U.S. 595, 617 (2021) (plaintiffs made a showing of a chilling effect by introducing record evidence that they were subjected to bomb threats, protests, stalking, and physical violence).

Further, even if Plaintiffs could overcome this evidentiary deficiency, any infringement on their freedom of association is justified. Although Plaintiffs argue otherwise, Pl. Br. 34-35, the Court need not apply exacting scrutiny because the record does not establish that any plaintiff before the Court is seeking to advance "political, economic, religious or cultural" beliefs, *Bonta*, 594 U.S. at 606; *see Ward v. Thompson*, 2022 WL 14955000, at *2 (9th Cir. Oct. 22, 2022).  The statute requires purely factual information about beneficial owners and applicants (not customers or donors) of entities that have chosen to seek corporate status.

Even if exacting scrutiny were to apply, the CTA would easily pass muster. Plaintiffs cannot deny that the government has a sufficiently important interest in national security, foreign policy, and anti-money laundering measures. And there is a substantial relation between those interests and the collection of beneficial ownership and applicant information. *See, e.g.*, Pub. L. 116-283 §§ 6002, 6402(3)-(5), 134 Stat. at 4547-48, 4604; 31 U.S.C. § 5331; H.R. Rep. No. 116-227, at 10-11; 87 Fed. Reg. at 59,501, 59,547; *cf. Buckley v. Valeo*, 424 U.S. 1, 64-68 (1976). Additionally, the requirements are narrowly tailored to discrete categories of information that are "highly useful," none of which mandates disclosure of the purpose of the Plaintiffs, or the identities of their clients, customers, or employees. *See generally* 31 U.S.C. § 5336; 166 Cong. Rec. at H6928, H6932 (statements of Rep. Luetkemeyer and Rep. McHenry) (noting that CTA minimizes burden on small businesses). As the Fourth Circuit has made clear, "there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the 'free functioning of our national institutions' is involved." *Master Printers*, 751 F.2d at 706 (quotation omitted). One such interest is the "deterrence of

actual corruption," and the "government's power to inform itself through investigations in order to act and protect its legitimate and vital interests." *Id.* (quotation omitted). As the legislative history of the CTA conclusively demonstrates, the statute is substantially related and narrowly tailored to serving these twin goals.

## II.    Plaintiffs Fail to Show Irreparable Harm Absent Injunctive Relief.

Plaintiffs also fail to make out the second required showing for a preliminary injunction—irreparable harm. The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis added). Conclusory or speculative allegations do not establish a likelihood of irreparable harm. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); *see Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) ("The plaintiff must make a clear showing of irreparable harm and the required irreparable harm must be neither remote nor speculative, but actual and imminent."). Plaintiffs identify two claimed irreparable harms absent an injunction, but neither withstands scrutiny.

*First*, Plaintiffs assert that the deprivation of their constitutional rights constitutes irreparable harm. Pl. Br. 42. But for the reasons explained above, Plaintiffs have wholly failed to show that the CTA's reporting requirements in fact violate the Constitution. *See supra* Section I.D. And "[w]ithout [their] alleged constitutional injury, [Plaintiffs] ha[ve] failed to show that [they] will suffer irreparable harm." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).

*Second*, Plaintiffs contend that denying their request for an injunction will prompt "an immediate mass resignation of their volunteer Board members," which—they claim—will result in community associations being unable to "operat[e] as state laws require." Pl. Br. 42-44. There are two fatal flaws in this argument. To start, the evidence Plaintiffs have submitted is inadequate to demonstrate that the claimed harm will even occur. At best, Plaintiffs' evidence shows only that two

board members from two different community association governing boards—out of "more than 365,000 Community Associations in America"—"no longer wish" to serve in their positions due to the CTA. Dkt. 14-1, Ex. A-3 ¶ 14, Ex. A-4 ¶ 15, Ex. A-6 ¶ 5. The other three declarants attest only that they *may* resign. *See* Dkt. 14-1, Ex. A-1 ¶ 20 ("I am *likely* to resign" (emphasis added)), Ex. A-2 ¶ 17 ("I am *seriously considering* whether to continue to volunteer" (emphasis added)), Ex. A-5 ¶ 16 ("I and other members of my Board are *unlikely* to continue volunteering" (emphasis added)). Plaintiffs' evidence therefore shows, at most, that the CTA will prompt between two and five resignations from different governing boards—hardly a mass resignation that threatens the survival of even the Plaintiff community associations, let alone such organizations nationwide. And even if Plaintiffs could show that *all* of these declarants would resign their positions, there is no record evidence—beyond bald speculation—that no one would step in to replace them. Plaintiffs accordingly have failed to carry their burden of establishing that the threatened harm is "neither remote nor speculative, but actual and imminent." *Scotts Co.*, 315 F.3d at 284 (citation omitted).

On top of Plaintiffs' failure to show that they will suffer harm, there is also no evidence to support a finding that the claimed harm would be *irreparable*. Even if the Court were to assume, *arguendo*, that Plaintiffs' sparse evidence could establish that there will be a large-scale resignation of community association board members, a preliminary injunction still would not be appropriate because that harm could be remedied by a final judgment in the normal course. Indeed, nothing would stop the former board members from volunteering again in the event that the Court ultimately agrees with Plaintiffs and invalidates the CTA's reporting requirements as applied to community associations. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (citation omitted)).

At bottom, Plaintiffs' evidence fails to establish either that they will suffer the claimed harm

absent an injunction or that such harm would be irreparable. Plaintiffs therefore are not entitled to a preliminary injunction. *See Firestone*, 2024 WL 4250192, at *13; Mot. Hr'g Tr. 50, *Small Bus. Ass'n of Mich. v. Yellen*, No. 1:24-cv-00314-RJJ-SJB (W.D. Mich. Apr. 29, 2024), ECF No. 25 (concluding that CTA was unlikely to cause irreparable harm and denying preliminary injunction).

## III.   The Balance of Equities and Public Interest Weigh Against an Injunction.

The remaining two preliminary injunction factors—the balance of the equities and the public interest—"merge when the Government is the opposing party" and weigh sharply in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). As an initial matter, because Plaintiffs cannot establish the first two factors necessary to obtain an injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

But even if Plaintiffs could satisfy one or both of the first two factors, the remaining factors tip decisively in Defendants' favor. The speculative risk of harm to Plaintiffs' asserted interests must be weighed against the obstruction of legitimate government functions that could result if the Court enters Plaintiffs' proposed injunction. *See Winter*, 555 U.S. at 24; *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016). Indeed, "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). Here, the public interest is weighty—countering money laundering, terrorism financing, and other financial crimes. NDAA § 6402(3)-(6). An injunction would interfere with Congress' judgment about how best to combat these serious concerns. These compelling interests weigh heavily against granting an injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs have not met their burden to show entitlement to the

extraordinary remedy of a preliminary injunction. Defendants thus respectfully request that the Court deny the motion.

Dated: October 2, 2024

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
PETER B. BAUMHART
KIRSTIN K. O'CONNOR
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3738/3799
Fax:    (703) 299-3983
Email:  peter.baumhart@usdoj.gov
        kirstin.o'connor@usdoj.gov

*Counsel for Defendants*