**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| COMMUNITY ASSOCIATIONS INSTITUTE, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:24-cv-1597 (MSN/LRV) |
| v. | ) ) | |
| JANET YELLEN, Secretary of the United States Department of the Treasury, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................... 1

II.    PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ...................................... 2

    A.    Plaintiffs Are Entitled to a Declaration That They Are Exempt ........................... 2

    B.    The CTA Exceeds Congress' Enumerated Powers .................................................. 3

    C.    The CTA Violates Community Associations' Fourth Amendment Rights ............ 7

    D.    The CTA Violates Community Associations' First Amendment Rights ............. 14

    E.    FinCEN's FAQs Constitute Final Action and Its Denial of CAI's Exemption Request was Arbitrary and Capricious ................................................................. 18

III.    IRREPARABLE HARM, BALANCE OF EQUITIES, AND PUBLIC INTEREST WARRANT THE PRELIMINARY INJUNCTION ........................................ 19

IV.    CONCLUSION .................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airbnb, Inc. v. City of New York*,
  373 F.Supp.3d 467 (S.D.N.Y. 2019) .......................................................................13

*Amers. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ........................................................................................ *passim*

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................19

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000) ................................................................................................15

*Brown* v. *Socialist Workers '74 Campaign Comm. (Ohio)*,
  *459 U.S. 87 (1982)* ................................................................................................15

*Brown v. Texas*,
  443 U.S. 47 (1979) ..................................................................................................12

*California Bankers Association v. Shultz*,
  416 U.S. 21 (1974) .............................................................................................8, 9, 10

*Carpenter v. United States*,
  585 U.S. 296 (2018) ............................................................................................1, 8, 9

*Children's Hosp. of the King's Daughters, Inc. v. Azar*,
  896 F.3d 615 (4th Cir. 2019) ..................................................................................18

*City of Indianapolis v. Edmond*,
  531 U.S. 32 (2000) ...............................................................................................8, 9

*City of Los Angeles v. Patel*,
  576 U.S. 409 (2015) .............................................................................................8, 12

*Cort v. Ash*,
  422 U.S. 66 (1975) ...................................................................................................5

*Educ. Media Co. at Virginia Tech v. Insley*,
  731 F.3d 291 (4th Cir. 2013) ....................................................................................1

*Firestone v. Yellen*,
  2024 WL 4250192 (D. Or. Sept. 20, 2024) .............................................................7

ii

*Free Speech Coalition, Inc. v. Att'y Gen. U.S.*,
    825 F.3d 149 (3d Cir. 2016)....................................................................13

*Gibbs v. Babbitt*,
    214 F.3d 483 (4th Cir. 2000) ...................................................................5

*Golden and Zimmerman, LLC v. Domentach*,
    599 F.3d 426 (4th Cir. 2010) .................................................................18

*Gonzalez v. Raich*,
    545 U.S. 1 (2005).....................................................................................6

*Griswold v. Connecticut*,
    381 U.S. 479 (1965)...............................................................................15

*Iota XI Chapter of the Sigma CHI Fraternity v. Paterson*,
    538 F.Supp.2d 915 (E.D. Va. 2008) .......................................................16

*Kidwell v. Transportation Communications Int'l Union*,
    946 F.2d 283 (4th Cir. 1991) .................................................................16

*Kyllo v. U.S.*,
    533 U.S. 27 (2001)...................................................................................9

*Lady J. Lingerie, Inc. v. City of Jacksonville*,
    176 F.3d 1358 (11th Cir. 1999) .............................................................17

*Marbury v. Madison*,
    1 Cranch 137, 2 L.Ed. 60 (1803) .............................................................1

*Master Printers of America v. Donovan*,
    751 F.2d 700 (4th Cir. 1984) .................................................................17

*McCulloch v. State*,
    17 U.S. 316 (1819)...................................................................................4

*Michigan Dep't of State Police v. Sitz*,
    496 U.S. 444 (1990)...............................................................................12

*NAACP v. Alabama*,
    357 U.S. 449 (1958).........................................................................15, 16

*Nat'l Fed'n. of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012).....................................................................3, 4, 5, 7

*Nat'l Small Bus. United v. Yellen*,
    2024 WL 899372 (N.D. Ala. Mar. 1, 2024) ....................................4, 6, 7

*Planned Parenthood of Sw. & Cent. Fla. v. Philip,*
    194 F.Supp.3d 1213 (N.D. Fla. 2016)......................................................................13

*Research Corp. v. Commissioner,*
    138 T.C. 192 (2012)...........................................................................................2

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984).........................................................................................16

*Rumsfeld v. Forum for Acad. Institutional Rights, Inc.,*
    547 U.S. 47 (2006)...........................................................................................14

*Shelton v. Tucker,*
    364 U.S. 479 (1960)....................................................................................15, 16

*Skinner v. Ry. Lab. Executives' Ass'n,*
    489 U.S. 602 (1989).........................................................................................11

*Texas Children's Hosp. v. Burwell,*
    76 F.Supp.3d 224 (D.D.C. 2014)........................................................................19

*U.S. Dep't of Justice v. Reps. Comm. For Freedom of Press,*
    489 U.S. 749 (1989)..........................................................................................9

*U.S. v. Comstock,*
    560 U.S. 126 (2010)........................................................................................4, 7

*U.S. v. Edwards,*
    498 F.2d 496 (2d Cir. 1974)..............................................................................12

*U.S. v. Jones,*
    565 U.S. 400 (2012).........................................................................................11

*Wickard v. Filburn,*
    317 U.S. 111 (1941)..........................................................................................6

