UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| COMMUNITY ASSOCIATIONS INSTITUTE, et al<br>*Plaintiffs*,<br><br>v.<br><br>JANET YELLEN, Secretary of the United States Department of the Treasury, et al.,<br>*Defendants*. | No. 1:24-cv-1597 (MSN/LRV) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction. ECF 13. Plaintiffs are comprised of an organization that represents various community associations (CAs) across the United States, along with several such associations. They filed this action seeking injunctive and declaratory relief to prevent enforcement of the Corporate Transparency Act ("CTA") against CAs by the Department of the Treasury ("Treasury"). Plaintiffs levy a barrage of challenges against the CTA as applied to them, claiming, in turn, that requiring their members to disclose so-called "beneficial owners" to the Treasury is unwarranted under the statute, violates the Administrative Procedure Act ("APA"), exceeds Congress' Article I authority, and is unconstitutional under the First and Fourth Amendments. Upon consideration of the pleadings, the parties' oral argument and for the following reasons, the Court will DENY Plaintiffs' motion.

### I.   BACKGROUND

#### A.   Community Associations

CAs are creatures of state law, and are typically registered as nonprofit corporations, unincorporated associations, cooperatives, or business trusts. ECF 14 at 2. CAs are governed by

board members who reside in the area governed by that CA. *Id.*[1] Board members are typically elected volunteers who carry out their CA's business, including budgeting, property management, and enforcement of rules and restrictions. *Id.* at 2-3. These board members do not have a different ownership interest in the CAs than their fellow homeowners. *Id.*

For federal tax purposes, CAs are governed by Section 528 of the Internal Revenue Code. That section provides for taxation of CAs' "taxable income," which is gross income not received in the form of membership dues, fees, or assessments levied on CAs' members. 26 U.S.C. § 528(b), (d). The law further provides that CAs "shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." *Id.* § 528(a).

**B.      The Corporate Transparency Act**

As part of the National Defense Authorization Act for Fiscal Year 2021, Congress passed the Anti-Money Laundering Act of 2020 ("AMLA"). *See* Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021). The AMLA was enacted to "improve coordination and information sharing among the agencies tasked with administering anti-money laundering," "modernize anti-money laundering" laws, "encourage technological innovation . . . to more effectively counter money laundering and the financing of terrorism," and "to establish uniform beneficial ownership reporting requirements." *Id.* § 6002, 134 Stat. 4547, 4547-4548. That last goal—establishing beneficial ownership reporting requirements—is the one at issue here, and was put in place with the aim of "improv[ing] transparency for national security, intelligence, and law enforcement agencies and financial institutions concerning corporate structures," "discourag[ing] the use of shell corporations as a tool to disguise and move illicit funds," "assist[ing] national security,

---

[1] These board members are sometimes also referred to as directors or trustees. ECF 14 at 2.

intelligence, and law enforcement agencies with the pursuit of crimes," and "protecti[ing] the national security of the United States." *Id.* This was to be achieved by "establish[ing] a secure, nonpublic database at FinCEN for beneficial ownership information." *Id.*[2]

As a means of achieving this goal, the AMLA included as one part the CTA. 134 Stat. at 4604-4625, 31 U.S.C. § 5336. The CTA requires any "reporting company" to submit to FinCEN a report containing the name, date of birth, address, and identification document (such as a passport or state I.D.) of each of that company's "beneficial owners." 31 U.S.C. § 5336(b).