*Zivotofsky v. Clinton,*
    566 U.S. 189 (2012)..........................................................................................1

## Constitutions

U.S. Const. art. I, § 8.........................................................................................6

U.S. Const. art. II, § 2........................................................................................6

## Statutes

8 U.S.C. § 1324a(b) ..........................................................................................11

8 U.S.C. § 1324a(b)(1)(A) ...................................................................................11

8 U.S.C. § 1324a(b)(3) ........................................................................................11

26 U.S.C. § 528(a) ................................................................................................2

26 U.S.C. § 6012 .................................................................................................11

26 U.S.C. § 6031-60 ...........................................................................................11

26 U.S.C. § 6103(i)(1)(A) ...................................................................................11

31 U.S.C. § 5336(a)(11)(B)(xix) ....................................................................2, 18

31 U.S.C. § 5336(a)(11)(B)(xxiv) ......................................................................18

42 U.S.C. § 14501 ................................................................................................3

52 U.S.C. § 30104(a) ..........................................................................................11

Del. Code Ann. tit. 8 § 122 ...................................................................................5

**Other Authorities**

87 Fed. Reg. 59498 ...............................................................................................8

87 Fed. Reg. 59504 ...............................................................................................8

2 M. Farrand, *Records of the Federal Convention of 1787*, at 325 (Pinckney) &
    615-16 (Madison) ...........................................................................................5

## I.      INTRODUCTION

The Government suggests that Plaintiffs should petition the political branches, not this Court, if they have concern with the CTA. This is misdirection. "[W]hen an Act of Congress is alleged to conflict with the Constitution, '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (quoting *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803)). This Court is a co-equal branch of government and can both interpret the CTA and determine its constitutionality.

Throughout its Opposition, the Government stresses that the CTA has an important purpose in detecting money laundering and terrorist financing. But the constitutional analysis is not satisfied by pointing to a law's criminal investigative purpose, deeming it important, and thus concluding the law infringes no rights. This is not what the Framers envisioned or the Constitution demands. *Carpenter v. U.S.*, 585 U.S. 296, 305 (2018) ("[A] central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'"); *Amers. for Prosperity Found. v. Bonta*, 594 U.S. 595, 610 (2021) ("The government may regulate the First Amendment area only with narrow specificity … and compelled disclosure regimes are no exception"); *Educ. Media Co. at Virginia Tech, Inc. v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013) ("In an as-applied challenge, … the state must justify the challenged regulation with regard to its impact on the plaintiffs").

The Government largely avoids the required constitutional analysis and grossly misrepresents the crippling harm the CTA would cause to community associations and volunteers. The constitutional analysis is not whether financial crime is bad, but about what the CTA regulates, what it requires, and the impact it would have. The CTA's plain language confirms that community associations are exempt, and well-established precedent confirms that the CTA cannot be justified under Congress' enumerated powers and violates the Fourth Amendment and First Amendment.

## II.      PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS

### A.      Plaintiffs Are Entitled to a Declaration That They Are Exempt

The parties agree "[t]he ultimate goal of statutory interpretation is to ascertain and implement the intent of Congress." Dkt. 35 at 22 (quotations omitted). A homeowners association that files its taxes under 26 U.S.C. § 528(a) ("Section 528") is expressly exempt from the CTA pursuant to 31 U.S.C. § 5336(a)(11)(B)(xix) ("NPO Exemption"). The NPO Exemption provides that "[t]he term 'reporting company' does not include … any organization that is described in section 501(c) of the Internal Revenue Code … and exempt from tax under section 501(a) of such Code." According to the Government, homeowners associations are outside the NPO Exemption because they are not expressly "described" or "exempt" under Section 501. This position ignores Section 528's use of the words "any law."

Section 528(a) states that "[a] homeowners association shall be considered an organization exempt from income taxes for the purpose of ***any law*** which refers to organizations exempt from income taxes." (emphasis added). Because "any law" necessarily includes Section 501, Section 528 should be read as "[a] homeowners association shall be considered an organization exempt from income taxes for the purpose of ***any law*** [***including Section 501***] which refers to organizations exempt from income taxes." *See Research Corp. v. Commissioner*, 138 T.C. 192, 199 (2012) (addressing similar IRC statutory cross-reference and holding "Section 501(b) refers to 'any law', which refers to the entire Code."). Properly applying Section 528's cross-reference to "any law," homeowners associations that file under Section 528 are "described in" and "exempt from" tax under Section 501 and thus within the NPO Exemption.

This construction is further supported by the CTA's legislative history, which ***does not mention*** homeowners associations or any possible connection with the CTA's focus on money laundering and terrorist financing. The Government tries to suggest otherwise by pointing to

statements by Senator Brown and U.S. Treasury about instances where "criminals and terrorist groups have abused charitable organizations." Dkt. No. 35 at 24 (citations omitted). However, these statements exclusively concern charities, and there was no concern about homeowners associations. Since Congress included charities within the NPO Exemption despite past financial crimes, yet expressed no concern with homeowners associations, it stands to reason that Congress intended to include them in the NPO Exemption.[1]

The Government has no legislative history for its argument. Section 528's plain language confirms that homeowners associations are exempt from income taxes for the purpose of **any law**, including Section 501. As such, homeowners associations are within the NPO Exemption.

## B.      The CTA Exceeds Congress' Enumerated Powers

The Government does not dispute that formation of a community association is not, by itself, commercial activity. Instead, it seeks to justify the CTA by overstating the reach of the Necessary and Proper Clause while understating the CTA's unprecedented intrusion into State sovereignty over corporate charters. The Government argues that the CTA should be upheld under the Necessary and Proper Clause because it is "rationally related to Congress' permissible exercise of interstate-commerce power to combat harmful financial activity." Dkt. 35 at 15. This argument is foreclosed by *Nat'l Fed'n. of Indep. Bus. ("NFIB") v. Sebelius*, 567 U.S. 519, 557 (2012).