The CTA defines a reporting company as a "corporation, limited liability company, or other similar entity that is (i) created by the filing of a document with a secretary of state or similar office under the law of a State or Indian tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States." *Id.* § 5336(a)(11)(A). Expressly excluded from the definition of reporting entities are governmental bodies, certain financial entities, entities with more than 20 employees and more than $5 million in gross receipts. *Id.* § 5336(a)(11)(B). Two express exceptions are particularly important here. First, the CTA excludes any "organization that is described in section 501(c) of the Internal Revenue code of 1986 (determined without regard to section 508(a) of such code) and exempt from tax under section 501(a) of such code." *Id.* § 5336(a)(11)(B)(xix)(I). Furthermore, the Secretary of the Treasury may, by regulation, "with the written concurrence of the Attorney General and the Secretary of Homeland Security," exclude any other "entity or class of entities" that she has "determined should be exempt . . . because requiring beneficial ownership information from the entity or class of entities— (I) would not serve the public interest; and (II) would not be highly useful in national security, intelligence, and law

---

[2] FinCEN is used as shorthand for the Financial Crimes Enforcement Network, a bureau of the United States Department of the Treasury.

enforcement efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes."

A "beneficial owner," in turn, "means, with respect to an entity, an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise— (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." *Id.* § 5336(a)(3)(A).

The Department of the Treasury issued a final rule governing the implementation of the CTA, which was published in the Federal Register on September 30, 2022. 87 Fed. Reg. 59498; 31 C.F.R. § 1010.380. That regulation provides that any reporting company created on or after January 1, 2024, must file an initial report with FinCEN after its creation becomes effective with a secretary of state, and that a reporting company created before January 1, 2024, shall have until January 1, 2025, to file such a report. 31 C.F.R. § 1010.380(a)(1)(i)-(iii). It further requires that an entity submit an updated report within 30 days when "there is any change with respect to required information previously submitted." *Id.* § 1010.380(a)(2). The reports submitted must include each beneficial owner's full legal name, date of birth, address, identifying number, and an image of the document from which the identifying number was obtained. *Id.* § 1010.380(b)(1)(ii).

The Treasury's final rule also provides additional explanation regarding the definition of a beneficial owner. *Id.* § 1010.380(d). The Treasury indicates that an individual exercises substantial control over a reporting company when she "(A) Serves as a senior officer of the reporting company; (B) Has authority over the appointment or removal of any senior officer or a majority of the board of directors (or similar body); (C) Directs, determines, or has substantial influence over important decisions made by the reporting company." *Id.* § 1010.380(d)(1).

4

Noncompliance with the CTA subjects a person to both civil and criminal liability. A person who willfully provides false beneficial ownership information or fails to report such information shall be subject to civil penalties of $500 per day, or "may be fined not more than $10,000, imprisoned for not more than 2 years, or both." 31 U.S.C. § 5336(h)(1), (3).

The CTA authorizes FinCEN to share beneficial ownership information upon receipt of a request from federal or state law enforcement agencies, or upon a request from a federal agency on behalf of a foreign law enforcement agency, prosecutor, or judge of another country under an applicable international treaty, agreement, convention or official request. *Id.* § 5336(c).

C.     **Procedural History**

In December 2023, Plaintiff Community Associations Institute ("CAI") sent a letter to the Director of FinCEN requesting that CAs "be extended the same exemption afforded to tax-exempt organizations as outlined in the law." ECF 14-2 at 3. CAI claimed that CAs "are not a viable vehicle for terrorist activities or money laundering," that they "already furnish detailed information on their board members as part of annual tax or other statutory filings," and that "[t]hose who govern community associations are not investors and serve without any remuneration." *Id.* at 3-4.[3]

In June 2024, FinCEN posted a page of "FAQs" regarding the CTA on its website. Question C.10 involved CAs. It stated that CAs which are not recognized as 501(c)(4) organizations and are formed by the filing of a document with a secretary of state may fall within the definition of a reporting company and be required to report their beneficial owners to FinCEN.[4] Question D.13 addressed the issue of who qualifies as a beneficial owner of a CA. FinCEN wrote

---

[3] CAI has also lobbied for legislation in Congress. ECF 14 at 19. To that end, Representative Richard McCormick of Georgia introduced the Community Association Reporting Exemption Act, which would add an additional exception to the CTA for any "entity subject to taxation under section 528 of the Internal Revenue Code of 1986." H.R. 9045, 118th Cong., § 2 (2024).