---

[1] In a footnote, the Government observes that Section 528 and Section 501(c) organizations file different tax forms, with Section 501(c) organizations filing more information. Dkt. 35 at n. 17. But this is no basis to disregard Congressional intent or conclude Congress wanted different treatment under the NPO Exemption. Rather, it shows that, since the Tax Reform Act of 1976, Congress is less concerned with homeowners associations than Section 501(c) organizations. Further, with the Volunteer Protection Act of 1997, 42 U.S.C. §14501 *et seq*., Congress lauded volunteerism and enacted law to help protect non-profit volunteers from civil liability. Considering Section 528, the NPO Exemption, and the Volunteer Protection Act of 1997, it would be absurd to believe Congress now intended to force homeowners associations to file and update BOI Reports every time the board changes or otherwise face civil and criminal penalties.

*NFIB* held that Congress cannot use the Necessary and Proper Clause to regulate "those" who are not "by some pre-existing activity" *already* "within the sphere of federal regulation." *Id.* at 560. The Court emphasized that prior cases upholding laws under the Necessary and Proper Clause involved situations where the laws regulated those already subject to federal power, such as "provisions permitting continued confinement of those *already in federal custody* when they could not be safely released, [*U.S. v.*] *Comstock*, [560 U.S. 126], 129, 130 [(2010)]; criminalizing bribes involving organizations *receiving federal funds*, *Sabri v. U.S.*, 541 U.S. 600, 602, 605 (2004), and tolling state statutes of limitations while cases are *pending in federal court*, *Jinks v. Richland County*, 538 U.S. 456, 459, 462 (2003)." (emphasis in original).

By contrast, the CTA seeks to regulate entities over which the federal government has no prior regulatory authority, based solely on their formation and change in members. It does so even though the entities have not yet engaged in commerce, much less committed the financial crimes the Government claims the CTA to be a "necessary and proper" means of effectuating its powers under the Commerce Clause. By attempting to apply the Necessary and Proper Clause in this way, the Government treats it not as a derivative power, but as a "'great substantive and independent power,'" which *NFIB* explicitly rejects. *NFIB*, 567 U.S. at 560-61 (quoting *McCulloch v. State*, 17 U.S. 316, 411 (1819)); *see also Comstock*, 560 U.S. at 144 (invocations of federal power under the Necessary and Proper Clause may not "invade state sovereignty or otherwise improperly limit the scope of powers that remain with the States.") (internal quotations and citation omitted).

The crux of the issue is that there is no preexisting federal power for the Necessary and Proper Clause to attach to. Entity formation has always been a matter of state regulation. While the CTA is "not a direct regulation of corporate formation," it imposes "a federal reporting requirement" on entities that are wholly "'creatures of state law.'" *Nat'l Small Bus. United v. Yellen*

(*"NSBU"*), 2024 WL 899372, at *8 (N.D. Ala. Mar. 1, 2024) (quoting *Cort v. Ash*, 422 U.S. 66, 84 (1975)). The Constitution does not empower Congress to regulate entity formation. In fact, during the Constitutional Convention, two separate proposals to grant Congress that power were rejected. 2 M. Farrand, *Records of the Federal Convention of 1787*, at 325 (Pinckney) & 615–16 (Madison). This history underscores that entity formation is not itself economic activity, nor does it substantially affect interstate commerce.

The Government also seeks to justify the CTA by reframing it as regulating "conduct of a covered entity *as a going concern,*" and observing that entities may conduct transactions like making contracts, borrowing money, and transferring property. Dkt. 35 at 15, 16 (emphasis in original) (citing Del. Code Ann. tit. 8, § 122). However, *potential future* commercial activity does not give Congress authority to regulate entity formation. Congress may only "anticipate the *effects* on commerce*" of preexisting economic activity; it cannot regulate someone "simply because he will predictably engage" in commerce. *NFIB*, 567 U.S. at 557. *NFIB* ruled out the idea that the CTA is justified based on the likelihood that an entity will engage in future interstate commerce. *Id*. The CTA improperly regulates an entity on the mere basis of its existence, just as the Affordable Care Act improperly regulated persons because they simply existed, not because of their activity. *Id.* The Government also argues that the CTA is part of a comprehensive regulatory regime, making it necessary and proper to the exercise of the Commerce Clause. However, Congress cannot regulate inactivity, even if it would support a broader regulatory regime. *Id.* at 560.

The Government cannot justify the CTA under Congress's authority to regulate activities that, when considered in the aggregate, "substantially affect interstate commerce." Dkt. 35 at 14. The Government primarily relies on cases where Congress regulated homegrown production of commodities like wheat or marijuana under the Commerce Clause. In those cases, although one

individual's small-scale production for personal use did not substantially affect interstate commerce, the cumulative impact of similar conduct by many individuals could. *See Wickard v. Filburn*, 317 U.S. 111, 127–28 (1941); *Gonzalez v. Raich*, 545 U.S. 1, 19 (2005).

The CTA has a far different approach. It regulates entities simply because they exist, not because they engage in economic activity. The Government does not dispute that the mere formation of an entity is not inherently economic and, thus, does not implicate the Commerce Clause. *See NSBU*, 2024 WL 899372, at *14, *16. Even if entity formation were repeated on a large scale, such activity—without accompanying economic actions—would have no impact on interstate commerce. As a result, because the CTA regulates entities based solely on their existence rather than any commercial activity, "the CTA does not regulate economic or commercial activity on its face" and therefore exceeds Congress' Commerce power. *Id.* at *17.