[4] Financial Crimes Enforcement Network, Beneficial Ownership Information, *Frequently Asked Questions*, https://www.fincen.gov/boi-faqs (last accessed Oct. 23, 2024) [hereinafter FinCEN FAQs].

that individuals who are "senior officer[s]," have "authority to appoint or remove" officers of the CA, are "important decision-maker[s]," or "ha[ve] any other form of substantial control" over the CA, would be considered a beneficial owner under the CTA.

FinCEN responded to CAI's letter in July 2024. Deputy Director Jimmy Kirby wrote to the CAI that CAs "are not specifically listed" among the CTA's exemptions and must therefore report to FinCEN their beneficial owners if they "otherwise meet[] the definition of a 'reporting company.'" ECF 14-4 at 2. Deputy Director Kirby further explained that FinCEN was considering whether to exempt CAs as a "class of entities" under Section 5336(a)(11)(B)(xxiv), but noted that to do so it must make certain factual findings and obtain the written concurrence of the Attorney General of the United States and the Secretary of Homeland Security. *Id.* at 3.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. The third and fourth factors "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435.

## III. ANALYSIS

### A. Likelihood of success on the merits.

#### 1. Nonprofit exemption

Plaintiffs first argue that they are entitled to declaratory relief from reporting obligations under the CTA because they fall under the exception to the definition of "reporting companies" for nonprofit organizations. ECF 14 at 15-19. There, Congress provided that "any organization that is described in section 501(c) of the Internal Revenue Code . . . and exempt from tax under

section 501(a) of such Code" is not encompassed within the term "reporting company," and therefore need not report beneficial ownership information to FinCEN. 31 U.S.C. § 5336(a)(11)(B)(xix)(I).

Plaintiffs cannot rely directly on Section 501 of the Internal Revenue Code to demonstrate that they are covered by the exemption here. Section 501(c) lists a number of different types of organizations (29 in total) that are exempt from taxation under Section 501(a). And 501(a) simply grants tax-exempt status to all those organizations listed in 501(c) and 501(d). But CAs like Plaintiffs are not included among those organizations "described in section 501(c)." Indeed, they are described elsewhere, in Section 528 of the Internal Revenue Code.

Stuck with this reality, Plaintiffs rely on a more roundabout argument in their attempt to shoehorn CAs into the CTA's nonprofit exemption. They argue that Section 528(a), where Congress provided that a "homeowners association shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes," 26 U.S.C. § 528, means that the reference to exempt organizations in the CTA should be read to include Plaintiffs. That is, the CTA is "any law," and it "refers to organizations exempt from income taxes," and so CAs should "be considered an organization exempt from income taxes for the purpose of" the CTA.

This argument cannot be squared with the CTA's plain meaning, which controls here. *United States v. Ide*, 624 F.3d 666, 668 (4th Cir. 2010) ("When interpreting a statute, we first consider the plain meaning of the statutory language."); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous."). The nonprofit exemption applies not to "organizations exempt from income taxes" generally, but to the discrete category of organizations "described in section 501(c)

7

. . . *and* exempt from tax under section 501(a)." 31 U.S.C. § 5336(a)(11)(B)(xix) (emphasis added). Even if this Court were to find that "exempt from tax under section 501(a)" is a phrase that "refers to organizations exempt from income taxes," 26 U.S.C. § 528(a), CAs would not meet the first prong of the exemption, which requires they be organizations "described in section 501(c)." *Id.* § 5336(a)(11)(B)(xix)(I).