The Government's other enumerated powers arguments fall short. Congress' foreign affairs and national security powers—whether considered alone or with the Necessary and Proper Clause—do not extend to the entirely ministerial action of entity formation. The Government fails to identify any specific foreign affairs power in the Constitution that the CTA implements, such as the powers to define and punish offenses against the Law of Nations, declare war, or make treaties. U.S. Const. Art. 1 § 8 & Art. II, § 2. Instead, the Government argues that the CTA was motivated by the need to comply with international standards and prevent foreign actors from using domestic entities to conceal illicit activities. *See* Dkt. 35 at 19. But while catching bad actors and "[c]ompliance with international standards may be good policy, … it is not enough to make the CTA 'necessary' or 'proper.'" *NSBU*, 2024 WL 899372 at *10.

Finally, the CTA cannot be justified under Congress' taxing power, even as amplified by the Necessary and Proper Clause. For a statute to be a valid exercise of the Necessary and Proper

6

Clause, it must be "'reasonably adapted' to the attainment of a legitimate end under" Congress' enumerated powers. *Comstock*, 560 U.S. at 135 (2010) (quotation omitted). The CTA's burdensome disclosure requirements serve an investigative purpose, not taxation. *See* 87 Fed. Reg. 59498, 59504. Although tax officials could eventually access the database, this is incidental to the CTA's primary law enforcement purpose. As *NFIB* noted, "Congress' authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more." 567 U.S. at 574. Extending the Necessary and Proper Clause "to permit Congress to bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials access to that data" "would be a 'substantial expansion of federal authority.'" *NSBU*, 2024 WL 899372, at *21 (quoting *NFIB*, 567 U.S. at 574).[2]

### C.   The CTA Violates Community Associations' Fourth Amendment Rights

Imagine that FinCEN agents walked into a community association meeting, announced they were investigating money laundering and terrorism, demanded identification documents from each volunteer board member, and then threatened all with criminal penalties if any member declined to cooperate. There is no functional distinction between this unreasonable search and the CTA as applied here. That is, it makes no Fourth Amendment difference that the CTA would compel community associations to upload information, rather than have officers physically seize it. The fact the  Government can seize information and records with greater ease does not mean

---

[2] *Firestone v. Yellen*, 2024 WL 4250192 (D. Or. Sept. 20, 2024) should be given no weight. The *Firestone* court denied a preliminary injunction to enjoin the CTA, largely because the movants provided no supporting evidence. *Id.* at 1. Moreover, the *Firestone* court failed to follow controlling precedent, including *NFIB*, incorrectly concluding the CTA could be upheld under the Commerce Clause simply because it regulates "entities with the capacity to engage in commerce," regardless of whether they are actually engaged in or will engage in commerce. *Id.* at 7. This holding contravenes *NFIB*. "The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions. Any police power to regulate individuals as such, as opposed to their activities, remains vested in the States." *NFIB*, 567 U.S. at 557.

that the Fourth Amendment's warrant or individualized suspicion requirement no longer applies.

With the Fourth Amendment, "a central aim of the Framers was to place obstacles in the way of a too permeating police surveillance." *Carpenter*, 585 U.S. at 305. Yet, the CTA was intentionally designed to circumvent these "obstacles." As FinCEN's then-Director testified, the CTA's driving purpose was to eliminate the necessity of "grand jury subpoenas" and "search warrants" when conducting criminal investigations because those constitutional requirements took too much time and "waste[d] resources." 87 Fed. Reg. 59498, 59504.

The Government does not dispute that the CTA needs to comply with the Fourth Amendment or that the CTA mandates the disclosure of information to law enforcement agencies so the agencies can use it to investigate and prosecute people. Rather, the Government argues that the CTA presents no Fourth Amendment concern, asserting it merely imposes "reporting requirements" long held constitutional or otherwise falls within the "special needs" exception to the warrant requirement. This minimizes the CTA's requirements, overstates the scope of *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), and ignores longstanding precedent.

Because the Fourth Amendment generally requires a warrant, "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable … subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015). Further, when a law authorizes searches "primarily for the ordinary enterprise of investigating crimes," no exception applies and either a warrant or—at minimum—individualized suspicion is necessary. *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000). Unless the CTA satisfies an exception to the warrant requirement, it violates the Fourth Amendment. *Patel*, 576 U.S. at 419–20. No exception applies here.

The CTA is the functional equivalent of the checkpoint in *Edmond*, where the government

attempted to defend suspicionless stops by asserting officers had no discretion and thus everyone was stopped. "[W]hat principally distinguishes these checkpoints from those we have previously approved is their primary purpose." *Id.* at 40. The Court emphasized it has "never approved a checkpoint program whose primary purpose [is] to detect evidence of ordinary criminal wrongdoing." *Id.* at 41. The Court refused "to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends." *Id.* at 43. If suspicionless searches were permitted whenever government pursued an interest in "crime control," people could be subjected to criminal investigation checkpoints as "a routine part of American life." *Id.* at 42. To prevent this, the Court found it necessary to "draw[] the line" and declare suspicionless searches "designed primarily to serve the general interest in crime control" unconstitutional. *Id.* at 42. The CTA is the same unconstitutional checkpoint only in far broader, repetitive, and more modern form.[3]

The Government says nothing about *Edmond*. Rather, it argues that because the bank reporting requirements in the Bank Secrecy Act ("BSA") were upheld in *Shultz*, the CTA also passes Fourth Amendment muster. *Shultz* is distinguishable in every respect. Unlike the CTA and community associations, *Shultz* addressed a narrow law applicable only to banks who operate a highly-regulated business-type likely to have information about financial crimes.