Adopting Plaintiffs' reading of the CTA's nonprofit exemption, even if it were plausible, would also be inappropriate under the canon against surplusage because it would render another one of the CTA's exceptions entirely superfluous. That canon supplies the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion). "When a statutory construction . . . renders an entire subparagraph meaningless, . . . the canon applies with special force." *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (citing *National Ass'n of Mfrs. v. Department of Defense*, 583 U.S. 109, 128 (2018)) (cleaned up). Reading the CTA's nonprofit exemption to include CAs would do just that, rendering the statute's subparagraph providing an exemption for political organizations wholly unnecessary. That subparagraph—occurring immediately after the nonprofit exemption—provides that a "political organization (as defined in section 527(e)(1) of [the Internal Revenue Code]) that is exempt from tax under Section 527(a) of such Code" shall be exempt from the CTA's reporting requirements. 31 U.S.C. § 5336(a)(11)(B)(xix)(II). On Plaintiffs' reading, political organization would already be exempt, since Section 527(a), like Section 528(a), provides that a "political organization shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes." 26 U.S.C. § 527(a). Because that reading would render "meaningless" a subparagraph "designed to serve a

8

concrete function," *Pulsifer*, 601 U.S. at 143, the canon against surplusage applies and counsels strongly in favor of a reading of the nonprofit exemption that does not include CAs.[5]

For these reasons, Plaintiffs are not likely to succeed on the merits of their claim that the statutory exemptions in the CTA relieve CAs of the obligation to report beneficial ownership information.

### 2. Administrative Procedure Act

Next, Plaintiffs argue that FinCEN's "FAQs," which determined that CAs "may fall within the reporting company definition" and outlined the individuals who may be the "beneficial owner" of a CA, violated the APA's notice-and-comment rulemaking requirements or, in the alternative, were arbitrary and capricious. ECF 14 at 19-26. This argument cannot succeed because Plaintiffs do not challenge a final agency action.

#### i. FinCEN was not required to engage in notice-and-comment rulemaking to issue its FAQs.

Plaintiffs' first argument is that FinCEN's FAQs were—at least with respect to CAs—a legislative rule that was required to pass through notice-and-comment rulemaking. *Id.* at 19-24. Under the APA, "rules" which have the "force and effect of law" are required to be "issued through a statutorily prescribed notice-and-comment process." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620-621 (4th Cir. 2018) (citing 5 U.S.C. § 553(a)-(c); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)). But the APA excludes from this requirement "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). If a legislative rule is passed without going through the process

---

[5] The government points also to legislative and regulatory history that suggests Congress may have intended a narrow reading of the CTA's exceptions. ECF 35 at 24 (citing 166 Cong. Rec. S7311 (2020) (Statement of Sen. Brown; 87 Fed. Reg. 59,498, 59542 (Sept. 30, 2022)).

of notice-and-comment rulemaking, a court may enjoin an agency from enforcing the policy stated therein. *King's Daughters*, 896 F.3d at 624.

The Fourth Circuit has held that interpretive rules[6] "simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties." *King's Daughters*, 896 F.3d at 620 (citing *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (1989)). Put otherwise, interpretive rules "are those that clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or merely track preexisting requirements and explain something the statute or regulation already required." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (2014) (cleaned up) (citation omitted). "By contrast, 'a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.'" *King's Daughters*, 896 F.3d at 620 (citing *Jerri's*, 874 F.2d at 207). "[A] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in law or policy." *Id.* (quoting *Mendoza*, 754 F.3d at 1021).

The distinction between legislative and interpretive rules "is not always easily made," *Jerri's*, 875 F.2d at 207, but is hardly difficult to apply here. For starters, FinCEN does not hold out that the rules come with any force of law and prefaces them by explaining that they "are explanatory only and do not supplement or modify any obligations imposed by statute or regulation."[7] A closer examination reveals this to be correct—that is, the FAQs are "merely an explanation of the statutory requirements." ECF 35 at 31. FAQ C.10 simply reiterates that CAs which do not fall into an exemption such as the nonprofit exemption "may fall within the reporting

---

[6] While the APA uses "interpretative," modern judicial decisions more commonly use "interpretive." *Perez*, 575 U.S. 92, 97 n.1.
[7] FinCEN FAQs, *supra* note 4.

company definition."[8] And its FAQ D.13, addressing who is the beneficial owner of a CA, simply restates the definition of a beneficial owner promulgated in FinCEN's prior binding regulation at 31 C.F.R. § 1010.380(d)(1). Plaintiffs may take issue with the CTA and its implementing regulations, but they identify no point where the FAQs "supplement[]" that law, "adopt[] a new position inconsistent with existing regulations, or otherwise effect[] a substantive change in law or policy." *King's Daughters*, 896 F.3d at 620. On the contrary, the FAQs merely "remind [CAs] of [their] existing statutory or regulatory duties." *Mendoza*, 752 F.3d at 1021.