In *Shultz*, 416 U.S. at 37, the Supreme Court explained that the BSA "provides for certain

---

[3] "[T]here is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *U.S. Dep't of Justice v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 764 (1989). Moreover, while the intrusion is not burdensome or even known to the suspect, warrantless searches of cell site data and thermal imaging are unconstitutional even though they require nothing from the suspect. *See, e.g.*, *Carpenter*, 585 U.S. at 313 (cell site data); *Kyllo v. U.S.*, 533 U.S. 27, 35 (2001) (thermal imaging).

reports of domestic transactions where such reports have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." The Court emphasized that "Congress recognized the importance of reports of large and unusual currency transactions in ferreting out criminal activity, and desired to strengthen the statutory basis for requiring such reports." *Id.* at 38. Consistent with the BSA's narrow focus on a highly-regulated business, "the Secretary has required *only* that financial institutions file certain reports with the Commissioner of Internal Revenue." *Id.* at 39 (emphasis added). Accordingly, the Court held "[t]he regulations do not impose unreasonable reporting requirements on the banks [since] [t]he regulations require the reporting of information with respect to abnormally large transactions in currency, much of which information the bank as a party to the transaction already possesses or would acquire…." *Id.* at 67. The opinion makes sense given what banks do, what banks have, and how they are used. Banks have nothing in common with community associations.

The differences between banks and the BSA, as compared to community associations and the CTA, could not be more stark. Unlike banks, which play a critical role in criminal investigations due to their handling of large financial transactions, Congress made no finding about community associations or how they could possibly assist "in ferreting out criminal activity." Unlike sophisticated, commercial entities, these are volunteer-run, non-profits that exist to help their local communities. They have no exposure to "large and unusual" or "abnormal" financial transactions. Moreover, the CTA is not triggered by unusual or abnormal conduct. Further, unlike the BSA's narrow focus on the entity, *i.e.*, the bank, CTA requires that an entity ***and*** its people provide information and identification records or face criminal and civil liability. In short, *Shultz*, the BSA, and banks have nothing in common with this case, the CTA, and community associations.

The Government next argues that the CTA satisfies the Fourth Amendment since other

laws require businesses to report information to federal agencies. Yet those are far less intrusive and burdensome administrative laws that are not targeted at criminal activity. 8 U.S.C. § 1324a(b) is an immigration statute that requires certain employers to retain and "make … available for inspection" documentation to verify that an employee "is not an unauthorized alien." *Id.* §§ 1324a(b)(1)(A) and (b)(3). Its purpose is compliance with immigration and employment laws, not to catch criminals. 52 U.S.C. § 30104(a) requires political committees to file reports with the FEC. Its purpose is to ensure fair and transparent elections, not to catch criminals. 26 U.S.C. §§ 6012, 6031–60 exist to assess and collect taxes. Further, tax return information ordinarily cannot be disclosed by the IRS to federal prosecutors absent a court order, which generally requires proof of individualized suspicion. 26 U.S.C. § 6103(i)(1)(A). Unlike the above laws, the CTA is specifically targeted at criminal activity, requires direct production to law enforcement, and is far more intrusive and burdensome.[4]

In the alternative, the Government argues that CTA falls within the "special needs" exception given national security and foreign policy interests. However, since Plaintiffs assert an "as applied" challenge, the issue is whether "special needs" permit the Government to conduct a warrantless search of community associations and their volunteers. The "special needs" exception applies only when "special needs, *beyond the normal need for law enforcement*, make the warrant and probable-cause requirement impracticable." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S.

---

[4] BOI information is provided directly to FinCEN, *i.e.*, a law enforcement agency, to be stored in a law enforcement database. Unlike an annual tax return, the BOI information must be updated whenever board members change, which could mean updates up to twelve times a year. Further, the CTA would require that community associations send FinCEN copies of board member or property owner drivers licenses or passports—records they do not possess and may not be able to obtain. It makes no difference that these are government-issued documents. There is "no case" supporting "the argument that what would otherwise be an unconstitutional search is not such where it produces only public information." *U.S. v. Jones*, 565 U.S. 400, 409 (2012).

602, 619 (1989) (emphasis added). The prime examples are suspicionless airline security searches and DUI checkpoints. *See U.S. v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990).[5] But CTA's sole justification is the "normal need for law enforcement." A search of community associations is different than airline security searches or DUI checkpoints. Because the CTA's purpose is collecting evidence for law enforcement, the CTA does not satisfy the "special needs" exception, especially as to community associations. A host of cases confirm this.

The CTA is functionally the same as the statute in *Brown v. Texas*, 443 U.S. 47, 49 (1979), which made it a crime "for a person to refuse to give his name and address to an officer 'who has lawfully stopped him and requested the information.'" A police officer stopped the defendant, demanded he identify himself, and—when the defendant refused—charged him under the statute. *Id.* at 48–49. The officer later acknowledged "the only reason he stopped appellant was to ascertain his identity." *Id.* at 52. Notwithstanding the statute's "weighty social objective in large metropolitan centers: prevention of crime," the statute violated the Fourth Amendment. *Id.*

The CTA mirrors the unconstitutional law in *Patel*, 576 U.S. at 419–20. There, the Court struck down a law mandating that hotel operators disclose guest information to any law enforcement officer on demand, without warrant or reasonable suspicion of wrongdoing. *Id.* at 412. The Court held that the law violated the Fourth Amendment. *Id.* at 419. In the same way, the CTA violates the Fourth Amendment because it would require community associations to obtain and produce information and identification documents for board members and other "beneficial