Plaintiffs point to *Texas Children's Hosp. v. Azar*, 315 F. Supp.3d 322 (D.D.C. 2018), as a case where an agency's FAQs were found to be legislative rules requiring notice and comment. ECF 14 at 22-23. The court there found that the FAQ at issue had independent legal effect because the statute did not provide for the policy outlined in the FAQ, and the FAQ *contradicted* a prior legislative rule. *Texas Children's*, 315 F. Supp. 3d at 332-333. That is unlike the situation here, where the FAQs simply restate the CTA's preexisting statutory and regulatory requirements.[9] Plaintiffs are therefore unlikely to succeed on the merits of any argument that would require the FAQs to have undergone notice-and-comment rulemaking.

### ii. Plaintiffs cannot challenge the FAQs under the APA because they are not final agency action.

Plaintiffs next argue that the FAQs should be set aside as arbitrary and capricious under 5 U.S.C. § 706(2)(A). ECF 14 at 24-26. This argument can be disposed of quickly, because the FAQs are not final agency action. *See* 5 U.S.C. § 704 (providing that "final agency action for

---

[8] *Id.*
[9] Plaintiffs argue that the FAQs "substantive[ly] change the regulations' meaning" because "neither the CTA nor the regulations mention a 'senior officer,' an individual who is authorized to 'appoint or remove certain officers,' or an 'important decision-maker' within the definition of a 'beneficial owner.'" ECF 14 at 23. The trouble with this argument is that those terms do appear in FinCEN's regulation. 31 C.F.R. § 1010.380(d)(1)(A)-(C) (providing that a person who "[s]erves as a senior officer," "[h]as authority over appointment or removal," or "[d]irects, determines, or has substantial influence over important decisions" possesses substantial control over a reporting company).

11

which there is no other adequate remedy in court [is] subject to judicial review"). For agency action to be final, it (1) "must mark the consummation of the agency's decisionmaking process;" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *United States Army Corps of Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 177-178 (1997)). The FAQs meet neither criterion. For one, the FAQs referenced are not necessarily "the consummation of the agency's decisionmaking process," *id.*—indeed, they have been updated several times and "FinCEN expects to publish additional guidance" regarding the CTA "in the future."[10] Furthermore, they are by their own terms "explanatory only," and do not purport (nor do they) determine CAs' rights or obligations.[11] Whatever obligations CAs are subject to are those imposed by the CTA itself or FinCEN's regulation.[12]

### 3. Congressional Authority

Plaintiffs also ask this Court to follow the lead of the Northern District of Alabama, which in *National Small Business United v. Yellen*, No. 5:22-cv-1448-LCB, 2024 WL 899372 (N.D. Ala. Mar. 1, 2024), found that the CTA "exceeds the Constitution's limits on the legislative branch and lacks a sufficient nexus to any enumerated power to be a necessary and proper means of achieving Congress' policy goals." *Id.* at *1. This Court respectfully disagrees and finds Plaintiffs are unlikely to be able to show that Congress overstepped the outer bounds of its commerce power when it enacted the CTA.[13]

---

[10] FinCEN FAQs, *supra* note 4.
[11] *Id.*
[12] Plaintiffs frame the FAQs as "final" in the sente that they constitute a "*de facto* denial of Plaintiffs' request for an exemption under the CTA." ECF 14 at 24-26. But they do no such thing. The FAQs do not mention that exemption request, and FinCEN continues to consider whether an exemption is warranted. *See* ECF 35-1 ¶ 16.
[13] Finding that the CTA is likely a valid exercise of Congress's commerce power, this Court need not address Plaintiffs' or the government's arguments regarding Congress's Taxing or Foreign Affairs powers.