---

[5] An administrative search may comply with the Fourth Amendment in certain "pervasively regulated" industries. *Patel*, 576 U.S. at 424. But that doctrine applies only to industries where "no reasonable expectation of privacy could exist." *Free Speech Coalition, Inc. v. Att'y Gen. U.S.*, 825 F.3d 149, 169 (3d Cir. 2016). Thus, this "narrow exception" applies to only four industries: liquor sales, firearms dealing, mining, and running an automobile junkyard." *Patel*, 576 U.S. at 424.

owners," without any suspicion of wrongdoing.[6]

*Free Speech Coalition, Inc.*, 825 F.3d at 154–55, concerned a federal law requiring pornography producers to collect information confirming that performers were not minors and to make those records available for government inspection. Although aimed at preventing child pornography, a weighty social objective, the law violated the Fourth Amendment because the government could not justify the warrantless search. *Id*. at 171, 173. By comparison, the CTA has worse fit. The law in *Free Speech* was aimed at preventing child pornography and targeted pornography producers. The CTA is aimed at preventing money laundering and terrorist financing, but FinCEN targets volunteer run community associations.

In *Airbnb, Inc. v. City of New York*, 373 F.Supp.3d 467 (S.D.N.Y. 2019), New York defended a law requiring online rental-property marketplaces to upload hosts' personal data to a city database, arguing "this would spare [the City] the need to build cases through conventional investigative means." *Id*. at 491. "Instead of developing leads as to illegal rentals ... and then following up ... the [City] could ... search the platforms' electronic user records for unlawful or apparently unlawful listings." *Id*. The court rejected the notion that law enforcement efficiency or crime prevention justified bypassing warrant requirements.[7] *Id*. at 495. This was the right result. If the Government can compel disclosure of a community association's volunteer information for

---

[6] *See also Planned Parenthood of Sw. & Cent. Fla. v. Philip*, 194 F.Supp.3d 1213, 1221 (N.D. Fla. 2016) (invalidating Florida law requiring abortion clinics to submit to annual inspections of 50% of patient records, absent any cause for concern).

[7] "By the City's logic, a City Council presumably could also compel (1) all online auction services monthly to produce all records of sales by New York City residents, on the premise that such records could assist in finding sellers who evaded capital gain taxes on sales of collectibles; (2) all medical providers monthly to produce all patient records for care rendered in New York City, on the premise that such records could assist in finding instances in which users engaged in up-coding and other health-care fraud; and (3) all credit card companies monthly to produce all records of expenditures in New York restaurants, on the premise that such records could assist in identifying instances in which commercial income was not reported to tax authorities." *Id.*

investigative purposes, tomorrow it could compel businesses to disclose information about music streamers, alcohol purchasers, or motorcycle riders for criminal investigative purposes. This is the warrantless investigatory regime the Fourth Amendment prohibits.

The CTA is worse than the laws in the cases above. It would conscript community associations to obtain and deliver volunteers' records to federal law enforcement, on pain of a two-year felony, all because they volunteered to help their association. The CTA compels this reporting so law enforcement can investigate and prosecute those who report, compels this reporting without any court oversight, and allows FinCEN to share the information with law enforcement agencies across the country and world. Notwithstanding national security and foreign policy interests, there is no "Big Brother" exception to the Fourth Amendment. Because the Government cannot demonstrate that any exception to the warrant requirement applies to the CTA as applied to community associations, Plaintiffs have a likelihood of success on their Fourth Amendment claim.

### D.      The CTA Violates Community Associations' First Amendment Rights

The Government tries to overcome Plaintiffs' First Amendment claim by insisting they are largely commercial enterprises. The opposite is true. As their name suggests, community associations perform a vital role in communities by allowing their members to speak with an organized, collective voice to government officials on matters of public concern. *Rumsfeld v. Forum for Acad. Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006) (citations omitted) ("The right to speak is often exercised most effectively by combining one's voice with the voices of others").

If the CTA applies to community associations, it unconstitutionally compels speech because it requires them to report information about volunteers, effectively placing a criminal target on their backs. If a community association later fails to update its BOI information within thirty days any time someone leaves or joins the board, all board members are exposed to prosecution and penalties. Given frequent board turnover, the CTA presents serious administrative

challenge, risk of non-compliance, and penalties. To satisfy the First Amendment, the Government has the burden to prove compelling this speech by community associations and their volunteers serves a legitimate governmental purpose. *Shelton v. Tucker*, 364 U.S. 479, 485–90 (1960) (invalidating on First Amendment grounds, state law requiring that teachers annually file an affidavit listing every organization they joined or contributed to in prior five years). It cannot.

The Government tries to duck this burden by arguing that the compelled speech doctrine "typically applies" when someone must "convey a 'particular message' publicly" or "publicly disclose certain factual information intertwined with controversial or issue-based matters." Dkt. No. 35 at 37–38. This is an incomplete paraphrase of the law. The compelled speech doctrine applies to factual information, including membership lists and a person's affiliations. *See Shelton*, 364 U.S. at 485–87; *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); *Brown* v. *Socialist Workers '74 Campaign Comm. (Ohio),* 459 U.S. 87, 101–02 (1982); *Amers. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021).  For community associations and their volunteers who fear criminal prosecution, the compelled speech also implicates issues and controversy, which now trigger anxiety and will trigger resignation. *See Shelton*, 364 U.S. at 486 ("Even if there were no disclosure to the general public, the pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy").