The Constitution authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting U.S., Const., Art. I, § 8, cl. 3). Pursuant to this power, Congress "can regulate the channels of interstate commerce," "the instrumentalities of interstate commerce, and persons and things in interstate commerce," as well as "activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005). As part of that third category, the Supreme Court's "case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17. The Court has "never required Congress to legislate with scientific exactitude" when it comes to its commerce power. *Id.* Moreover, the Necessary and Proper Clause supplements Congress' authority, expanding the "relevant inquiry" to "whether the means chosen are 'reasonably adapted' to the attainment of a legitimate end under the commerce power." *United States v. Comstock*, 560 U.S. 126, 135 (2010) (quoting *Gonzales*, 545 U.S. at 37 (Scalia, J., concurring in the judgment)).

Plaintiffs and the government agree that the CTA does not regulate the "channels" or "instrumentalities" of interstate commerce. ECF 14 at 36-37; ECF 35 at 14 (arguing only that the "CTA's reporting requirements fit comfortably within the *third* permissible category of Commerce Clause regulation) (emphasis added). The issue then boils down to whether the CTA regulates activity that has a substantial effect on interstate commerce (or is reasonably adapted so some such end). Plaintiffs argue it does not. On their view, the CTA regulation of "the creation and operation of Community Associations" deals with "wholly intrastate functions performed entirely under state law." ECF 14 at 39. "The mere formation of a Community Association," Plaintiffs posit, "is a

13

ministerial and non-economic act that has no substantial economic effect on interstate commerce." *Id.*

On the government's view, this framing entirely misses the point of the CTA. The government argues that the "CTA does not, and does not purport to, regulate corporate-entity formation . . . . Rather, the CTA governs the conduct of a covered entity *as a going concern*." ECF 35 at 16 (emphasis in original). That is, the CTA's requirements extend well beyond a corporation's formation. *Id.* On the government's telling, the CTA's ongoing reporting requirements are a necessary means of implementing Congress' power under the Commerce clause to prevent and regulate "money laundering" and "other illicit financial activities." *Id.* at 14-15.

The government's view of the CTA's role is more persuasive, as it squares with the Act's structure, purpose, and role in Congress's broader statutory regime targeting money laundering and terrorism financing. This Court therefore finds that there is a "rational basis" for concluding that the regulated activities, "taken in the aggregate, substantially affect interstate commerce." *Gonzales*, 545 U.S. at 22. To begin with, while the CTA's reporting requirement may be *triggered* by corporate entity formation, it makes little sense to see the Act as *regulating* corporate entity formation.[14] Rather, the CTA regulates the ongoing *conduct* of covered entities.

Next, the proper analysis under the Commerce Clause does not focus solely on the CAs' particular circumstances, but on the aggregate effect of *all* regulated entities' conduct. *See e.g., Raich*, 545 U.S. at 18-19 (finding that Congress could criminalize the production and use of homegrown marijuana because it could nonetheless have "a substantial effect on supply and demand in the national market"); *Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942) (finding that

---

[14] As Plaintiffs are well aware, the CTA applies equally to both pre-existing and newly formed corporate entities, all of which must file the required disclosures. 31 U.S.C. § 5336(a)(11); 31 C.F.R. § 1010.380(a)(1)(i)-(iii). Furthermore, updated reporting is required whenever a covered entity experience a change in beneficial ownership, irrespective of when the entity was formed. 31 U.S.C. § 5336(b)(1)(D).