The Government next tries to argue that volunteer run community associations lack freedom of association. According to the Government, "community associations … are generally engaged in commerce to benefit their members, and '[a]ctivities and services that are primarily commercial rather than communicative'" which do not support a freedom of association. Dkt. 39 (citations omitted). This position ignores the law and record. The First Amendment protects all "expressive association[s]." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000); *Griswold*

*v. Connecticut*, 381 U.S. 479, 483 (1965) ("[W]e have protected forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members."). The Supreme Court has defined "expressive activity" broadly, covering collectives that "'engage in a variety of civic, charitable, lobbying, fundraising, and other activities.'" *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626–27 (1984). By any measure, community associations have civic, political and economic interests, as they meet and advocate on environmental, zoning, health, safety, and other matters. Dkt. 14-1 Ex. A-1, at ¶¶ 10–11; Ex. A-2, at ¶¶ 7, 12; Ex. A-3, at ¶ 12. They are expressive associations.[8]

The Government then wrongly asserts that violation of the freedom of association requires "reasonable probability" of "threats, harassment, or reprisals" against members. Dkt. 35 at 40. This assertion is flatly contradicted by *Bonta*. There, the Supreme Court held "[o]ur cases have said that disclosure requirements can chill association *'[e]ven if there [is] no disclosure to the general public*,'" *Bonta*, 594 U.S. at 617 (quoting *Shelton*, 364 U.S. at 486) (emphasis added); "[e]xacting scrutiny is triggered by 'state action which *may* have the effect of curtailing the freedom to associate," and by the "'*possible* deterrent effect of disclosure,'" *id.* at 616 (quoting *NAACP v. Alabama*, 357 U.S. at 460–61) (emphasis in original); and "the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals [rather] *the risk of a chilling effect is enough*," *id.* at 618–19 (emphasis added). Thus, community association volunteers ***do not*** need to suffer "threats, harassment, or reprisals." The

---

[8] Despite their economic goals of collective bargaining, unions are an "an archetype of an expressive association." *Kidwell v. Transportation Communications Int'l Union*, 946 F.2d 283, 301 (4th Cir. 1991). Likewise, a fraternity that "described its institutional mission to inculcate its members with certain leadership skills and community values" was "protected by the First Amendment's expressive associational right." *Iota XI Chapter of the Sigma CHI Fraternity v. Paterson*, 538 F.Supp.2d 915, 923 (E.D. Va. 2008).

issue is whether the CTA creates a risk of chilling effect on their freedom of association. It does, indeed, they actually fear "threats, harassment, or reprisals" from FinCEN.[9]

*Bonta* controls the analysis here. There, the Supreme Court addressed a law requiring charities to report "the names and addresses of donors who have contributed more than $5,000 in a particular tax year." *Id.* at 602. The government asserted an interest in conserving resources and rooting out charity fraud, citing complaints of misconduct "from 'misuse, misappropriation, and diversion of charitable assets,' to 'false and misleading charitable solicitations,' to other 'improper activities by charities soliciting charitable donations.'" *Id.* at 611–12. The Court had a different view. "The [government] may well prefer to have every charity's information close at hand, just in case. But the prime objective of the First Amendment is not efficiency." *Id.* at 615. Because the government's interest did not justify "cast[ing] a dragnet for sensitive … information from tens of thousands of charities each year" and there was "dramatic mismatch … between the interest that the Attorney General seeks to promote and the disclosure regime that he has implemented," the law failed "exacting scrutiny" and thus the First Amendment. *Id.* at 614.[10]

The CTA poses the same problem here. In dragnet fashion, tens of thousands of community associations will be required to identify their hundreds of thousands of volunteers (and expose them to penalties for later failing to update BOI information) even though the Government has made no showing that their information is important or necessary to investigate financial crimes.

---

[9] The Government's reliance on *Master Printers of Am. v. Donovan*, 751 F.2d 700 (4th Cir. 1984) is misplaced since it predated *Bonta*. The court also did not hold that a decline in membership was insufficient to find violation of the freedom of association, but rather "it is difficult to take seriously MPA's fears that disclosure will force a decline in membership." *Id.* at 705.

[10] *See also Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1366–67 (11th Cir. 1999) (law requiring disclosure of principal stockholders of adult entertainment establishments could not withstand exacting scrutiny because no "'substantial relation' between the names of principal stockholders and the harmful secondary effects of adult entertainment establishments.")

To survive exacting scrutiny, "disclosure regimes [must] be narrowly tailored to the government's asserted interest." *Bonta*, 594 U.S. at 608. The CTA, as applied to community associations and their volunteers, violates the First Amendment because the Government cannot establish this.

### E. FinCEN's FAQs Constitute Final Action and Its Denial of CAI's Exemption Request was Arbitrary and Capricious

The Government's argument that FinCEN's FAQs were not final agency action overlooks what happened. By December 28, 2023 letter, CAI asked that FinCEN expressly recognize that community associations and their volunteers are exempt from CTA. *See* Dkt. 14, Ex. B. CAI met with FinCEN to discuss the request on April 18, 2024. The ***very next day***, FinCEN rejected CAI's request with FAQs announcing that most community associations and their volunteers are in fact subject to the CTA. The timing was no coincidence. Like a judge receiving evidence and argument, leaving the bench, and then returning and rendering verdict, FinCEN issued its decision, changing what community associations understood about the CTA, eliminating any hope of exemption under either 31 U.S.C. § 5336(a)(11)(B)(xix) or (xxiv) before January 1, 2025, and exposing community associations and volunteers to civil and criminal penalties.[11]