14

Congress had a rational basis for believing that, in the aggregate, "home-consumed wheat would have a substantial influence on price and market conditions"). Accordingly, this Court need not focus on the purported function of CAs in "maintain[ing] the common areas of the property," ECF 14 at 49, but on the activities of all regulated covered entities, including "the harmful economic practices the CTA is specifically designed to combat." ECF 35 at 18. At bottom, this Court cannot conclude that Plaintiffs are likely to succeed in showing that a Commerce power that allows Congress to regulate the production of wheat or marijuana for home consumption cannot be extended so far as to impose modest reporting requirements that help prevent the interstate and international commercial crimes of money laundering and terror financing.

### 4. Challenges under the First and Fourth Amendments

Plaintiffs urge this Court to find that they are likely to prevail on their claim that the CTA violates both their First Amendment rights of free speech and free association, and their Fourth Amendment rights to be free from illegal searches and seizures. ECF 14 at 27, 31. But the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to either claim.

#### i. Plaintiffs are unlikely to succeed on their First Amendment Claim

Plaintiffs argue that the CTA violates their First Amendment rights because it impermissibly compels Board members' speech and chills their right to freely associate. ECF 14 at 12. But the compelled speech doctrine typically only applies when the government requires an individual to convey a "particular message" publicly. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). And the CTA does not require the *public* disclosure of

information.[15] The CTA therefore does not violate the compelled-speech doctrine. *See also Firestone v. Yellen*, 2024 WL 4250192, at *9 (D. Or. Sept. 20, 2024). In any event, the CTA's requirements are neither an unjustified nor unduly burdensome way for the CTA to "strengthen the government's ability to detect and prosecute financial crime" ECF 35 at 39.[16]

Plaintiffs' free association claim fares no better. Plaintiffs contend that their "free association rights are also violated because, as they have attested, they will resign from Board service rather than disclose their personal identifying information pursuant to the CTA." ECF 14 at 13. But such speculations about *potential* resignations are insufficient to demonstrate a likelihood of success on the merits. *See Firestone,* 2024 WL 4250192, at *9 ("Plaintiffs' speculative and conclusory assertions that reporting beneficial ownership or control information will 'deter … persons from exercising their free speech and association and dissuade others from joining or assuming leadership positions' are insufficient." (citation omitted)); *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

Plaintiffs are therefore unlikely to succeed on their claim that the CTA contravenes the First Amendment. Even if the First Amendment is properly implicated by the CTA's disclosure requirement, the Government likely has met its burden of proving that such compelled speech serves a legitimate government purpose and that any infringement of Plaintiffs' freedom of association is justified.

---

[15] "[T]he information the CTA requires entities to disclose is 'not for publication, nor is it a matter of considerable controversy, such as compelling political, ideological, or religious speech.'" ECF 35 at 38 (quoting *MA LEG Partners 1 v. City of Dallas,* 442 F. Supp. 3d 958, 968 (N.D. Tex. 2020)).

[16] The "unjustified and unduly burdensome" standard typically applies to commercial speech (rather than a compelled speech analysis), but the CTA nonetheless satisfies this heightened standard.

### ii. Plaintiffs are unlikely to succeed on their Fourth Amendment Claim

Plaintiffs argue that the CTA's disclosure requirements unconstitutionally invade Plaintiffs' reasonable expectations of privacy without individualized suspicion of wrongdoing. ECF 14 at 27, 28. In Plaintiffs' view, the disclosure of their personal identifying information is akin to the checkpoint in *Edmond*, where the Court found the government's suspicionless stops for the purpose of detecting criminal activity unconstitutional. *Id.* at 31; *City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 41 (2000).

But reporting requirements are not new, nor do they contravene the Fourth Amendment. ECF 35 at 34, 35. The Supreme Court has held as much: "[R]eporting requirements are by no means per se violations of the Fourth Amendment. Indeed, a contrary holding might well fly in the face of the settled sixty-year history of self-assessment of individual and corporate income taxes in the United States." *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 59-60 (1974). In *Shultz*, the Court upheld a statute requiring banks to disclose the name, address, and social security number of persons making transactions above a specific dollar amount. *Id.* at 67. The Court concluded that the reporting requirements were reasonable under the Fourth Amendment because Congress had found this information highly useful "in criminal, tax, or regulatory investigations." *Id.* at 26. The same rationale follows here where "the CTA directs the disclosure of information that Congress explicitly identified as 'highly useful' to combatting serious crimes." *Firestone*, 2024 WL 4250192, at *10. Because the CTA likely falls "within the category of reasonable reporting requirements that courts have long understood as constitutional," *id.*, this Court finds that Plaintiffs are unlikely to succeed on the merits of their Fourth Amendment claim.