To argue no final agency action, the Government relies on *Golden and Zimmerman, LLC v. Domentach*, 599 F.3d 426 (4th Cir. 2010). However, *Golden* concerned the 13th edition of an ATF reference guide which repeated 40-year-old published guidance. *Id.* at 432. By contrast, FinCEN's decisive action aligns with cases where FAQs constitute a legislative rule. *See Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 621–22 (4th Cir. 2019) (FAQ altering calculation of uncompensated care costs imposed new legal requirement because

---

[11] FinCEN's FAQs actually created more confusion for community associations since it answered the question about CTA's applicability with "[i]t depends" and many community associations are not incorporated or formed by a Secretary of State filing, but rather are trusts, unincorporated associations, or file with the land records division of their local court.

costs were not addressed in existing statutory and regulatory schemes); *Texas Children's Hosp. v. Burwell*, 76 F.Supp.3d 224, 239–41 (D.D.C. 2014) (similar holding). Published the day after FinCEN met with CAI, the FAQs constitute final agency action because they represent "the consummation of the agency's decisionmaking process" and determine "rights or obligations" from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

As discussed at pp. 19–26 in Plaintiffs' Memorandum of Law, because the FAQs were not issued in accordance with the APA and failed to address any rationale for denying CAI's exemption request, the FAQs should be set aside or declared arbitrary and capricious.

## III.  IRREPARABLE HARM, BALANCE OF EQUITIES, AND PUBLIC INTEREST WARRANT THE PRELIMINARY INJUNCTION

Unlike businesses focused on making money and where ownership is stable over time, community associations are run by unpaid volunteers and their boards have ongoing turnover. The CTA would thus impose major financial, reporting burden, and fear, as boards are typically elected and board members resign, relocate, or even die throughout the year.  Every single change would require another CTA reporting or else each board member would face criminal and civil liability. FinCEN has said exactly this. It is a sacrifice that unpaid volunteers cannot make.

Absent preliminary injunctive relief, thousands of community association volunteers will resign by January 1, 2025. This will lead to boards not properly constituted under state laws, important community decisions not made, and ultimately many associations entering receivership. This will hurt communities, reduce the value of homes within community associations, and negatively impact the well-being of more than 25% of American families who live in them.

The Government's argument as to no irreparable harm, the balance of equities, and the public interest is actually insulting as it entirely dismisses the record evidence about the devastating impact the CTA would have on community associations, their volunteers, and

communities across the country.

The Government incredibly argues "[a]t best, Plaintiffs' evidence shows only that two board members … 'no longer wish' to serve in their positions due to the CTA." Dkt. 35, 42–43. Yet, in a survey of CAI's community association members, 80% reported that the CTA will cause board members to resign and 88% reported that the CTA will inhibit their ability to recruit new board members. Dkt. 14-1, Ex. A-6 ¶¶ 34–38. This data proves thousands of volunteer board members are likely to resign and that Plaintiffs will suffer irreparable injury absent relief.

The Government next argues no irreparable harm because, if board members were to resign, "nothing would stop the former board members from volunteering again in the event the Court ultimately agrees with Plaintiffs."  Dkt. 35, 43. This too is an incredible statement. It is akin to saying no irreparable harm if a wooded forest is clearcut since someone can always come along later, plant seeds, and hope trees will one day grow again. The harm is done.

Finally, the Government argues the balance of equities and public interest weigh against an injunction since "the public interest is weighty—countering money laundering, terrorism financing, and other financial crimes." Dkt. 35, 44. But this begs the question: ***what do volunteer run community associations have to do with money laundering, terrorism financing, or other financial crimes?*** As the Government knows, the answer is nothing.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

Dated: October 7, 2024                              Respectfully submitted,

/s/ Brendan Bunn                                    /s/ Damon W.D. Wright
Brendan Bunn, No. 34861                             Damon W.D. Wright, No. 40319
Chadwick, Washington, Moriarty,                     Clair E. Wischusen, No. 99174
Elmore & Bunn, P.C.                                 Stephanie Bortnick, No. 87216
3201 Jermantown Road, Suite 600                     Gordon Rees Scully Mansukhani LLP
Fairfax, VA 22030                                   277 S. Washington Street, Suite 550
Tel: 703-352-1900                                   Alexandria, VA 22314

Fax: 703-352-5293
bpbunn@chadwickwashington.com

*Attorneys for Canterbury*
*Crossing Condominium Trust,*
*Townhouse Green Cooperative Inc.,*
*Terraces on Memorial Homeowners*
*Association, Farrcroft Homeowners*
*Association, Regency at Ashburn Greenbrier*
*Condominium Association*

Edmund Allcock (*Pro Hac Vice* pending)
Allcock & Marcus, LLC
10 Forbes Road, Suite 400W
Braintree, MA 02184
Tel: 781-884-1660
ed@amcondolaw.com

*Attorneys for Canterbury Crossing*
*Condominium Trust*

Tel: 202-399-1009
Fax: 202-800-2999
dwright@grsm.com
cwischusen@grsm.com
sbortnick@grsm.com

Gretchen Sperry (*Pro Hac Vice*)
Mary J. Goers (*Pro Hac Vice*)
Gordon Rees Scully Mansukhani LLP
One North Wacker, Suite 1600
Chicago, IL 60606
Tel: 312-565-1400
Fax: 312-565-6511
gsperry@grsm.com
mgoers@grsm.com

*Attorneys for Community Associations*
*Institute*

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on October 7, 2024, I electronically filed the

foregoing using the Court's CM/ECF system, which will send a notification to all counsel of

record.

*/s/ Clair E. Wischusen*
Clair E. Wischusen