### B. Irreparable Harm

Plaintiffs also fail to meet the second required element to obtain a preliminary injunction. To meet this element, Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence

of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). This "clear showing of irreparable harm" must be "neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (internal citations and quotations omitted).

Plaintiffs first contend that where they "have succeeded in establishing that their constitutional rights are being threatened or violated, a finding of irreparable harm is required." ECF 14 at 42. But as explained above, Plaintiffs have not established such violations. Accordingly, "[w]ithout [Plaintiffs'] alleged constitutional injury, [they] ha[ve] failed to show that [they] will suffer irreparable harm." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).

Plaintiffs next set forth their concern that without injunctive relief CAs will face a mass resignation of their volunteer board members who do not wish to provide their personal information or be subject to the corresponding penalties. ECF 14 at 42. And when these board members resign, Plaintiffs fear, CAs will not be able to continue operating. *Id.* at 43. But Plaintiffs have failed to offer nonspeculative evidence about potential resignations. In support of their allegations of irreparable harm, Plaintiffs have included with their motion declarations from several CA leaders. These declarants respectively, claim they are "likely to resign," "seriously considering whether to continue to volunteer," "no longer wish to volunteer," "no longer wish to serve," and "are unlikely to continue volunteering," respectively. ECF 14-1 at 5, 10, 14, 17, 20. These tentative statements of concerns by a handful of individual board members do not push Plaintiffs' concerns over the edge from "remote and speculative" to "actual and imminent," especially considering the possibility that other members of the community could replace any board members who resign.[17] Moreover, the "possibility that . . . corrective relief will be available

---

[17] Plaintiffs also point to a survey conducted of CAI members in which 80% reported that the CTA will cause board members to resign. ECF 38 at 20. But, as noted during oral argument and in Plaintiffs' pleadings, there are over 300,000 CA boards across the country and only 850 CAI members responded to the survey. *See* ECF 14 at 10; ECF 14-6 at 5.

18

at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). If Plaintiffs are ultimately successful in obtaining an exemption from FinCEN, any board members who resign could return to their positions. *Cf. Nken*, 556 U.S. at 435 (removal of immigrants pending review of petitions not irreparable harm where they could return to the country if eventually successful).

Given the *de minimis* nature of the alleged harm (individual taxpayers already disclose the same information to the Treasury every time they file their tax returns) and Plaintiffs' failure to establish that a substantial number of its members are likely to resign, the Court finds that Plaintiffs have not made the clear showing of irreparable harm required for preliminary relief.

### C. Balance of Equities and Public Interest

Plaintiffs argue that the public interest and equities weigh in favor of an injunction, reiterating their claims that CAs will be unable to operate if the CTA goes into effect on account of mass resignations. ECF 14 at 44. Notwithstanding the problems with this argument noted above, this ignores the public interest (as noted by Congress) in the effective enforcement of federal law to counter money laundering and terrorism financing. *See MediNatura Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021) (public interest weighs in favor of agency enforcement of regulations to protect the public); *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety and Homeland Security*, 108 F.4th 194, 205 (3d Cir. 2024) ("'There is always a public interest in prompt execution' of the laws.") (quoting *Nken*, 556 U.S. at 436). Plaintiffs have not therefore shown that the third and fourth factors weigh in favor of a preliminary injunction.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction (ECF 13).

**SO ORDERED.**

/s/
Michael S. Nachmanoff
United States District Judge

October 24, 2024
Alexandria, Virginia